1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CINDY VAN LOO,

                        Plaintiff,

          v.

UNITED STATES OF AMERICA et al.,

                        Defendant.

CASE NO. 3:23-cv-05618-DGE

ORDER ON MOTIONS TO
DISMISS (DKT. NOS. 44, 45, 46,
50)

## I     INTRODUCTION

Before the Court are three motions to dismiss: the first from Defendants Craig Gocha,

James Oleole, and Jacob Whitehurst (Dkt. No. 44), joined by Michael Merrill (Dkt. No. 50); the

second from Defendant United States of America (Dkt. No. 45); and the third from Defendant

State of Washington (Dkt. No. 46.)  Upon review of those motions, Plaintiff's responses (Dkt.

Nos. 59, 60, 61, 62) and Defendants' replies in support (Dkt. Nos. 64, 65, 66, 67), the Court finds

as follows.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## II      BACKGROUND[1]

On September 3, 2020, law enforcement officers killed Michael Reinoehl.  At the time, Portland was the site of significant protests against police brutality and racism in the United States following the murder of George Floyd in May 2020.  (Dkt. No. 37 at 9.)  Reinoehl was heavily involved in these protests.  (*Id.*)  A counterdemonstration then emerged in which "far-right activists . . . descended on the City of Portland while armed with deadly force and with the express intention of confronting and disrupting ongoing protests against police violence."  (*Id.*)  Amid the two groups clashing on August 29, 2020, one "far-right activist," Aaron Danielson, was killed.  (*Id.* at 9–10.)  A warrant was issued for Reinoehl's arrest based on a Portland Police Bureau detective's affidavit of probable cause that Reinoehl was involved in the homicide.  (*Id.*)

The events garnered national attention.  Reinoehl gave an interview with a national media outlet in which he asserted he killed Danielson as a lawful act of self-defense.  (*Id.* at 11.)  Reinoehl and his family began receiving death threats, and one or more individuals fired live ammunition at Reinoehl's home in Portland while he and his children were present.  (*Id.* at 10.)  Due to these threats, Reinoehl and his family went into hiding in Lacey, Washington.  (*Id.*)

Meanwhile, state and local law enforcement officers met for a briefing on how to arrest Reinoehl.  (*Id.* at 12.)  Some of the briefing attendees were local law enforcement officers who were deputized members of the United States Marshals Services' Violent Offender Taskforce ("VOTF").  (*Id.* at 16.)  Although the warrant had not yet been issued, the briefing informed officers that Reinoehl was a "fugitive" from Multnomah County, Oregon and considered himself to be "at war" with police.  (*Id.* at 12–13.)  While the briefing "was supposed to develop a

---

[1] When considering a motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded factual allegations.  *See Wood v. City of San Diego*, 678 F.3d 1075, 1080 (9th Cir. 2012).  These are the events as asserted by Plaintiff in the complaint.

1    detailed plan to arrest Reinoehl in Thurston County, Washington[,]" "no real plan to arrest

2    Reinoehl appears to have been developed." (*Id.* at 13.)

3          At approximately 4:30 p.m. on September 3, 2020, law enforcement officers traveled to

4    Lacey, Washington to arrest Reinoehl. (*Id.* at 19.) Members of the team included James Oleole

5    and Craig Gocha, employees of Pierce County Sheriff's Department; Michael Merrill, employee

6    of Lakewood Police Department; Jacob Whitehurst, employee of Washington State Department

7    of Corrections; and USMS employee Ryan Kimmel. (*Id.* at 5–6, 19.) At 4:50 p.m., the

8    Multnomah County allegations were filed in state court and an Oregon judge issued the warrant

9    for Reinoehl's arrest. (*Id.* at 19.) The officers took up positions in unmarked vehicles on a

10   residential street near a home and Volkswagen Jetta they believed to be associated with

11   Reinoehl. (*Id.* at 19–20.) At approximately 6:45 p.m., Reinoehl emerged from the residence

12   carrying a backpack and walking toward the Jetta. (*Id.* at 22.) The officers "began to issue rapid

13   and contradictory directives over the Pierce County radio frequencies regarding the critical

14   decision whether to 'take' Reinoehl." (*Id.*) At that point, "the chain of command . . . if there

15   ever was any, broke down." (*Id.*)

16         Without coordinating with the other officers, Oleole or Merrill, neither of whom were in

17   supervisory nor command roles, made the decision to move in shortly after Reinoehl reached the

18   Jetta. (*Id.* at 23.) Oleole radioed: "Let's go take him!"; "OK, we're moving!"; "Take him, take

19   him now!" (*Id.*) Merrill suddenly accelerated his vehicle, swerving left and "charging toward

20   the Jetta before slamming on the brakes within one foot of the Jetta's front bumper." (*Id.*)

21   Gocha then "gunned" his vehicle's engine, "racing to catch up and careening wildly over two

22   grassy medians" before suddenly stopping next to Merrill's vehicle and facing the Jetta. (*Id.*)

23   Oleole then fired six rounds through the front windshield, three of which pierced the Jetta's

24

1  windscreen and driver's seat headrest.  (*Id.*)  Neither police vehicle had emergency lights on

2  during the approach.  (*Id.*)

3          Civilian onlookers "had no idea any of the individuals or vehicles were associated with

4  police until after the shooting stopped."  (*Id.* at 24.)  Oleole, Merrill, and Gocha exited their

5  vehicles and began firing automatic rifles and pistols at the Jetta and at Reinoehl.  (*Id.*)  Reinoehl

6  ducked and ran away alongside the Jetta, trying to find cover from the unidentified gunmen.  (*Id.*

7  at 24.)  Whitehurst then drove his vehicle up from behind, stopping approximately 30 feet from,

8  and at a 45-degree angle to, the Jetta.  (*Id.*)  Whitehurst emerged and began shooting at Reinoehl.

9  (*Id.* at 25.)  Although Whitehurst's lights were "supposedly" on, the lights "could not be seen by

10 someone sitting in the Jetta nor from Reinoehl's path of retreat."  (*Id.*)  No vehicle used a siren at

11 any point.  (*Id.*)  Civilian witnesses who watched the shooting unfold heard no verbal warnings

12 or commands before, or at any time during, the shooting.  (*Id.*)  The round count indicated that

13 law enforcement had fired a total of more than forty rounds.  (*Id.*)

14         Reinoehl was struck by at least five bullets, including two rounds in his chest cavity

15 attributable to Gocha, Whitehurst, Merrill, or Oleole's firearm, and one round passing through

16 the back of his head, attributable to Merrill or Oleole's firearm.  (*Id.* at 27–28.)  Reinoehl died

17 from his injuries.  (*Id.* at 28.)

18         Plaintiff Van Loo Fiduciary Services, LLC, the duly appointed Personal Representative

19 of the Estate of Michael Reinoehl, filed this lawsuit on July 11, 2023.  (Dkt. No. 1.)  The

20 amended complaint alleges claims against the individual officers, Pierce County, the

21 Municipality of Lakewood, the State of Washington, and the United States Government for

22 various constitutional violations under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named*

23 *Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) as well as state-law battery and

24

1    negligence claims under the Federal Tort Claims Act ("FTCA").  (Dkt. No. 29–33.)

2         Defendants Gocha, Oleole, and Whitehurst (later joined by Merrill) (together, "Individual

3    Defendants") moved to dismiss the Counts 1 and 2, the § 1983 and *Bivens* claims against them.

4    (Dkt. No. 44.)  The United States moved to dismiss Counts 3 and 5 against it for lack of subject

5    matter jurisdiction.  (Dkt. No. 45.)  The State of Washington moved to dismiss Counts 4 and 6,

6    the negligence and battery claims.  (Dkt. No. 46.)

7                        **III     DISCUSSION**

8         **A.  Legal Standard**

9         All three motions ask this Court to dismiss Plaintiff's claims pursuant to Federal Rule of

10   Civil Procedure 12(b)(6) for failure to state a claim.  On a motion to dismiss for failure to state a

11   claim, the Court must accept as true all well-pleaded factual allegations and construe the

12   allegations in favor of the non-moving party.  *See Wood v. City of San Diego*, 678 F.3d 1075,

13   1080 (9th Cir. 2012).  The Court need not, however, assume the truth of conclusory allegations.

14   *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause

15   of action, supported by mere conclusory statements, do not suffice.").  "[O]nly a complaint that

16   states a plausible claim for relief survives a motion to dismiss."  *Id.*

17        While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

18   factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

19   requires more than labels and conclusions, and a formulaic recitation of the elements will not do.

20   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rule 8(a)(2) requires only "a short and

21   plain statement of the claim showing that the pleader is entitled to relief," in order to "give the

22   defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]"  *Id.* (quoting

23   *Conley v. Gibson*, 355 U.S. 41, 27 (1957)).

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**B.  Motion to Dismiss by Individual Defendants Gocha, Oleole, Whitehurst, and Merrill (Dkt. No. 44)**

Individual Defendants argue Plaintiff's claim under 42 U.S.C. § 1983 cannot stand because Individual Defendants acted under color of federal rather than state law.  (Dkt. No. 44 at 12.)  Thus, as federal agents, Individual Defendants argue their conduct is subject to analysis under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

"To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law."  *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011).  As members of the federal VOTF, Individual Defendants argue any actions they took resulting in a deprivation of Reinoehl's constitutional rights were done within the scope of their federal authority on the task force.  (*See* Dkt. No. 44 at 12–13.)

The Ninth Circuit has not yet addressed whether state and local law enforcement officers serving on a federal task force act under "color of state law" for purposes of § 1983.  Other circuits have found state actors on federal task forces operate under color of federal law.  *See Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022) *cert. denied*, 143 S. Ct. 779 (2023); *Logsdon v. United States Marshal Serv.*, 91 F.4th 1352, 1358 (10th Cir. 2024); *King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019), *rev'd sub nom. on other grounds, Brownback v. King*, 592 U.S. 209 (2021).

Whether an officer acted under color of state or federal law is a question of law rather than fact.  *Yassin*, 39 F.4th at 1089 n.2 (collecting cases).  Color of law is rooted in authority.  *Id.* at 1090.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West v. Atkins*, 487 U.S. 42,

1   49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  The central question is

2   whether the conduct is "fairly attributable to the State."  *Lugar v. Edmondson Oil Co.*, 457 U.S.

3   922, 937 (1982).  "To determine if it is, the focus is on the 'nature and circumstances of the

4   officer's conduct and the relationship of that conduct to the performance of . . . official duties.'"

5   *Yassin*, 39 F.4th at 1090 (quoting *Magee v. Trs. of Hamline Univ., Minn.,* 747 F.3d 532, 535 (8th

6   Cir. 2014)).

7          In *Yassin*, St. Paul police officer Heather Weyker was cross-deputized as a federal agent

8   to investigate an interstate sex-trafficking scheme.  *Yassin*, 39 F.4th at 1087–1088.  Plaintiff Ifrah

9   Yassin found herself in an altercation with Muna Abdulkadir, who was a witness in the federal

10  sex-trafficking investigation.  *Id.* at 1088.  A verbal confrontation turned physical, and

11  Abdulkadir eventually struck Yassin while brandishing a knife.  *Id.*  Yassin called 911,

12  prompting the arrival of a Minneapolis police officer.  *Id.*  Meanwhile, Abdulkadir called

13  Weyker and falsely told her Yassin had started the altercation.  *Id.*  Worried about losing a

14  witness, Weyker called the responding police officer and identified herself as both a St. Paul

15  police officer and a member of a federal task force.  *Id.*  She also introduced others in the room

16  with her, including the lead federal prosecutor and another federal agent.  *Id.*  Weyker claimed

17  Abdulkadir was a witness in a federal investigation and the other women involved in the fight

18  had, upon "information and documentation," been out "to intimidate" her.  *Id.*  No such

19  information or documentation existed.  *Id.*  Yassin was prosecuted for witness retaliation based

20  on an affidavit from Weyker riddled with inaccuracies.  *Id.*  Yassin was ultimately acquitted at

21  trial and sued Wekyer both in her capacities as a St. Paul police officer and a federal agent.  *Id.*

22         The Eighth Circuit determined Weyker was acting in her capacity as a federal agent when

23  she falsely accused Yassin of witness intimidation because state law had nothing to do with "the

24

nature and circumstances" of Weyker's conduct. *Id.* at 1090 (citing *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014)).  When she made the phone call, she was in Nashville working on federal task force matters; she introduced other task-force members in the room during the call, including the lead federal prosecutor and lead federal agent; the witness she attempted to protect was only known to her because she was assigned to the federal investigation; she did not stray from the performance of her official duties when speaking to the officers on the phone; she was tasked with "investigative work on the sex trafficking task force" and acted within the scope of those duties by trying to keep a federal witness out of trouble. *Id.* at 1090–1091.

The Eighth Circuit also noted the federal character of Weyker's actions was not impacted by her occasional mixing of state and federal practices. *Id.* at 1091.  One example was introducing herself as a St. Paul police officer. *Id.*  Another was when she used a St. Paul police form to advise Abdulkadir of her *Miranda* rights. *Id.*  And a third was when she filed an incident report with the St. Paul Police Department, despite preparing an affidavit a short time later to support federal charges against Yassin and her friends. *Id.*  "[T]hese practices do not alter the federal character of what she did.  Weyker's work on the federal sex-trafficking investigation led to Yassin's arrest, she acted within the scope of her federal duties while dealing with the situation, and she referenced her federal-task-force role during her conversations with [the responding officer]." *Id.* at 1091.

*Yassin* is not binding on this Court, but its reasoning is persuasive.  The *Yassin* court noted: "juries still have a role to play when material facts are in dispute.  Suppose in this case, for example, that the parties disputed whether Weyker had been cross-deputized as a federal agent." *Id.* at 1090.  "In those circumstances, a jury may well need to resolve the factual dispute

first, before the district court can decide the color-of-law question." *Id.* And, while *Yassin* noted the "color of state law" question is legal rather than factual, the court emphasized the determination "can turn out to be quite 'fact[]bound,'" and relied on numerous undisputed facts in resolving the issue: the circumstances surrounding the phone call, the statements she made on the phone, the specific duties Weyker was given on the task force, and the use of her state uniform and the filing of the incident report. *Id.*

By contrast, here, the information upon which to base such a determination is prohibitively inadequate. Unlike *Yassin*, which resolved a motion for summary judgment, this Court is tasked with resolving a motion to dismiss. Construing the facts in the complaint as true, the officers were "operating under the vanishingly thin pretense of a [USMS] task force" (Dkt. No. 37 at 3) whose membership terms were potentially governed to some degree by a "Memorandum of Understanding" not attached to the complaint; Reinoehl was approached by "state and local law enforcement officers dressed in militia-style fatigues" (*Id.* at 2, 16–17); the officers opened fire "without any warning or announcement" that they were federal officers or local police (*Id.* at 3); and the individual officers drove three unmarked vehicles without using sirens—although one "supposedly" used emergency lights likely not visible by Reinoehl. (*Id.* at 25). There are no other facts upon which to base this Court's determination of whether the officers' conduct during the arrest could be fairly attributable to the state. Thus, at this stage, it is plausible Individual Defendants acted under either state or federal law.

And, in Merrill's case, the complaint explicitly questions whether he was a member of VOTF. According to the complaint, state and local officers who were "members" of VOTF are required to periodically renew their membership. (*Id.* at 17.) Merrill's membership expired August 31, 2020, prior to the shooting. (*Id.*) Whether Merrill's lapsed membership jeopardizes

1    his status as a federal agent for purposes of § 1983 may be governed by the Memorandum of

2    Understanding between USMS and local law enforcement, which also emphasized the officers

3    were not federal employees and that local agencies were responsible for the acts and omissions

4    of their employees.  (*Id.* at 17.)

5            Individual Defendants argue the MOU does not control the color of state law analysis

6    because "courts look to federal law, not private contracts, to determine 'whether a defendant is a

7    federal employee.'"[2]  (Dkt. No. 44 at 17) (quoting *Askar v. Hennepin Cnty.*, 600 F. Supp. 3d 948,

8    954 (D. Minn. 2022) and *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995)).  Merrill

9    argues regardless of his lapsed membership, he "was functioning as a member of the USMS task

10   force at all times during this incident."  (Dkt. No. 50 at 4.)  But there is no information regarding

11   the difference between "membership" and "deputization," what USMS (or the MOU, if relevant

12   at all) requires for an individual officer to be considered a "member" of the VOTF or deputized

13   as a U.S. Marshal, or whether one can simply "function as a member of the USMS task force" to

14   be considered a federal actor as Merrill suggests.

15           Notably, at least one court in this district has agreed with Individual Defendants'

16   position.  *See Nelson v. Weber*, No. 3:16-CV-05680-BHS-JRC, 2017 WL 3034641 (W.D. Wash.

17   May 19, 2017), *report and recommendation adopted*, No. C16-5680 BHS-JRC, 2017 WL

18   3017632 (W.D. Wash. July 17, 2017).  In *Nelson*, plaintiffs brought a § 1983 claim against local

19   officers deputized as members of the VOTF who shot plaintiffs during their arrest.  *Id.* at *1.

20   The court found the officers to be acting under color of federal law because the probable cause

21

22   _____
     [2] Likewise, Individual Defendants argue execution of a state warrant does not mean officers

23   acted under "color of state law."  (Dkt. No. 66 at 5) (citing cases).  Even setting aside the MOU
     and warrant issues, the complaint does not provide sufficient information with which to

24   determine whether the Individual Defendants acted under color of state or federal law.

1    statement indicated defendants were acting as members of the VOTF when they arrested

2    plaintiffs, and the investigation report delegated the apprehension responsibility to VOTF.  *Id.* at

3    *4.  *Nelson*, along with many of the other cases Individual Defendants cite as persuasive

4    authority, had the benefit of a more complete record because the "color of state law" arguments

5    arose on summary judgment rather than a motion to dismiss.  *Id.* at *2 (summary judgment);

6    *King*, 917 F.3d 409 (summary judgment); *Yassin*, 39 F.4th 1086 (summary judgment); *see also*

7    *Love v. Mosley*, No. 1:14-CV-281, 2015 WL 5749517 (W.D. Mich. Mar. 30, 2015), *report and*

8    *recommendation adopted*, No. 1:14CV281, 2015 WL 5749508 (W.D. Mich. Sept. 30, 2015)

9    (combined motion to dismiss and for summary judgment); *Challenger v. Bassolino*, No.

10   CV1815240KMMAH, 2023 WL 4287204, at *4 (D.N.J. June 30, 2023), *appeal dismissed*, No.

11   23-2339, 2023 WL 9378392 (3d Cir. Nov. 22, 2023) (summary judgment).

12        The issue is certainly capable of disposal at the pleadings stage in some instances.  *See*,

13   *e.g., Jakuttis v. Town of Dracut*, 95 F.4th 22, 29 (1st Cir. 2024).  However, given the complaint's

14   lack of information regarding the "nature and circumstances of the officer[s'] conduct and the

15   relationship of that conduct to the performance of . . . official duties[,]" this is not one of those

16   instances.  *Yassin*, 39 F.4th at 1090 (quoting *Magee,* 747 F.3d at 535).

17        Finally, Individual Defendants argue that when deciding this question, the Court should

18   look to the authority under which the individual acted rather than to any question of fact.  (Dkt.

19   No. 44 at 12); *see Yassin*, 39 F.4th at 1090 ("Color of law is rooted in authority.").  Individual

20   Defendants argue they acted with federal authority because Congress has expressly authorized

21   the USMS to "investigate such fugitive matters, both within and outside the United States, as

22   directed by the Attorney General."  28 U.S.C. § 566(e)(1)(B). (Dkt. No. 44 at 13.)  "The

23   Attorney General shall, upon consultation with appropriate Department of Justice and

24

1    Department of the Treasury law enforcement components, establish permanent Fugitive

2    Apprehension Task Forces consisting of Federal, State, and local law enforcement authorities in

3    designated regions of the United States, to be directed and coordinated by the United States

4    Marshals Service, for the purpose of locating and apprehending fugitives."  34 U.S.C.

5    § 41503(a).  Almost thirty years ago, the Office of Legal Counsel articulated: "[w]hen marshals

6    participate in a task force investigation of state law fugitives pursuant to the Attorney General's

7    direction under 28 U.S.C. § 566, they are 'executing the laws of the United States within a

8    State.'"  Office of Legal Counsel Opinion, Authority of FBI Agents, Serving as Special Deputy

9    United States Marshals, to Pursue Non-Federal Fugitives, 19 U.S. Op. O.L.C. 33, 1995 WL

10   944018, at *7 (1995) (quoting 28 U.S.C. § 564).

11          Whether the VOTF has federal authority to apprehend fugitives is of no consequence if

12   there are insufficient facts to find the Individual Defendants were deputized and/or members of

13   the VOTF.  Additionally, Plaintiff's complaint, although not addressing the issue head-on,

14   appears to suggest Reinoehl may not have been a "fugitive" at the time the VOTF acted.

15   Specifically, Plaintiff alleges, "[i]nformation reported to the officers included the claim that

16   Reinoehl was a 'fugitive' from the Multnomah Allegations (which had not yet been filed) and

17   the Multnomah Arrest Warrant (which had not yet been issued)."  (Dkt. No. 37 at 12.)  Nor do

18   Individual Defendants identify any definition of the word "fugitive" or how Reinoehl fit that

19   definition when the VOTF attempted to apprehend him.

20          It may very well be that Reinoehl was clearly a fugitive, and all Individual Defendants

21   were deputized members of the VOTF acting with federal authority in attempting to apprehend

22   him.  But those facts are not clear from the complaint, making Individual Defendants' motion

23   premature.  There is simply not enough information regarding the nature and circumstances of

24

1   Individual Defendants' membership or deputization, the authority delegated to them because of

2   that membership or deputization, their conduct, nor the relationship of that conduct to the

3   performance of their official duties.  With no instructive Ninth Circuit case, and persuasive

4   authority largely having the benefit of more complete records, this Court is without sufficient

5   basis to dismiss Plaintiff's complaint at this time.  Individual Defendants' motion to dismiss is

6   therefore DENIED.[3]

7               **C.  Motion to Dismiss by United States (Dkt. No. 45)**

8          The United States argues this Court lacks subject matter jurisdiction over Counts 3 and 5

9   because Plaintiff's FTCA claims are barred by sovereign immunity.  (Dkt. No. 45 at 3.)  Count 3

10  alleges the acts and omissions of the United States and its employee Ryan Kimmel constitute

11  common law negligence because the Government failed, through its employees, to require

12  adequate planning and to maintain operational control of the attempt to "take" Reinoehl,

13  breaching their duty to exercise reasonable care.  (Dkt. No. 37 at 30–31.)  Count 5 is pled in the

14  alternative to Count 4, which alleges common law negligence attributable to City, County, and

15  State defendants for the actions of employees Oleole, Gocha, Merrill, and Whitehurst.  (Dkt. No.

16  37 at 31–32.)  Count 5 alleges in the alternative, should the actions of those employees not be

17  attributable to City, County, or State defendants, such negligence is attributable to the United

18  States.  (*Id.* at 32.)  Because it is not yet clear whether Individual Defendants acted under color

19  of state or federal law, it is likewise unclear whether Count 4 or 5 is operative.

20         In any event, the FTCA waives the government's sovereign immunity for tort claims

21

22  _____

23  [3] The Court defers analysis of the § 1983 and *Bivens* claims on their merits.  Analyzing both
    contingently necessarily implicates a hypothetical, rather than actual legal dispute depending on
    whichever claim becomes inapplicable.  In the interest of judicial economy and the benefit of a
24  more complete record, those claims can be addressed on summary judgment, if raised.

arising out of the negligent conduct of government employees acting within the scope of their employment.  Among the exceptions to that waiver is the "discretionary function exception," which provides immunity from suit for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The "discretionary function" exception insulates certain governmental decision making from judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.  *Myers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011) (citing *Terbrush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) and *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).

But "[e]ven if the agents' actions involved elements of discretion, agents do not have discretion to violate the Constitution."  *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021).  Nearly every circuit has held conduct cannot be discretionary if it violates the Constitution because federal officials do not possess discretion to violate constitutional rights.[4] *Id.*; *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016); *Limone v. United States*, 579 F.3d 79, 101–102 (1st Cir. 2009); *Xi v. Haugen*, 68 F.4th 824, 838 (3d Cir. 2023); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir.

---

[4] The Seventh and Eleventh Circuits see a tautology in this logic.  They find the idea that "no one has discretion to violate the Constitution" "has nothing to do with the Federal Tort Claims Act, which does not apply to constitutional violations. It applies to torts, as defined by state law[.]" *Linder*, 937 F.3d at 1090; *Shivers*, 1 F.4th at 931 ("[T]he FTCA is not based on alleged constitutional violations[.]").  Instead, the Seventh and Eleventh Circuits maintain the FTCA applies in circumstances where the United States, *if a private person*, would be liable to the claimant in accordance with the law of the place where the act or omission occurred; "[t]he Constitution governs the conduct of public officials, not private ones." *Linder*, 937 F.3d at 1090.

2001); *Myers & Myers, Inc. v. USPS*, 527 F.2d 1252, 1261 (2d Cir. 1975); *but see Shivers v. United States*, 1 F.4th 924, 931 (11th Cir. 2021); *Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019).  In this circuit, "if there were a constitutional violation, a plaintiff's claim could proceed notwithstanding the discretionary function exception." *Voeltz v. United States*, No. 5:21-CV-00151-FWS-KK, 2023 WL 6881831, at *9 (C.D. Cal. Aug. 23, 2023).  The inquiry turns on whether the complaint adequately alleges the constitutional violations at issue. *Quinonez v. United States*, 667 F. Supp. 3d 1015, 1028 (N.D. Cal. 2023).

As discussed above, Plaintiff's § 1983 and *Bivens* claim survive Individual Defendants' motion to dismiss because there is not yet enough information to determine whether they acted in their local or federal capacities, and, as plead, it is plausible Individual Defendants violated Reinoehl's constitutional rights.  Thus, regardless of whether Count 4 or 5 is operative, because the complaint adequately alleges the constitutional violations at issue, Count 4 or 5 could proceed notwithstanding the discretionary function exception.  Therefore, Count 5, alleged against the United States via Oleole, Gocha, Merrill, and Whitehurst, cannot be dismissed.  Even if the alleged conduct is subject to the discretionary exception, Individual Defendants do not maintain discretion to violate constitutional rights, which is plausibly alleged elsewhere in the complaint.

Kimmel, however, is not alleged to have committed a constitutional violation.  (Dkt. No. 37 at 29–30.)  Count 3, dealing only with the acts and omissions of Kimmel and the United States, is still subject to dismissal under the discretionary exception to the FTCA.

The Ninth Circuit applies a two-step analysis when determining whether conduct falls under the discretionary-function exception.  *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996).  "First, we ask whether the challenged actions involve 'an element of judgment or

1   choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)).  "An agency retains

2   discretion whether to act where no statute or agency policy dictates the precise manner in which

3   the agency is to complete the challenged task."  *Bailey v. United States*, 623 F.3d 855, 860 (9th

4   Cir. 2010).  If a "federal statute, regulation, or policy specifically prescribes a course of action

5   for an employee to follow[,]" the act is not discretionary because "the employee has no rightful

6   option but to adhere to the directive."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

7   Second, if the court determines "the challenged actions involve an element of choice or

8   judgment," the court then "determine[s] 'whether that judgment is of the kind that the

9   discretionary function exception was designed to shield.'"  *Sabow*, 93 F.3d at 1451 (quoting

10  *Gaubert*, 499 U.S. at 322–323).  "More specifically, if the judgment involves considerations of

11  social, economic, or political policy, the exception applies."  *Id.* (cleaned up).

12          The complaint alleges that, through its employees, the United States "failed to require

13  adequate planning and maintain operational control of the attempt to 'take' Reinoehl.  This

14  failure was a breach of the common law duty to exercise reasonable care."  (Dkt. No. 37 at 30–

15  31.)  The United States argues law enforcement officers must exercise an element of judgment or

16  choice during any criminal investigation or operation, including the manner in which to execute

17  an arrest warrant.  (Dkt. No. 45 at 5.)  It argues Plaintiff failed to identify a law, policy, mandate,

18  or directive prescribing non-discretionary conduct in the way federal law enforcement officers

19  plan and execute an arrest warrant.  (*Id.* at 7.)  Plaintiff agrees it "is unaware of a specific policy

20  regulating officers' pre-shooting conduct[,]" but argues, even assuming officers had complete

21  discretion, "there is no policy rationale for failing to establish a clear command structure or

22  working means of communication when executing an arrest warrant, especially one considered

23  by law enforcement to be high risk."  (Dkt. No. 60 at 8.)  Thus, the parties appear to agree the

24

1    first part of the discretionary exemption test is satisfied: the challenged actions involved an

2    element of judgment or choice.

3           Moving to the second step, the Court considers "whether that judgment is of the kind that

4    the discretionary function exception was designed to shield.'"  *Sabow*, 93 F.3d at 1451 (quoting

5    *Gaubert*, 499 U.S. at 322–323).  "More specifically, if the judgment involves considerations of

6    social, economic, or political policy, the exception applies."  *Id.* (cleaned up).

7           The United States cites *Gonzalez v. United States*, 814 F.3d 1022, 1032 (9th Cir. 2016)

8    and *Sabow*, 93 F.3d at 1451 for the proposition that the investigation of a crime by federal law

9    enforcement officers requires officers to consider relevant political and social circumstances in

10   making decisions about the nature and scope of a criminal investigation.  (Dkt. No. 45 at 8.)  The

11   Court agrees with the United States that "the logistical and tactical planning surrounding when,

12   where, and how to execute an arrest warrant involve the kind of policy considerations that

13   Congress intended to exempt from the FTCA."  (Dkt. No. 45 at 8.)

14          But, at least with respect to the "pre-shooting conduct" or the planning stage of the

15   operation, Plaintiff's complaint does not appear to challenge the "when, where and how" of the

16   plan.  Instead, the complaint alleges the *lack thereof* constitutes negligence; Plaintiff alleges the

17   briefing "did not develop contingencies for when, where, and how to 'take' Reinoehl."  (*See* Dkt.

18   No. 37 at 13.)  For instance, Plaintiff does not object to USMS's decision to put a particular

19   officer in charge, but rather objects that there was no established chain of command at all.  (*See*

20   Dkt. No. 37 at 22.)  The briefing materials provided no information regarding the warrant's

21   specifics: "Warrant Date: TBD 2020", "Warrant Time: TBD", and "Warrant Location: ??"; and

22   the briefing regarding the proposed communications channel stated "PRIMARY: ???",

23   "ALTERNATE: ???", and "CONTINGENCY: Cell Phone."  (*Id.* at 15.)

24

1        The United States responds that this argument merely reiterates Plaintiff's theory of

2   negligence, and whether this conduct is negligent is "simply irrelevant to the discretionary

3   function inquiry." (Dkt. No. 65 at 4) (quoting *Kennewick Irr. Dist. v. United States*, 880 F.2d

4   1018, 1029 (9th Cir. 1989)).  The question is not whether the absence of plan was negligent;

5   instead, the second step requires the Court to consider whether "the nature of the actions

6   taken . . . are susceptible to policy analysis." *Gonzalez*, 814 F.3d at 1027–1028.  Importantly, the

7   Court does not focus on the agent's subjective intent in exercising the discretion.  *Id.*  "The

8   decision need not *actually* be grounded in policy considerations so long as it is, by its nature,

9   susceptible to a policy analysis." *Id.* (quoting *GATX/Airlog Co. v. United States*, 286 F.3d 1168,

10  1174 (9th Cir. 2002)).

11        In *Green v. United States*, 630 F.3d 1245 (9th Cir. 2011), the Ninth Circuit addressed the

12  framework for determining whether an action—specifically, a failure to act or an omission—was

13  susceptible to policy analysis.  The case arose from a wildfire for which the Forest Service set

14  containment boundaries.  *Id.* at 1247.  Firefighters started a backfire near appellants' private

15  properties but did not take any action to protect appellants' properties, and when the backfire

16  exceeded the desired containment area, it burned appellant's properties.  *Id.* at 1248.  Afterward,

17  Forest Service employees admitted appellant's properties were not defended because the

18  firefighters had not been informed of their existence, and thus, did not know the properties were

19  at risk.  *Id.*  The district court granted the United States's motion to dismiss, finding the United

20  States was immune from appellant's action because the discretionary function exception to the

21  FTCA applied to the Forest Service's decision regarding how to fight the wildfire.  *Id.* at 1247.

22        The Ninth Circuit reversed.  *Id.*  Finding no statute or agency policy dictated the precise

23  manner in which the Forest Service must act when it lights a backfire, the question turned on

24

whether the Forest Service's failure to inform the firefighters of appellant's properties was

susceptible to policy analysis. *Id.* at 1250–1251. The court determined it was not:

> [T]here is no evidence in the record to support the Forest Service's contention that
> the nature of its actions in this case—i.e., its decisions when and whether to
> communicate directly with private citizens whose properties might have been in
> harm's way—are susceptible to policy analysis. There is no evidence, for example,
> that the Forest Service must determine how to allocate personnel during firefighting
> operations between contacting citizens and direct firefighting activity, or that the
> Forest Service must determine during firefighting operations how to allocate its
> communications resources between community-wide distribution (such as
> newspapers and radio stations) and direct contact with private citizens (such as
> phone calls or door-to-door contacts). If the Appellants had been notified of the
> proposed backfire, they might have been able to take measures to protect their
> properties, or at least ensured the Forest Service took measures to do so. For
> purposes of this appeal from a motion to dismiss, we find Appellants' pleadings
> adequately state such a possibility. Accordingly, and in light of the specific record
> in this case, we disagree with the district court's application of the discretionary
> function exception.

*Id.* at 1252.

   *Green* is instructive here. The failure to plan how the warrant was to be executed as

described in the complaint is not susceptible to policy analysis. For example, Plaintiff alleges

there was no clear command structure. (Dkt. No. 60 at 8.) The United States argues defining

command structure "involves numerous tactical decisions and considerations[,]" including "the

kind of warrant; the crime at issue; the dangerousness of the fugitive; the number of officers

needed; public safety concerns; officer safety concerns; whether command should be on scene or

at a central location; and whether command responsibilities should be divided amongst multiple

people." (Dkt. No. 65 at 5.) The decision to establish a particular command structure is

susceptible to policy analysis; the absence of *any* command structure allegedly due to the lack of

forethought is not. Or, at this stage, there is nothing in the complaint (or the parties' briefing) to

indicate the United States must balance some social or economic factor in deciding whether to

establish a command structure at all. The same is true for the alleged failures to provide

adequate communications systems and develop a plan to safely execute the arrest.  In invoking

the discretionary exception to the FTCA, the United States bears the burden of proving that the

exception applies.  *Reed ex rel. Allen v. U.S. Dep't of Interior,* 231 F.3d 501, 504 (9th Cir. 2000).

In these circumstances, the policies these omissions could serve are not obvious, and the Court

will not invent some.

The United States argues the measure of adequacy of preparedness in and of itself

requires policy judgment, and therefore discretion.  (Dkt. No. 65 at 6.)  Reading the FTCA this

way would allow the exception to swallow the rule.  The second part of the inquiry would do no

work if the United States could merely declare it judged its own conduct "adequate" for

whatever purpose it purports to serve.  There may be instances where inadequate preparation

serves another interest, for example, in *Green*, where the court suggested instances where the

Forest Service is forced to allocate personnel during firefighting operations between contacting

citizens and direct firefighting activity.  *Green*, 630 F.3d at 1252.  But nothing in the complaint

indicates USMS or the individual actors made the tactical decision *not to plan* how the warrant

would be executed.  The United States's motion to dismiss is DENIED.

### D.  Motion to Dismiss by State of Washington (Dkt. No. 46)

Plaintiff alleges two claims against Washington: state law negligence (Count 4) and state

law battery (Count 6).  (Dkt. No. 37 at 31–33.)  The complaint implicates Washington because

Defendant Jacob Whitehurst, one of the Individual Defendants, was employed by the

Washington Department of Corrections ("DOC") at the time of the event.  (*Id.* at 6.)  Washington

argues that other than providing Whitehurst to USMS as a loaned servant, DOC had no interest

or involvement in the operation, did not maintain control nor direct Whitehurst in any way, and

therefore cannot be held vicariously liable for any of Whitehurst's actions.  (Dkt. No. 46 at 2.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

i.   <u>Statute of Limitations</u>

As a threshold matter, Washington argues the battery claim (Count 6) is untimely under the Washington Revised Code, which provides a two-year statute of limitations.  Wash. Rev. Code § 4.16.100(1).  Plaintiff argues when a battery claim seeks wrongful death damages, the statute of limitations is three years, not two.  (Dkt. No. 59 at 5.)  "Washington courts have repeatedly asserted . . . '[t]he statute of limitations for a wrongful death action in Washington is three years.'"  *Smalls v. City of Tacoma*, No. 3:22-CV-5043, 2023 WL 3076643, at *4 (W.D. Wash. Apr. 25, 2023) (citing *Atchison v. Great W. Malting Co.*, 166 P.3d 662, 664 (Wash. 2007) (*en banc*)).  "This period comes from the so-called 'catch-all' provision at [Washington Revised Code] 4.16.080(2), which provides a three-year limitation on claims for '[a]n action for taking, detaining, or injuring personal property, including an action for the specific recovery thereof, or for any other injury to the person or rights of another not hereinafter enumerated.'"  *Id.*  Washington did not respond to Plaintiff's argument in its reply.  (*See* Dkt. No. 64.)

In *Smalls*, the court was tasked with determining whether plaintiffs' fifth and sixth claims were in fact wrongful death claims for purposes of the statute of limitations.  *Smalls*, 2023 WL 3076643, at *3.  The fifth claim stated: "[p]laintiffs are seeking both survival and wrongful death damages under this claim."  *Id.*  The sixth claim did not include the phrase "wrongful death," but "sufficiently put Defendants on notice that Plaintiffs bring this claim both individually and as a successors-in-interest to DECEDENT, and seek both survival and wrongful death damages."  *Id.*  Under Rule 8(a)'s liberal standard, the *Smalls* court concluded the two claims were adequately stated to provide notice to defendants that plaintiffs were asserting wrongful death claims.  *Id.*

Here, Plaintiff's claim under Count 6 is written: "state law battery."  (Dkt. No. 37 at 32.)  The allegations state the defendants intentionally and unlawfully shot and killed Reinoehl, were

1   acting within the scope of their official duties, and therefore the city, county, and state

2   defendants are responsible "for the battery committed by their respective Local Officer

3   Defendant employees." (*Id.*)  The phrases "wrongful death[,]" and "survival[,]" are nowhere in

4   the complaint, even in reference to damages. (*See id.*)  Count 6 gives Washington notice of a

5   battery claim, not a wrongful death claim.  Although the complaint is clearly brought in the

6   interest of Reinoehl's estate, it does not necessarily follow that Plaintiff's battery claim is a

7   wrongful death claim under Washington Revised Code § 4.20.010 merely because the battery

8   victim is deceased.  Claim 6 is a battery claim, the statute of limitations for which is two years.

9   Wash. Rev. Code § 4.16.100(1).  The alleged battery took place on September 3, 2020; this

10  action was not brought until July 11, 2023. (Dkt. No. 1.)  Plaintiff's battery claim (Count 6)

11  against City, County, and State Defendants is therefore DISMISSED.

12                      ii.    Westfall Act

13          Washington also claims Plaintiff "has no reasonable basis to challenge the certification

14  already on file in this case, which otherwise conclusively establishes that Specialist Whitehurst

15  was acting in the scope of his federal employment." (Dkt. No. 46 at 5.)  Washington refers to the

16  certification of by C. Salvatore D'Alessio, Jr., Director of the Department of Justice's Torts

17  Branch, Civil Division, in which he found "federally deputized task force officers Craig Gocha,

18  James Oleole, and Jacob Whitehurst were acting in the scope of federal office or employment at

19  the time of the incident out of which the plaintiff's claims arose." (Dkt. No. 29-1 at 1–2.)

20  Washington cites 28 U.S.C. § 2679(d)(1), which Washington explains "provid[es] that upon

21  certification, any civil action shall be deemed to be an action against the United States, rather

22  than the individual officer." (Dkt. No. 46 at 5.)

23          "The Federal Employees Liability Reform and Tort Compensation Act of 1988,

24

1    commonly known as the Westfall Act, accords federal employees absolute immunity from

2    common-law tort claims arising out of acts they undertake in the course of their official duties."

3    *Osborn v. Haley*, 549 U.S. 225, 229 (2007).  "When a federal employee is sued for wrongful or

4    negligent conduct, the Act empowers the Attorney General to certify that the employee 'was

5    acting within the scope of his office or employment at the time of the incident out of which the

6    claim arose.'"  *Id.* at 229–230; § 2679(d)(1), (2).  Upon the Attorney General's certification, the

7    employee is dismissed from the action, and the United States is substituted as defendant in place

8    of the employee.  *Id.* at 230.  The litigation is thereafter governed by the FTCA.  *Id.*

9         Plaintiff did not bring the negligence claim against Defendant Whitehurst as an

10   individual; Plaintiff brought that claim against the State of Washington.  (Dkt. No. 37 at 31.)

11   The State of Washington is not an "employee of the Government" within the meaning of the

12   Westfall Act.  28 U.S.C. § 2671.  The United States therefore cannot substitute itself for the State

13   of Washington, even though Plaintiff asserts Washington's liability is based on the conduct of

14   Whitehurst.

15              iii.    <u>Negligence and vicarious liability</u>

16        Washington argues it cannot be vicariously liable for Whitehurst's actions because he

17   acted pursuant to his special deputization rather than within the scope of his employment at

18   DOC.  (Dkt. No. 46 at 5.)

19        According to the Complaint, "[a]t all times material to this action, Whitehurst was

20   employed by the Washington State Department of Corrections as a law enforcement officer and

21   acted within the scope of employment."  (Dkt. No. 37 at 6.)  Count 4 alleges negligence against

22   Washington "for [its] own torts as well as the torts of [its] employees occurring within the scope

23   of employment."  (Dkt. No. 37 at 31.)  Plaintiff alleges law enforcement officers owed a duty of

24

ordinary care when carrying out their official duties, and Washington failed to meet the standard

of care in several ways including, but not limited to, "failing to develop a plan to safely execute

the arrest or failing to follow the plan, failing to establish an adequate incident command

structure, and failing to conduct the operation with adequate communications." (*Id.* 31–32.)

"Analyzing whether a government employee was acting under color of state law for

a § 1983 claim may often yield the same result as when analyzing whether that employee was

acting within the scope of employment." *Doe v. San Diego*, 445 F.Supp.3d 957, 969 (S.D. Cal.

2020). "[H]owever, the standards are not only different, but apply in different situations." *Id.* In

Washington, "[a]n employee's conduct will be outside the scope of employment if it 'is different

in kind from that authorized, far beyond the authorized time or space limits, or too little actuated

by a purpose to serve the master.'" *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002) (*en

banc*) (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2) (1958)). "The proper

inquiry is whether the employee was fulfilling his or her job functions at the time he or she

engaged in the injurious conduct." *Id.*

An exception exists, however, when a servant's general employer loans the servant to

another, or "special," employer. *Wilcox v. Basehore*, 389 P.3d 531, 538 (Wash. 2017) (*en banc*).

For those activities over which the special employer exercises complete control, the special

employer also assumes vicarious liability under the "borrowed servant" doctrine. *Id.*

Washington argues Whitehurst was a such a borrowed servant. (Dkt. No. 46 at 3–4.)

Under Washington law, four factors are significant in determining whether an individual has

become the borrowed servant of a new master: (1) whether the "borrowing master" has the right

to hire and fire the servant; (2) whether the "borrowing master" has the right to direct the manner

in which the servant performs his duties; (3) whether the value of any equipment the servant

1    brings with him has any bearing on the servant's continued relationship with the "borrowing

2    master"; and (4) whether the "borrowing master" exclusively controls or has the exclusive right

3    to control the servant.  *Ward v. Gordon*, 999 F.2d 1399, 1403 (9th Cir. 1993).  Notably, the

4    borrowed servant doctrine does not require complete and exclusive control over all aspects of the

5    loaned worker's conduct.  *Wilcox*, 389 P.3d at 783.  "Liability arises out of those particular

6    transactions over which the special employer has exclusive control."  *Id.*  If it can be established

7    that the servant had borrowed servant status at the time of performance of such transaction, the

8    servant's general employer can escape liability for damage or injuries flowing from the

9    transaction.  *Stocker v. Shell Oil Co.*, 716 P.2d 306, 308 (Wash. 1986) (*en banc*).

10          The same problem with Individual Defendants' motion to dismiss exists here.  The

11   complaint does not contain enough information to answer these questions.  This Court cannot

12   deduce whether USMS had the right to "hire" or "fire" Whitehurst; whether USMS had the right

13   to direct the manner in which he performed his duties (and what those duties were); whether

14   DOC equipment was used; and whether USMS or DOC had the exclusive right to control

15   Whitehurst.  Whether Whitehurst definitively had "borrowed servant status" at the time the

16   officers killed Reinoehl is not yet clear.  It is also possible that Whitehurst's duties "were

17   multifaceted" or "could be discharged concurrently."  *See Ward*, 999 F.2d at 1403.  These are

18   questions of fact that, if left undefined or otherwise disputed, are properly questions for the jury.[5]

19   *Wilcox*, 389 P.3d at 534.

20

21   _____

[5] Washington argues there are no additional facts needed to inform the analysis, and Plaintiff

22   already admitted as much when, in her response in opposition to the renewed motion to stay
     discovery, she "stated she does not need any discovery to respond to [Washington]'s motion to

23   dismiss." (Dkt. No. 64 at 6–7 n.8.)  Not quite; Plaintiff stated "discovery is not necessary for the
     Court to deny Defendants' pending motions[,]" which is true; discovery is necessary, however,

24   for the Court to grant the relief Washington requests. (Dkt. No. 53 at 5.)

1        Washington argues DOC cannot be vicariously liable because Whitehurst was not

2   effectuating any purpose of DOC at the time Reinoehl was killed.  Unlike the color-of-law

3   inquiry, vicarious liability undoubtedly can be governed by contract.  *See Stocker*, 716 P.2d at

4   309.  The complaint states the MOU between USMS and the DOC includes terms that

5   Whitehurst was not a federal employee and was required to comply with DOC's guidelines

6   concerning the use of firearms, deadly force, and less-lethal devices.  (Dkt. No. 37 at 17.)  The

7   MOU also contained a term stating: "[e]ach agency shall be responsible for the acts or omissions

8   of its employees."  (*Id.*)  When enforceable, "[a]n express contractual agreement for

9   indemnification must prevail over the tort defense of 'borrowed servant.'"  *Stocker*, 716 P.2d at

10   309.  Whether the MOU constitutes an enforceable contract, and whether that contract governs

11   Whitehurst's behavior in this instance are additional, unresolved questions that this Court is

12   without the facts to answer.  The complaint states a plausible case that the MOU governs which

13   "master" is vicariously liable for Whitehurst's alleged negligence—DOC.  That is enough to

14   withstand a motion to dismiss.  Washington's motion to dismiss Count 4 is therefore DENIED.

15                                              *  *  *

16        As a general matter, the Court recognizes Individual Defendants, the United States, and

17   Washington's substantive arguments appear to be well-grounded in federal and state law.  The

18   Court is not oblivious to the fact that these same arguments have been raised once before, prior

19   to the first amendment of the complaint, and may now be raised for a third time at summary

20   judgment.  But the arguments are grounded in the facts as the Defendants know them to be rather

21   than the facts as stated in the complaint.  Because Defendants chose 12(b)(6) as the vehicle for

22   asserting these arguments, the Court is bound by the 12(b)(6) standard and must accept as true all

23   well-pleaded factual allegations and construe the allegations in favor of the non-moving party.

24

1    Aside from the statute of limitations issue, Plaintiff's complaint survives under that standard.

2                                    **IV      CONCLUSION**

3            Accordingly, and having considered the parties' motions, the briefing of the parties, and

4    the remainder of the record, the Court finds and ORDERS that:

5            1.   Defendants Craig Gocha, James Oleole, and Jacob Whitehurst's Motion to

6                 Dismiss (Dkt. No. 44), joined by Defendant Michael Merrill (Dkt. No. 50), is

7                 DENIED;

8            2.   Defendant United States of America's Motion to Dismiss Counts 3 & 5 (Dkt. No.

9                 45) is DENIED;

10           3.   Defendant State of Washington's Motion to Dismiss (Dkt. No. 46) is GRANTED

11                in part and DENIED in part.  The State of Washington's Motion to Dismiss Count

12                4 (state law negligence) is DENIED.  The State of Washington's Motion to

13                Dismiss Count 6 (state law battery) is GRANTED.  Count 6 (state law battery)

14                against City, County, and State Defendants is DISMISSED.

15           DATED this 5th day of June 2024.

16

17   

18                                    David G. Estudillo
                                      United States District Judge

19

20

21

22

23

24