UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

VAN LOO FIDUCIARY SERVICES,
an Oregon Limited Liability
Corporation, as Personal
Representative of the ESTATE OF
MICHAEL F. REINOEHL,

                Plaintiff,

    v.

THE UNITED STATES OF
AMERICA; PIERCE COUNTY, a
political subdivision of the State of
Washington; the MUNICIPALITY
OF LAKEWOOD, a municipal
corporation; STATE OF
WASHINGTON; JAMES OLEOLE,
an individual; CRAIG GOCHA, an
individual; MICHAEL MERRILL, an
individual; and JACOB
WHITEHURST, an individual.

                Defendants.

No.  3:23-cv-05618-DGE

SECOND AMENDED
COMPLAINT FOR DAMAGES

JURY DEMAND

SECOND AMENDED
COMPLAINT FOR DAMAGES – 1

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

1    Plaintiff demands a jury trial and alleges:

## I.    INTRODUCTION

Final two minutes of Defendants' radio traffic, September 3, 2020:

| 6:51:42 p.m. | Defendant Oleole | *He's getting in the Jetta, we should take him, he's in the Jetta* |
| 6:51:49 p.m. | Unidentified Officer #1 | *We're too far, let him drive* |
| 6:52:17 p.m. | Unidentified Officer #2 | *Jetta's running, Jetta's running, break lights are on* |
| 6:52:28 p.m. | Defendant Oleole | *Let's go take him* |
| 6:52:32 p.m. | Unidentified Officer #2 | *He's blocked from the rear, just go in the front* |
| 6:52:36 p.m. | Defendant Oleole | *Alright we're moving* |
| 6:52:44 p.m. | Unidentified Officer #1 | *Are you guys taking him? Cause we gotta move if you are* |
| 6:53:07 p.m. | Unidentified Officer #4 | *Shit shit bro* |
| 6:53:12 p.m. | Defendant Oleole | *Take him now, take him* |
| 6:53:31 p.m. | Defendant Oleole | *Fired, shots fired* |

On a sunny September afternoon in Lacey, Washington, state and local law enforcement officers dressed in militia-style fatigues raced a short distance through a quiet residential neighborhood in three unmarked SUVs toward their target: a man they were supposed to arrest.

SECOND AMENDED
COMPLAINT FOR DAMAGES – 2

Without any warning or announcement that they were police, four officers opened fire with automatic assault rifles and handguns. Their first shots were fired from inside one of the SUVs, shooting through their own windshield into a parked Jetta passenger vehicle. The officers then jumped out of the SUVs and continued firing.

Startled by this sudden and unprovoked attack, the man ducked and ran away from the threat, looking for cover. He only made it a few yards before he was surrounded and gunned down. Although the man had a pistol in his pocket, he never fired it or even pulled it from his pocket. Meanwhile, the officers sprayed more than 40 bullets through the neighborhood, killing the man, grazing a child playing nearby, and striking cars, fences, backyard playground equipment, buildings, and residences.

The actions of the officers, before, during, and after the shooting, show that they either had no plan to arrest the man without injury, made no effort to follow such a plan, or planned to use deadly force from the start.

This case involves the killing of Michael Forest Reinoehl ("Reinoehl") by Washington state and local police officers operating under the vanishingly thin pretense of a United States Marshals Service ("USMS") task force.

This complaint asserts that the state and local police officers who shot and killed Reinoehl were acting under color of state law, and so are liable under 42

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

U.S.C. § 1983 and Washington tort law. Their local government employers are also liable under state law. Should this Court conclude that the shooters were not state actors for purposes of § 1983 and/or state tort law, this complaint asserts alternative claims against those Defendants under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and the Federal Tort Claims Act (FTCA).

The USMS is sued under the FTCA for negligent acts, omissions, policies, and practices that led to Reinoehl's death.

## II.    JURISDICTION AND VENUE

2.1    This action asserts both state and federal law claims, including 42 U.S.C. § 1983 and 28 U.S.C. Chapter 171.

2.2    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 *[federal question]*, 28 U.S.C. 1332 *[diversity]*, 28 U.S.C. § 1343 *[civil rights]*, and 28 U.S.C. 1346(b)(1) *[US as defendant]*.

2.3    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to the claim occurred in this judicial district.

## III.    PARTIES

3.1    Van Loo Fiduciary Services, LLC is a resident of Oregon state. It is the duly appointed Personal Representative of the Estate of Michael Reinoehl ("Plaintiff Estate"), a probate action arising from the death of Michael Forest

Reinoehl ("Reinoehl"). Plaintiff Estate is admitted to administration by the Circuit Court of the State of Oregon for the County of Multnomah, case number 20PB07353.

3.2     Under Washington state law, Plaintiff Estate is the proper party to bring claims on behalf of the Estate and its beneficiaries. The beneficiaries of Plaintiff Estate are Reinoehl's children, Deaven Reinoehl ("Deaven" he/him/his) and L.L.R. (a minor).

3.3     Defendant James Oleole ("Defendant Oleole," he/him/his) is an individual. He is believed to be a resident of Washington state. At all times material to this action, he was employed by the Pierce County Sheriff's Department as a law enforcement officer and acted within the scope of employment.

3.4     Defendant Craig Gocha ("Defendant Gocha," he/him/his) is an individual. He is believed to be a resident of Washington state. At all times material to this action, he was employed by the Pierce County Sheriff's Department as a law enforcement officer and acted within the scope of employment.

3.5     Defendant Michael Merrill ("Defendant Merrill," he/him/his) is an individual. He is believed to be a resident of Washington state. At all times

material to this action, he was employed by the Lakewood Police Department as a law enforcement officer and acted within the scope of employment.

3.6     Defendant Jacob Whitehurst ("Defendant Whitehurst," he/him/his) is an individual. He is believed to be a resident of the State of Washington. At all times material to this action, he was employed by the Washington State Department of Corrections as a law enforcement officer and acted within the scope of employment.

3.7     Defendant Pierce County ("Defendant County") is a local government organized under Washington state law. It operates and is responsible for the liabilities of the Pierce County Sheriff's Department and its employees acting within the scope of their employment.

3.8     The Municipality of Lakewood ("Defendant City") is a municipal corporation organized under Washington state law. It operates and is responsible for the liabilities of the Lakewood Police Department and its employees acting within the scope of their employment.

3.9     Defendant State of Washington ("Defendant State") is a sovereign state government duly admitted to the United States of America. It has waived sovereign immunity for itself pursuant to the terms of RCW 4.92.090 and for local governments and municipal corporations organized under its laws pursuant to the terms of RCW 4.96.010. It operates and is responsible for the liabilities of

the Washington State Department of Corrections and its employees acting within the scope of their employment.

3.10 Defendant The United States of America ("Defendant Government") is the sovereign domestic national government. It has waived sovereign immunity for its own liabilities pursuant to the terms of 28 U.S.C. § 2674. It operates and is responsible for the liabilities of the United States Marshals Service (USMS) and that of its employees acting within the scope of their employment. Ryan Kimmel ("Kimmel," he/him/his) is an individual. At all times material to this action, he was employed by the USMS as a law enforcement officer and acted within the scope of his employment.

## IV.    PROCEDURAL REQUIREMENTS

4.1    Plaintiff Estate has satisfied all pre-filing claim presentment requirements under RCW 4.92.110, RCW 4.96.020, and 28 USC § 2401.

4.2    Claims for damages to Plaintiff Estate and its beneficiaries were presented to Defendant County on or about June 14, 2021.

4.3    Claims for damages to Plaintiff Estate and its beneficiaries were presented to Defendant City on or about June 14, 2021.

4.4    Claims for damages to Plaintiff Estate and its beneficiaries were presented to Defendant State on or about June 14, 2021.

4.5     Claims for damages to Plaintiff Estate were presented to Defendant Government in March 2021, on May 19, 2021, and again on August 30, 2022.

4.6     Claims for damages to Deaven and L.L.R. were presented to Defendant Government on August 30, 2022.

## V.     FACTS

## BACKGROUND

5.1     Michael Forest Reinoehl ("Reinoehl") had two children, Deaven and L.L.R.

5.2     Reinoehl was close to Deaven and L.L.R from their infancy onward and was involved in their lives until his untimely death.

5.3     On September 3, 2020, Deaven and L.L.R. were 18 and 11 years old, respectively.

5.4     On that date, the Defendant law enforcement officers shot their father, Reinoehl.

5.5     Reinoehl died because of injuries sustained during the shooting.

5.6     Reinoehl was 48 years old at the time of his death.

## LOCAL OFFICER DEFENDANTS

5.7     The only law enforcement officers who shot Reinoehl are Defendants Oleole, Gocha, Merrill, and Whitehurst.

5.8    At all times relevant to this action, Defendants Oleole, Gocha, Merrill, and Whitehurst ("Local Officer Defendants") were employed by Washington state, county, or municipal law enforcement agencies.

5.9    None of the Local Officer Defendants were employed by a federal department or federal agency at the time of the shooting.

## MULTNOMAH ALLEGATIONS

5.10   At the time of the shooting, the Local Officer Defendants were ostensibly attempting to arrest Reinoehl on a warrant issued by the Multnomah County Circuit Court ("Multnomah Arrest Warrant").

5.11   Multnomah County is in the state of Oregon. The City of Portland is entirely within Multnomah County.

5.12   The Multnomah Arrest Warrant was based on a Portland Police Bureau detective's affidavit of probable cause that Reinoehl committed two Oregon state law offenses in Multnomah County on August 29, 2020 (Multnomah Allegations) relating to the homicide of Aaron Danielson ("Danielson").

5.13   The Multnomah Allegations occurred in downtown Portland during a far-right demonstration where hundreds of far-right activists, including Danielson, descended on the City of Portland while armed with deadly force and with the express intention of confronting and disrupting ongoing protests against police violence.  Reinoehl was heavily involved in those protests.

**DRIVE-BY SHOOTING IN PORTLAND**

5.14   Late in the evening on August 30, 2020, or early the following morning, one or more individuals fired live ammunition at, and hit, Reinoehl's home in Portland.

5.15   The drive-by shooting occurred while Reinoehl's children, Deaven and L.L.R., were at the home.

5.16   Over the following days, one or more individuals made true threats on social media against Reinoehl's life and that of his family.

5.17   Reinoehl and his family were aware of these threats.

5.18   Reinoehl and his family presumed the drive-by shooting and threats were made by armed, violent, far-right extremists and militias.

5.19   Due to the drive-by shooting and threats, Reinoehl and his family went into hiding.

**POLITICIZATION OF THE MULTNOMAH ALLEGATIONS
AND ASSERTION OF SELF-DEFENSE**

5.20   From September 1-3, 2020, the Multnomah Allegations were the subject of national news coverage.

5.21   During that time, the Multnomah Allegations were also publicly addressed by candidates running for the American presidency including at least eleven "Tweets" by the then-President of the United States.

SECOND AMENDED
COMPLAINT FOR DAMAGES – 10

SCHROETER  GOLDMARK  &  BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

5.22   In early September 2020, Reinoehl recorded an interview with a national media outlet responding to the news coverage and politicization of the Multnomah Allegations.

5.23   During the interview, Reinoehl asserted that the homicide underlying the Multnomah Allegations was a lawful act of self-defense and defense of another person. Reinoehl asserted that Danielson, an adult male and far-right activist who was armed with several weapons including a gun at the time of the shooting, posed an immediate threat of serious physical injury or death.

5.24   Under Oregon state law, defense of self or others is privileged and a complete defense to criminal charges. Oregon self-defense law includes no duty to retreat. If Reinoehl's assertions were correct, the shooting death of Danielson would have been justifiable homicide under Oregon law.

5.25   Under Oregon law, a criminal prosecutor has the burden of proving beyond a reasonable doubt both (1) the elements of the offense and (2) disproving the affirmative defense of self or others. In other words, the prosecutor would have to prove to a jury beyond a reasonable doubt that Reinoehl was *not* acting in self-defense or defense of others when he shot Danielson.

5.26   Under state and federal law, Reinoehl was entitled to Due Process and to face the Multnomah Allegations in a court of law. Under state and federal

law, unless and until a prosecutor proved Reinoehl guilty beyond a reasonable doubt to a jury, Reinoehl was presumed innocent.

## TASK FORCE BRIEFING

5.27   At approximately 3:30 p.m. on September 3, law enforcement officers met in private to plan how to "take" Reinoehl ("Briefing").

5.28   The Briefing occurred in Pierce County, Washington, approximately 130 miles north of Multnomah County.

5.29   Pierce County is the territorial jurisdiction of Defendant County.

5.30   The Briefing occurred at a law enforcement facility owned and operated by Defendant (Pierce) County.

5.31   The Briefing was conducted by Erik Clarkson, an employee of Defendant County.

5.32   The Briefing was attended by the Local Officer Defendants, USMS employee Kimmel, and other law enforcement officers.

5.33   The Briefing provided the officers with information about Reinoehl.

5.34   Much, if not all, of the information provided during the Briefing was gathered by Portland Police Bureau detectives.

5.35   Information reported to the officers included the claim that Reinoehl was a 'fugitive' from the Multnomah Allegations (which had not yet been filed) and the Multnomah Arrest Warrant (which had not yet been issued).

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

5.36   Information provided during the Briefing included the inaccurate, misleading, incomplete, and/or out of context information, such as the claim that Reinoehl considered himself to be at "war" with police.

5.37   On information and belief, the Briefing did not alert Defendants to material facts such as that rightwing extremists had made threats on social media to kill Reinoehl, Reinoehl's assertion of self-defense to the Multnomah Allegations, or that Danielson was armed with a gun when Reinoehl shot him.

5.38   The Briefing was supposed to develop a detailed plan to arrest Reinoehl in Thurston County, Washington. However, other than sharing the inaccurate, misleading, incomplete, and, and/or out of context information about the danger Reinoehl posed, no real plan to arrest Reinoehl appears to have been developed.

5.39   The Briefing did not develop contingencies for when, where, and how to "take" Reinoehl.

5.40   The PowerPoint slide shown at the Briefing with respect to the expected warrant service showed no substantive information:

SECOND AMENDED
COMPLAINT FOR DAMAGES – 13

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305



5.41   The Briefing did not include any plan for officers to attempt to announce or identify themselves as law enforcement, to give any warning before using deadly force, or to give Reinoehl any opportunity to surrender.

5.42   The Briefing did not consider or comply with the standard of care for high-risk law enforcement operations.

5.43   The Briefing did not provide for any attempt to alert or coordinate with Thurston County law enforcement regarding the attempt to "take" Reinoehl.

5.44   The Briefing did not develop a plan for how the individual Defendants would communicate with one another before or during the attempt to "take" Reinoehl.

5.45   The PowerPoint slide shown at the briefing that addressed team communications included almost no information and a series of question marks ("???"):

SECOND AMENDED
COMPLAINT FOR DAMAGES – 14

1
2
3
4
5
6
7
8
9



10

11   5.46   Instead of developing a communication plan, the individual

12   Defendants relied on Pierce County law enforcement radio frequencies while

13   operating in Thurston County.
14

15   5.47   It was predictable that Pierce County radio frequencies would be

16   inadequate for communicating in Thurston County.
17

18   5.48   Individual Defendants, and their respective supervisors and chains

19   of command, knew or should have known that Pierce County radio frequencies

20   would be inadequate for communicating in Thurston County.
21

22   5.49   The Defendants relied on Pierce County frequencies because

23   Defendants did not alert or coordinate with Thurston County law enforcement to

24   "take" Reinoehl.

25
26

5.50   Most of the law enforcement officers who attended the Briefing, including all Local Officer Defendants, had taken an oath to uphold the laws and constitution of Washington state.

**VOTF**

5.51   A small number of those who attended the Briefing were employees of the United States Marshals Service ("USMS").

5.52   Some of the state and local law enforcement officers who attended the Briefing, and who participated in the attempt to "take" Reinoehl, were "members" of a USMS Violent Offender Taskforce ("VOTF").

5.53   Other state and local officers who attended the Briefing and participated in the attempt to "take" Reinoehl were not associated with USMS or VOTF.

5.54   The mission of the USMS is, in relevant part, to affect arrest without injury.

5.55   The USMS has a mandatory policy that requires USMS employees to always use the minimum force reasonably necessary under the circumstances.

5.56   On information and belief, the Memorandum of Understanding between the USMS and State and Local Governments whose employees were participants in this operation contained the following relevant terms:

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

a.  RELEASE OF LIABILITY: Each agency shall be responsible for the acts or omissions of its employees. Participating agencies or their employees shall not be considered as the agents of any other participating agency.

b.  All members of the VOTF shall comply with their agencies' guidelines concerning the use of firearms, deadly force, and less-lethal devices.

5.57   State and local officers who were "members" of VOTF are required to periodically renew their membership.

5.58   Defendant Merrill's VOTF membership expired on August 31, 2020.

5.59   The special deputization forms from the USMS creating VOTF membership explicitly state that members of the VOTF are *not* federal employees.

5.60   State and local law enforcement officers, including the Local Officer Defendants, were not transformed into federal agents by mere VOTF membership.

5.61   VOTF membership did not render the Local Officer Defendants' oaths, rights, and duties under color of Washington state law void.

5.62   While the Local Officer Defendants were operating with VOTF, the Defendant County and City failed to require the Local Officer Defendants to adhere to their oaths, rights, and duties under color of Washington state law.

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

5.63   The Local Officer Defendants' training, law enforcement certification, legal privileges, and access to informational databases and other resources, were enjoyed because of their status as law enforcement officers under color of Washington state law.

5.64   These benefits enjoyed under color of state law formed the basis of the Local Officer Defendants' participation in VOTF.

5.65   On information and belief, neither Defendant County nor Defendant City required their Local Officer Defendant employees to comply with their policies and procedures while operating with VOTF.

5.66   On information and belief, the USMS did not require Local Officer Defendants to comply with its policies and procedures while operating with VOTF.

5.67   The Local Officer Defendants were operating under color of state law when they took Reinoehl's life on September 3, 2020.

5.68   On information and belief, despite the existence of USDOJ policies requiring a federal investigation when federal officers use deadly force, no federal investigation took place in this case.

5.69   On information and belief, the only post-shooting investigation that occurred following this shooting was conducted by the Region 3 Critical Incident

Investigation Team (Region 3 CITT) comprised of local law enforcement agencies and chaired by Thurston County officials.

### ARRIVAL IN LACEY

5.70   At approximately 4:30 p.m. on September 3, 2020, Local Officer Defendants, USMS employee Kimmel, and other briefing attendees, including officers employed by Defendant County and City but not VOTF Special Deputies, traveled approximately thirty miles from the Pierce County briefing location to Lacey, a small town in Thurston County, Washington.

5.71   At approximately 4:50 p.m., the Multnomah Allegations were filed in Oregon state court and an Oregon state judge issued the Multnomah Arrest Warrant.

5.72   At approximately 5:30 p.m., the law enforcement officers converged in Lacey at a municipal police station.

5.73   At approximately 6:00 p.m., the individual Defendants took up positions in a quiet residential neighborhood in Lacey near a home and passenger vehicle they believed to be associated with Reinoehl.

5.74   From these positions, the individual Defendants watched the home and passenger vehicle from 6:00-6:45 p.m.

5.75   The home was located at the corner of School Street SE and 3rd Way SE ("Residence").

5.76   The passenger vehicle ("Jetta") was parked approximately 120 feet from the Residence on 3rd Way SE.

5.77   A pickup truck was parked behind the Jetta, blocking it in from the rear.

5.78   The individual Defendants were located in three "unmarked" vehicles parked near the Residence and Jetta: a Ford Escape ("Escape"), a Chevy Traverse ("Traverse"), and a Dodge Charger ("Charger").

5.79   The following image identifies the approximate locations of Defendants Merrill and Oleole (Escape ), Defendant Gocha and USMS employee Kimmel (Traverse), Defendant Whitehurst (Charger), the Residence, and the Jetta:



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

5.80   Defendants Merrill and Oleole were the only two in the Escape. Merrill was in the driver's seat. Oleole sat in the front passenger seat. The Escape was parked on School Street SE, facing south.

5.81   Defendant Gocha and USMS employee Kimmel were the only two in the Traverse. Gocha was in the driver's seat. Kimmel was in the front passenger seat. The Traverse was parked behind the Ford Escape on School Street SE, facing south.

5.82   Defendant Whitehurst was the only person in the Charger. He sat in the driver's seat. The Charger was parked on Third Way SE, facing west.

5.83   From 6:00–6:45 p.m., individual Defendants in the three separate vehicles communicated with one another by radio.

5.84   According to the Region 3 CIIT investigation conclusions, the Pierce County radio frequencies they were using did not work well in Thurston County.

5.85   If the Region 3 CIIT investigation conclusions are correct, prior to 6:45 p.m., radio communications between the individual defendants were delayed, poor-quality, garbled, hampered by static, and/or otherwise inadequate and unreliable for purposes of communicating during the attempt to "take" Reinoehl.

SECOND AMENDED
COMPLAINT FOR DAMAGES – 21

5.86    If the Region 3 CIIT investigation conclusions are correct, prior to 6:45 p.m. on September 3, 2020, each of the individual Defendants knew or should have known that their radio communications would be delayed, poor-quality, garbled, hampered by static, and/or otherwise inadequate for purposes of communicating during the attempt to "take" Reinoehl.

### THE SHOOTING

5.87    The sun was shining, and visibility was clear.

5.88    At approximately 6:45 p.m., Reinoehl came out of the Residence.

5.89    After some delay, Reinoehl began walking toward the Jetta carrying a standard size and shape backpack. Post-shooting, it was discovered that this backpack contained a rifle that was disassembled, incapable of firing, and entirely contained within the backpack.

5.90    Individual Defendants in the three separate vehicles began to issue rapid and contradictory directives over the Pierce County radio frequencies regarding the critical decision whether to "take" Reinoehl.

5.91    At least one officer radioed that they should not immediately contact Reinoehl and should instead wait to contact him during a traffic stop after he began driving.

5.92    At that point, the chain of command governing the individual Defendants, if there ever was any, broke down.

5.93   Without coordinating with other officers, Defendant Oleole or Merrill, neither of whom were in a supervisory or command role, made the crucial decision to move in shortly after Reinoehl reached the Jetta.

5.94   Defendant Oleole radioed: "*Let's go take him!*"; "*OK, we're moving!*"; "*Take him, take him now!*"

5.95   Defendant Merrill suddenly and rapidly accelerated the Escape down School Street SE, swerving left at the intersection of School Street and 3rd Ave. SE, charging toward the Jetta before slamming on the brakes within one foot of the Jetta's front bumper.

5.96   Within seconds of the Escape's acceleration, Defendant Gocha gunned the Traverse's engine, racing to catch up with the Escape. Instead of turning at the intersection, the Traverse cut directly across the corner, careening wildly over two grassy medians before stopping suddenly next to the Escape, facing the Jetta.

5.97   As the Escape screeched to a halt, Defendant Oleole fired six rounds through the Escape's front windshield, three of which pierced the Jetta's windscreen and driver's seat headrest.

5.98   Neither the Escape nor the Traverse had emergency lights on during this chaotic approach.

5.99   The aggressive driving and sudden shooting startled civilian onlookers. They assumed they were witnessing a road rage or gang incident.

5.100   Civilian onlookers had no idea any of the individuals or vehicles involved were associated with police until after the shooting stopped.

5.101   Defendants Oleole, Merrill, and Gocha immediately exited their vehicles and began firing automatic rifles and pistols at the Jetta and Reinoehl.

5.102   USMS employee Kimmel also exited the Traverse but (according to investigators) did not open fire. This is not known for a fact because (as addressed below) Kimmel refused to cooperate with investigators following the shooting.

5.103   From the perspective of a reasonable person in Reinoehl's shoes, the aggressive driving, sudden and unprovoked shooting, and physical appearance of the individual Defendants was indistinguishable from the armed and violent far-right extremists who Reinoehl feared had recently shot up his home (while his children were inside) and made true threats against his life.

5.104   Reinoehl ducked and ran away from the threat, alongside the Jetta and the pickup truck parked immediately behind it, trying to find cover from the unidentified gunmen.

5.105   Defendant Whitehurst drove the Charger up from behind and stopped approximately 30 feet from, and at a 45-degree angle to, the Jetta.

SECOND AMENDED
COMPLAINT FOR DAMAGES – 24

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

5.106   The Charger's emergency lights were supposedly on but could not be seen by someone sitting in the Jetta nor from Reinoehl's path of retreat (especially while trying to dodge bullets).

5.107   None of these unmarked vehicles used a siren at any point while trying to "take" Reinoehl.

5.108   After immediately exiting the Charger, Defendant Whitehurst also began shooting at Reinoehl.

5.109   No verbal warnings or commands (if any were given) could be heard over the gunfire.

5.110   Civilian witnesses who watched the shooting unfold heard no verbal warnings or commands before, or at any time during, the shooting.

5.111   The round count indicated that law enforcement had fired a total of more than forty rounds.

5.112   They sprayed these bullets through a quiet neighborhood, hitting residential buildings, vehicles, backyards, and into at least one occupied apartment.

5.113   Shrapnel or debris from one of the shots grazed a child who was playing nearby.

5.114   Throughout the shooting, Reinoehl had a small pistol in his pocket. He never removed it from his pocket, despite having ample time to do so. There

was no round in the chamber of the firearm meaning Reinoehl never racked the

pistol, despite having ample time to do so. It was still in his pocket when he was

laid out dead on the street.

    a.  Each Defendant officer was told about and/or shown the pistol in

Reinoehl's pocket prior to giving a statement to investigators.

    b.  The Defendant officers were not immediately separated from one

another after the shooting nor ordered to refrain from talking to one another about

the shooting.

    c.  None of the Defendant officers gave a statement to investigators

until at least ten days after the incident.

    d.  In their statements, the following Defendant officers reported a

belief that throughout the shooting, Reinoehl was reaching toward his waist.

        i.  Defendant Oleole claimed to have seen Reinoehl

reaching for his waist area while seated in his car, and then continuously reach

into his waistband area while running away as Oleole continued to shoot at him.

        ii.  Defendant Merrill stated that Reinoehl lunged forward

in the Jetta, raised an object in his hand that Merrill believed was a firearm, and

that Reinoehl's hands were near his waistline as he ran away.

        iii.  Defendant Gocha stated that when Reinoehl was

scrambling away from the car while being shot at by Oleole and Merrill, Reinoehl

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

was reaching down with his right hand and frantically pulling on his waistband/front right pocket area.

        iv.    No officer reported that Reinoehl shot first.

    e.  Defendants' post-shooting actions and procedures, which resulted in contamination of individual Defendant statements through direct and indirect discovery and sharing of information, is inconsistent with law enforcement standards, for obtaining reliable information.

5.115  USMS employee Kimmel still has not given a statement to investigators to this day.

5.116  The Defendants did not afford Reinoehl an opportunity to surrender.

5.117  The Defendants did not consider or comply with the standard of care for high-risk law enforcement operations.

**INJURIES**

5.118  Reinoehl was struck by at least five bullets.

5.119  Three of the five bullets caused fatal injuries.

5.120  The first fatal injury was a 9mm round that struck Reinoehl's back and passed through his chest cavity.

5.121  The second fatal injury was a 9mm round that struck the back of and passed through Reinoehl's head.

5.122   According to investigators, Defendants Gocha and Whitehurst were the only officers who fired 9mm rounds.

5.123   The third fatal injury was a .223 round that struck Reinoehl in the side and traveled through his chest cavity.

5.124   According to investigators, Defendants Merrill and Oleole were the only officers who fired .223 rounds.

5.125   Reinoehl died as a result of these injuries.

5.126   Prior to death, Reinoehl suffered extreme emotional distress and physical pain and suffering.

5.127   As a consequence of his death, Reinoehl's children, Deaven and L.L., suffered permanent and irreparable emotional injury resulting from loss of consortium with their father.

5.128   The children were also emotionally harmed by the foreseeable and highly publicized, sensational, and political nature of their father's violent death.

## VI.   CLAIMS

6.1   Plaintiff repeats and realleges the allegations contained in paragraphs 5.1-128 above as if fully stated herein for purposes of each of the claims below.

SECOND AMENDED
COMPLAINT FOR DAMAGES – 28

**COUNT ONE**
**(Federal Law claim under 42 U.S.C. § 1983)**
**(Plaintiff Estate v. Local Officer Defendants)**

6.2     The conduct of the Local Officer Defendants (Oleole, Gocha, Merrill, and Whitehurst) constitutes an unreasonable seizure of Reinoehl in violation of his rights under the Fourth Amendment to the United States Constitution.

6.3     No reasonable police officer in the Local Officer Defendants' shoes would have approached Reinoehl without a plan to arrest without injury, nor failed to identify themselves as police, nor started shooting before seeing any sign of aggression.

6.4     Their conduct occurred under color of state law.

6.5     If the Court determines that some of the individual officers who violated Reinoehl's right to be free from unreasonable seizures were federal employees under federal law, those individuals are still liable under section 1983 because there is a sufficiently close nexus between the state and the actions of those individuals such that their actions can fairly be attributed to the state in the following particulars:

a.  The claimed federal employees conspired and/or acted in concert with state and local employees:

SECOND AMENDED
COMPLAINT FOR DAMAGES – 29

i.      All of the planning for the arrest was conducted using purely state resources;

ii.     The person who ultimately decided to initiate the unlawful seizure of Reinoehl, Merrill, was a pure state actor. Merrill, in contravention of the direction to let Reinoehl drive, made the decision to speed forward and initiate the seizure. Each of the other individual defendants decided to join him rather than adhere to the directive to allow Reinoehl to drive away.

b. As alleged in paragraphs 5.51 through 5.69, the actions of the individual defendants were sufficiently intertwined with the state so as to render their conduct under color of state law.

**COUNT TWO (Alternative to Count One)**
**(Federal Law claim under *Bivens*)**
**(Plaintiff Estate v. Local Officer Defendants)**

6.6      To the extent that the Local Officer Defendants were acting under color of federal law, they are liable under this claim for violations of Reinoehl's rights under the Fourth Amendment to the United States Constitution.

**COUNT THREE**
**(State Law claim pled under Federal Tort Claims Act, 28 U.S.C. chapter 171) (Plaintiff Estate v. Defendant Government)**

6.7      The acts and omissions of the Defendant Government and of its employee Kimmel constitute the common law tort of negligence.

6.8      Defendant Government, through its employees, failed to require

adequate planning and maintain operational control of the attempt to "take" Reinoehl. This failure was a breach of the common law duty to exercise reasonable care.

6.9    Kimmel's acts and omissions occurred within the scope of his employment with Defendant Government.

6.10   Defendant Government is liable for the torts of its employees occurring within the scope of employment.

6.11   The tortious conduct here violated the USMS policy to use the minimum force necessary.

## COUNT FOUR - STATE LAW NEGLIGENCE
### (Plaintiff Estate vs. City, County, and State Defendants)

6.12   During the relevant times defendants Oleole, Gocha, Merrill, and Whitehurst were acting during the scope of their employment with Defendants County, City, and State respectively.

6.13   Defendants County, City, and State are liable for their own torts as well as the torts of their employees occurring within the scope of employment.

6.14   Law enforcement officers owe a duty of ordinary care when carrying out their official duties such as serving an arrest warrant.  Defendants failed to meet the standard of care in several ways including, but not limited to, failing to develop a plan to safely execute the arrest or failing to follow the plan, failing to

establish an adequate incident command structure, and failing to conduct the operation with adequate communications.

## COUNT FIVE
### (Alternative to Count Four)
### (State Law claim pled under Federal Tort Claims Act, 28 U.S.C. chapter 171)
### (Plaintiff Estate v. Defendant Government)

6.15   If the Court finds that Defendant County, City, and State are not liable for the torts of their employees under the facts of this case, then Defendant Government is liable for the torts of Local Officer Defendants as alleged in Count Four.

## COUNT SIX
### (State Law Battery–Wrongful Death)
### (Plaintiff Estate v. City and County Defendants)

6.16   Local Officer Defendants intentionally and unlawfully shot and killed Reinoehl.

6.17   Local Officer Defendants were acting within the scope of their official duties when they shot and killed Reinoehl.

6.18   Defendant City and County are responsible for the battery committed by their respective Local Officer Defendant employees.

6.19   Plaintiff brings this claim pursuant to RCW 4.20.010.

**COUNT SEVEN**
**(Alternative to Count Six)**
**(State Law claim pled under Federal Tort Claims Act,**
**28 U.S.C. chapter 171)**
**(Plaintiff Estate v. Defendant Government)**

6.20   If the Court find that the Local Officer Defendants were federal employees within the meaning of the Federal Tort Claims Act when they shot and killed Reinoehl, the Defendant Government is liable for the tort of battery as alleged in Count Six.

6.21   If the Local Officer Defendants were federal employees, they had a non-discretionary obligation under USMS policy to use the minimum force necessary.

6.22   As alleged above, the amount of force used was more than reasonably necessary to effect the arrest.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiff Estate seeks judgment as follows:

7.1   Compensatory damages for pre-death pain and suffering experienced by Reinoehl, for damages to the Estate, and for loss of consortium and other emotional damages suffered by its beneficiaries Deaven and L.L., as allowable by law and in amounts to be determined at trial;

7.2   Compensation for Reinoehl's loss of enjoyment of life;

SECOND AMENDED
COMPLAINT FOR DAMAGES – 33

7.3    Compensation for Reinoehl's loss of his civil right to be free from the use of excessive force by law enforcement;

7.4    Punitive and exemplary damages as allowable by law and in amounts to be determined at trial;

7.5    For an award of interest as allowable by law;

7.6    For an award of costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and as allowable by law;

7.7    For costs and disbursements as allowable by law;

7.8    For any other such and further relief as the Court deems just and proper.

DATED this 26th day of June, 2024.

SCHROETER GOLDMARK & BENDER


_s/ Rebecca J. Roe_____
REBECCA J. ROE, WSBA #7560
JEFFERY P. ROBINSON, WSBA #11950
LILY E. RAMSEYER, WSBA #57012
401 Union Street, Suite 3400
Seattle, WA  98101
Phone:  (206) 622-8000
Email: roe@sgb-law.com;
        robinson2@sgb-law.com
        ramseyer@sgb-law.com

SECOND AMENDED
COMPLAINT FOR DAMAGES – 34

1

2

MacDONALD HOAGUE & BAYLESS

3

*s/ Braden Pence*
BRADEN PENCE, WSBA #43495
705 2nd Avenue, Suite 1500
Seattle, WA 98104-1745
Phone: (206) 622-1604
Email: bradenp@mhb.com

4

5

6

7

8

LEVI MERRITHEW HORST PC

9

10

*s/ Jesse A. Merrithew*
JESSE A. MERRITHEW, WSBA #50178
610 SW Alder Street, Suite 415
Portland, OR 97205-3605
Phone: (971) 229-1241
Email: jesse@lmhlegal.com

11

12

13

14

15

Counsel for Estate of Michael F. Reinoehl

16

17

18

19

20

21

22

23

24

25

26

SECOND AMENDED
COMPLAINT FOR DAMAGES – 35