The Honorable David Estudillo

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
7                            AT TACOMA

8

9   VAN LOO FIDUCIARY SERVICES, an
    Oregon Limited Liability Corporation, as        No. 3:23-cv-05618-DGE
10  Personal Representative of the Estate of
    Michael F. Reinoehl,
11                                                   PLAINTIFF'S MOTION FOR PARTIAL
                               Plaintiff,            SUMMARY JUDGMENT
12
13        v.

14  THE UNITED STATES OF AMERICA;
    PIERCE COUNTY, a political subdivision
15  of the State of Washington; the
    MUNICIPALITY OF LAKEWOOD, a
16  municipal corporation; JAMES OLEOLE,            NOTE ON MOTION CALENDAR:
    an individual; CRAIG GOCHA, an                  JANUARY 24, 2025
17  individual; and MICHAEL MERRILL, an
    individual,                                     ORAL ARGUMENT REQUESTED
18
19                             Defendants.

20

21                       I.      INTRODUCTION

22        This case arises out of the shooting death of Michael Reinoehl by law enforcement

23  officers employed by the Pierce County Sheriff's Office and the City of Lakewood Police

24  Department. This motion, however, is about the avenue for accountability for tortious and

25  unconstitutional acts committed by state officers.

26

PLAINTIFF'S MOTION FOR                    SCHROETER GOLDMARK & BENDER
PARTIAL SUMMARY JUDGMENT - 1                401 Union Street ● Suite 3400 ● Seattle, WA 98101
(3:23-CV-05618-DGE)                          Phone (206) 622-8000 ● Fax (206) 682-2305

Task Forces organized by the United States Marshals Service ("USMS") have expansive reach. USMS task forces consist of "state and local police officers who receive special deputations with the Marshals." *See* Fugitive Apprehension Fact Sheet, Feb. 27, 2022, https://edit.usmarshals.gov/sites/default/files/media/document/2022-Fugitive-Operations.pdf (accessed 12/27/2024). The Marshals task force program is sprawling: as of 2022, state and local officers were deputized as part of fifty-six separate local task forces, as well as various ad-hoc task forces. *Id.*; *see* U.S. Marshals Service, *Fugitive Task Forces*, https://www.usmarshals.gov/what-we-do/fugitive-investigations/fugitive-task-forces (accessed 12/27/2024). In fiscal year 2021, the task forces arrested or "cleared" more than 84,000 people, including 71,224 state or local warrants, at a total rate of 337 fugitives per day. *Id.*

At the same time, the program has elicited concern and calls for oversight and investigation from elected officials, due to the lack of clear accountability for the hundreds of reported shootings by task force officers. *Federal watchdog to examine DOJ law enforcement task forces after NBC News report*, NBC News, March 27, 2024, https://www.nbcnews.com/news/us-news/federal-watchdog-examine-doj-law-enforcement-task-forces-nbc-news-repo-rcna145165 (accessed 12/27/2024). Michael Reinoehl was shot and killed in one such shooting.

Plaintiff moves for entry of summary judgment on two related but separate issues: that the Individual Defendants were acting under color of state law and that they were acting within the scope of their employment as a matter of law.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 2
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

## II.    FACTS AND BACKGROUND

The following facts are undisputed unless otherwise noted. References to Exhibits are to the Declaration of Rebecca J. Roe.

### A. Operation Background

Defendants Merrill, Gocha, and Oleole were all City or County employees at the time of the shooting. *See* Dkt. 97 (Answer of Pierce County), ¶ 5.5; Dkt. 91 (Answer of Defendant City of Lakewood), ¶ 5.5; Dkt. 96 (Answer of USA), ¶ 5.5. Defendant Merrill was a police officer employed by the Lakewood Police Department ("LPD"). Dkt. 91 (Answer of Merrill), ¶ 5.8. Defendants Oleole and Gocha were employed as Deputies at the Pierce County Sheriff's Office ("PCSO"). Dkt. 97 (Answer of Pierce County), ¶ 5.8. In these positions, Defendants Merrill, Gocha, and Oleole had authority under state law to carry out arrests in any county in the State of Washington, including arresting out-of-state fugitives. *See* **Exhibit 9,** Merrill Dep. 85:6-86:6 RCW 10.88.330; RCW 10.88.320; RCW 10.34.010. Neither Merrill, nor Oleole, nor Gocha was employed by the federal government. Dkt. 96 (Answer of USA), ¶ 5.9.

Defendants Gocha and Oleole were deputized members of a U.S. Marshals Service's Violent Offenders Task Force, while Defendant Merrill was not. *See* Dkt. 96, ¶5.58 (USA admits Merrill had no active task force deputation). Task force deputation with the U.S. Marshals service requires periodic renewal to be effective. Dkt. 96 (Answer of USA), at ¶ 5.57. Merrill's previous deputation form bears an Expiration Date of August 31, 2020, prior to the shooting. **Exhibit 1**. The "Terms of Special Deputation" for Merrill specifically provide that his "authorities terminate at the expiration of the term of the Special

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 3
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

Deputation," i.e., on August 31, 2020, prior to the shooting[1]. *Id*.; *see* **Exhibit 19** (task force officers "should be specially deputized"). Merrill entered another special deputation nearly sixth months after shooting Reinoehl, on March 4, 2021. **Exhibit 2**.

The "Terms of Special Deputation" for each deputation provides that deputation "does not constitute employment by the United States Marshals Service, the United States Department of Justice, or the United States Government." *See*, *e.g.*, **Exhibit 1**. The "Terms of Special Deputation" further provides that the deputation's "authorities terminate at the expiration of the term of the Special Deputation." *Id*. It also provides that deputation authority "extend[s] only so far as may be necessary to faithfully complete" the particular mission. *Id*. Deputation authorized task force members to "seek and execute arrest and search warrants," but does not separately authorize the use of force or deadly force beyond Defendants' state law authority. *See* **Exhibit 3** (Oleole deputation); *see also* **Exhibit 5** ("All members of the [task force] shall comply with their agencies' guidelines concerning the use of firearms, deadly force, and less-lethal devices."). Deputization does not transform task force members into federal employees. Dkt. 96 (Answer of USA), ¶ 5.59.

The PCSO and LPD had each entered a separate Memorandum of Understanding ("MOU") with the U.S. Marshals Service. LPD signed the MOU in April 2017. **Exhibits 5 and 6**. The Pierce County MOU lacks a date when it was purportedly agreed to or signed.[2] **Exhibit 5**. The MOU provides that all task force members "shall comply with their agencies'

---

[1] Defendant Merrill testified that "at the time my department was not wanting to be on the task force." **Exhibit 9**, Merrill Dep., 83:7-9. Defendant Merrill also testified that, "a supervisor had failed to, I guess redo my paperwork or renew my commission with the Marshal Service." *Id*., p. 82:6-9. Defendant Merrill testified elsewhere to the effect that he was unsure of the reason why and the exact date on which his membership expired. *Id*., 81:11-19 ("I think 2018 is when I went on the task force until 2020.").

[2] By the terms of the MOU, the MOU is "in effect once signed by a law enforcement participant agency."

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 4
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

guidelines concerning the use of firearms, deadly force and less-lethal devices." **Exhibit 5**, p. 3.

Each MOU contains an express "Release of Liability," as follows: "Each agency shall be responsible for the acts or omissions of its employees." **Exhibit 5**, p. 4; **Exhibit 6**, p. 4. The MOU separately states that "each agency retains responsibility for the conduct of its personnel." **Exhibit 5**, p. 2; **Exhibit 6**, p. 2. It is undisputed that Defendants Gocha, Oleole, and Merrill were employees of Pierce County and Lakewood respectively, and that none were employees of the federal government. *See* Dkt. 96 (Answer of USA), ¶ 5.9.

PCSO and LPD remained responsible for the core obligations of an employer to their employees. They were responsible for paying them, for authorizing all time off, for training, and for ensuring continued adherence to their policies as employers. *See* **Exhibit 11**, Gocha Dep., 35:18 (USMS did not require any additional training, either before or after the shooting of Reinoehl); **Exhibit 22**, Whitehurst Dep., 59:8-60:20 (state agency, not USMS, issues paychecks, provides ammunition, weapons, approves time off and leave requests, and reviews job performance of task force members); **Exhibit 9**, Merrill Dep., 63:1-64:2; **Exhibit 5**, p. 2-3; **Exhibit 6**, p. 2-3. Task Force Commander Craig McCluskey testified that local law enforcement officers on the task force "don't operate solely on our [USMS] authority. They are instructed from the day they're deputized that they have to operate within the scope of their position as a deputy sheriff or a police officer." **Exhibit 13**, McCluskey Dep., 46:19-47:6.

Task forces have limited authority and procedural requirements. USMS Policy Directive 8.18, Fugitive Task Forces, **Exhibit 19**, p. 3 of 4, provides that USMS districts "should operate in conjunction with the state or local authority with primary warrant

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 5
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

responsibility." USMS Operating Procedures explain caseloads should consist of certain types of crimes and that any state and local warrants must be in line with the Presidential Threat Protection Act mandate to target violent offenders. **Exhibit 20**, Standing Operating Procedures, p. 5-6. Congress passed the U.S. Pres. Threat Act with the stated purpose "to provide clearer coverage over threats against former president and members of their families and for other purposes." While section 6(a) authorizes the establishment of "permanent Fugitive Apprehension Task Forces, consisting of Federal, State and local law enforcement authorities...." It does not expand federal authority to execute state or local arrest warrants.

The USMS conducts no vetting of task force participants, other than identifying employment in good standing with a state or local law enforcement agency. **Exhibit 15**, Kimmel Dep., 133:11-134:5. Kimmel was not aware prior to Oleole and Gocha joining the task force that both officers had multiple prior fatal shooting incidents. *Id.*, 135:6-12. Kimmel (the Deputy U.S. Marshall present at the scene of the shooting) did not participate in any USMS administrative review of the shooting in this case and was unaware whether the USMS conducted any review. **Exhibit 15**, Kimmel Dep., 111:18-112:20.

**B. Operation Briefing.**

Defendants Merrill, Gocha, and Oleole were first briefed about Reinoehl on September 3, 2024, the same day as the shooting. **Exhibit 9**, Merrill Dep., 62:14-25; **Exhibit 11**, Gocha Dep. 196:11-13; **Exhibit 10**, Oleole Dep., 160:1-4. Defendants were briefed at two local law enforcement facilities, the South Hill Detachment of the Pierce County Sheriff's Office, and the Lacey Police Department. *See* **Exhibit 9**, Merrill Dep., 69:14-25; 64:6-23; **Exhibit 12**, Clarkson Dep., 113:17-25; 125:3-22. The briefing was prepared and led by Sgt. Clarkson of the Pierce County Sheriff's Department. **Exhibit 8**, p. 25; **Exhibit 12**,

Clarkson Dep., 34:16-18. Clarkson was responsible for tactical planning regardless of task force involvement, because he was the sergeant. *Id*., 34:19-35:2. Merrill arrived at South Hill midway through the briefing. **Exhibit 9**, Merrill Dep., 64:6-15.

Other state actors who were undisputedly not part of the task force were also integral to the operation. These included: Pierce County Detective Sergeant Brockway, who shared a vehicle with Sgt. Clarkson and was part of the "arrest team, " (**Exhibit 12**, Clarkson Dep., 21:22-22:7; 32:5-8); Deputy Jesse Hotz of the Pierce County Sheriff's Office, who was responsible for driving the arrest van, because Clarkson considered him to be "basically a NASCAR driver," (*id*., 21:22-22:1; 122:3-11); and K-9 officer Deputy Munson (Clarkson Dep., 30:4-10); *see also* **Exhibit 18** (Clarkson Statement), p. 1 ("It should be noted these individuals are not part of the Violent Offender Task Force….All of these individuals were past and/or present members of the Pierce County Sheriffs [sic] Department SWAT team."). Seargent Clarkson also coordinated the operation with Pierce County Bureau Chief Jim Heishman and Pierce County SWAT Commander John Delgado. *Id.*, (Clarkson Statement), p. 2; **Exhibit 12**, Clarkson Dep., 117:19-118:10.

At the time of the briefing (approximately 3:30 pm on the afternoon of September 3, 2024), no warrant existed for Reinoehl's arrest. **Exhibit 8,** p. 6; Dkt. 96 (Answer of USA), ¶ 5.35. Dkt. 94 (Answer of Oleole), ¶ 5.35; Dkt. 93 (Answer of Gocha), ¶ 5.35. An Oregon state arrest warrant for issued on September 3, 2024, the day of the shooting, at 4:52 pm, for alleged violations of Oregon Revised Statutes 163.115 and 166.220. *See* **Exhibit 7**; **Exhibit 14,** Beniga Dep., 9:22-10:3. At the time Defendants shot Reinoehl, there had been a warrant for his arrest for approximately 2 hours. **Exhibit 18**, p. 3 (Reinoehl exited the residence, and Defendants killed him, at approximately 6:51 pm).

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 7
(3:23-CV-05618-DGE)

SCHROETER  GOLDMARK  &  BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

1
2
3
4
5
6
7
8
9
10
11
12
13

The vehicle and weapons used by Defendants Merrill and Oleole were owned by local police agencies and were not federal government property. **Exhibit 9**, Merrill Dep., 63:1-23; **Exhibit 10**, Oleole Dep., 59:9-15. Defendant Gocha used a personally purchased firearm for the operation. **Exhibit 11**, Gocha Dep. 142:8-20. Merrill was armed with an AR-15 rifle. **Exhibit 9**, Merrill Dep., 31:20-23. Gocha was armed with a semiautomatic Glock 17 handgun. **Exhibit 11**, Gocha Dep., 142:5-22. Oleole also had an AR-15 issued by Pierce County. **Exhibit 10**, Oleole Dep., 63:23-25. *See also* **Exhibit 20**, USMS Standard Operating Procedures, p. 17 (task force members "shall utilize their parent agencies' authorized equipment with assigned to USMS Enforcement Operations" and parent agency responsible for repair costs and indemnity). Officers were communicating through a Pierce County radio channel with "terrible" transmission. **Exhibit 10**, Oleole Dep., 35:12-13; **Exhibit 11**, Gocha Dep., 227-30.

14
15
16
17
18
19
20
21

Defendants had no set hierarchy for the operation – rather "every officer has authority to act on his own[.]" **Exhibit 11**, Gocha Dep., 216:12-15. The United States describes the command structure as "decentralized." **Exhibit 21**, USA's Response to Plaintiff's First Interrogatories and RFPs, p. 26; *see* **Exhibit 15**, Kimmel Dep., 36:10-37:13; **Exhibit 12**, Clarkson Dep., 36:16-19. The briefing involved a "hasty plan" in case the group encountered Reinoehl during surveillance. *Id*. 111:21-112:2. Giving Reinoehl the opportunity to surrender was not part of the plan. **Exhibit 13**, McCluskey Dep., 67:4-10

22
23
24
25
26

At the briefing, Defendants were briefed that Reinoehl was located in Lacey, Washington, **Exhibit 11**, Gocha Dep., 188:24-189:3. Reinoehl was suspected by "Oregon LE detectives" in a murder that occurred in Portland, Oregon on August 29, 2024. **Exhibit 8**, p.

5. The mission objective was described as, "To serve a Nationwide Extraditable Warrant for Murder," though no warrant existed at the time of the briefing. *Id*, pp. 3, 6.

### A. Defendants Merrill, Gocha, and Oleole Shoot and Kill Reinoehl.

After briefing, Defendants proceeded from Lacey PD to the residence where they believed Reinoehl was located. **Exhibit 12**, Clarkson Dep., 12:22-13:1. Defendants Merrill, Oleole, and Gocha positioned themselves in a pair of unmarked vehicles near the intersection of 3rd Way and School St., across the street from the residence. Dkt. 96 (Answer of United States), ¶ 5.79 (admitting accuracy of incident diagram at Dkt. 89, Complaint, ¶ 5.79). Merrill was the driver of one unmarked vehicle (a Ford Escape), with Oleole as his passenger. **Exhibit 9,** Merrill Dep. 22:3-25. Gocha was the driver of the second unmarked vehicle (a Chevy Traverse), in which Kimmel was the passenger. **Exhibit 11,** Gocha Dep. 52:17-53:1. McCluskey was already at the scene conducting surveillance in an arrest van, around the corner from the incident location. **Exhibit 12,** Clarkson Dep., 13:8-14:18.

When Reinoehl walked out of the residence and towards a nearby Volkswagon Jetta, Defendants Merrill and Gocha drove toward the Jetta at a high rate of speed, "absent the go signal…." *Id*. 99:14-100:3. Prior to Oleole and Merrill engaging with Reinoehl, Clarkson (the task force commander) issued an order over the radio for the group to "let it go," "let him drive," or words to the effect that officers should not pursue Reinoehl. **Exhibit 15,** Kimmel Dep., 47:4-14. But Merrill decided to drive towards the Jetta and pin Reinoehl. **Exhibit 9,** Merrill Dep., 22:9-25. Oleole put over the radio, "Let's go take him." **Exhibit 11,** Gocha Dep., 259:18-22. Gocha drove towards the Jetta at the same time, "to match timing with Oleole and Merrill's vehicle to arrive at the same time" at Reinoehl's location. *Id*., 138:20-139:7. Gocha and Merrill "jumped the gun" rather than "waiting for the signal[.]" **Exhibit**

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 9
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

**13,** McCluskey Dep., 98:20-99:25. Merrill and Gocha drove at a speed of approximately 50 mph, crossing a grassy median at double the area's 25 mph speed limit. **Exhibit 16,** Louis Dep. 13:2-14:10; **Exhibit 17,** Lee Dep. 14:1-7.

Neither Gocha nor Merrill activated their lights or sirens. **Exhibit 11,** Gocha Dep., 97: 5-14; 241:6-21; **Exhibit 15,** Kimmel Dep., 28:13-22. Unmarked vehicles were used for the "[e]lement of surprise." **Exhibit 10,** Oleole Dep., 166:7-11.

Merrill, Oleole, and Gocha all opened fire at Reinoehl. Oleole first fired his weapon "a second" after approaching Reinoehl's Jetta. *Id*., 265:24-25. Oleloe testified, "I feel he was reach – feared he was reaching for a gun so I started shooting." *Id*., 82:7-14. Merrill fired his AR-15, "I don't recall how many times," and struck Reinoehl in his left side." **Exhibit 9,** Merrill Dep., 33:19-21. Gocha testifies he saw Reinoehl inside of the Jetta, "reaching for his hip," but he could not actually see Reinoehl's hip or hands, only "just lower than [his] chest up," because Reinoehl was seated in the vehicle when Gocha began firing at him. **Exhibit 11,** Gocha Dep., 80:13-25.

Within seconds of the surveillance team initiating contact with Reinoehl, Reinoehl was "face down on the road, and I could see was bleeding profusely." **Exhibit 12,** Clarkson Dep., 14:20-15:8. Civilian witnesses who saw the shooting were unaware any participants were police officers. **Exhibit 17,** Lee Dep., 22:23-23:3; Louis Dep. 15:7-9. Civilian witnesses heard no commands prior to Defendants Merrill, Gocha, and Oleole opening fire. **Exhibit 16,** Louis Dep., 16:3-5; **Exhibit 17,** Lee Dep., 15:9-12. They saw the two unmarked vehicles drive towards the Jetta and immediately open fire, in what they believed was a drug-related or road rage incident. **Exhibit 16,** Louis Dep., 15:16-21; **Exhibit 17**, Lee Dep., 12:20-13:8.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 10
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

1
2
3
4

A criminal investigation of the shooting was conducted by the Thurston County Sheriff's Office. **Exhibit 13,** McCluskey Dep., 84:24-85:10. Federal employees were not required to provide a statement for the investigation. **Exhibit 15,** Kimmel Dep., 110:18-111:17

5
6
7
8
9
10

The City of Lakewood investigated Merrill's conduct for compliance with Lakewood's policy, **Exhibit 24** (Lakewood PD investigation report)**,** and Pierce County investigated Oleole and Gocha's conduct for compliance with Pierce County's policy. *See* **Exhibit 11,** Gocha Dep., at 164:2-165:3. The DOJ prepared a cursory incident report which did not assess any officer's compliance with law or policy. **Exhibit 23,** DOJ Incident Report.

11

### III.    LEGAL AUTHORITY AND DISCUSSION

12

**A. Individual Defendants Acted Under Color of State Law**

13

**1.   State Action Under Section 1983 is Broadly Defined**

14
15
16
17

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injury in an action at law[.]

18

42 U.S.C. § 1983.

19
20
21
22
23
24
25
26

Whether particular conduct is actionable under § 1983 is a question of statutory interpretation. While often referred to simply as "color of state law," the operative language of § 1983 is far broader.  "Every person" operating "under color of *any* statute, ordinance, regulation … *or* usage, of any State" who deprives a person of a constitutional right "shall be liable[.]" *Id.* (emphasis added). This broad language is consistent with Congress's intent to broadly prohibit violations of individual's constitutional rights. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). The Ninth Circuit and the Supreme Court have both recognized the statute's

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 11
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

broad reach. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982); *Pistor v. Garcia*, 791 F.3d 1104, 1114 (9th Cir. 2015).

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "State employment is generally sufficient to render the defendant a state actor." *Id.* (quoting *Lugar*, 457 U.S. 922). Even when a state employee purports to exercise state authority unlawfully and outside of work hours, he still acts under color of state law. *Anderson v. Warner*, 451 F.3d 1053, 1068 (9th Cir. 2006) (police officer involved in private assault liable under § 1983 when he told bystanders to get back because he was a "cop").

Whether a person acts under color of state law is not subject to any "rigid formula," but rather asks whether state involvement is "significant." *Ouzts v. Md. Nat'l Ins. Co.,* 505 F.2d 547, 550 (9th Cir. 1974). In other words, it is not required that there be *no* federal or private involvement in the challenged action, nor is the question whether the federal or private involvement is *more* than the state involvement. *See Thai v. Saul*, 804 Fed. App'x 485, 488 (9th Cir. 2020) (unpublished) (district attorneys assigned to work with federal agents may have acted under color of state law) (quoting *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("holding that 'anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983")).

Consistent with Congress's intent, liability under § 1983 is available whenever state involvement in a constitutional deprivation is significant. *See Outz*, 505 F.2d at 550. This is true whether the wrongdoer was a state employee acting as part of their state duties, *Monroe*

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 12
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

*v. Pape*, 365 U.S. 167, 172 (1961); a state employee acting outside of their duties, *Anderson*, 451 F.3d at 1068; a tribal officer enforcing state law, *Pistor*, 791 F.3d at 1115; a private party performing a traditional state function, *Lee v. Katz*, 276 F.3d 550, 557 (9th Cir. 2002); a private party conspiring with state actors, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); or a federal official conspiring with state actors, *Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995). In all cases, "it is a process of 'sifting facts and weighing circumstances' which must lead us to a correct determination." *Ouzts*, 505 F.2d at 550 (quoting *Reitman v. Mulkey*, 387 U.S. 369, 378 (1968)).

As discussed in more detail in the sections below, the facts in this case demonstrate state action. The three individual Defendants, Oleole, Gocha, and Merrill, are local government employees who acted while fulfilling their duties to their local government employers. They took action to execute a state arrest warrant; action they could take only because of the authority granted to them by the state of Washington. In executing that warrant, their authority to use force was granted only by their status as Washington certified peace officers, their training on the reasonable use of force was provided by state and local authorities, and they were required to abide by their local agencies' policies. Despite the (minimal) federal involvement in this case, the state and local involvement in the deprivation of Reineohl's Constitutional rights was significant, leading to liability under § 1983.

The Defendants will undoubtedly provide a string cite of out of circuit and district court opinions summarily finding that local officers working with a federal task force are federal, not state actors. *See e.g.*, Dkt. 44 at 12 (citing cases including *Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022)). Although none of those opinions are binding on this Court and all are factually distinguishable, understanding the historical context in which many of these

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 13
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

cases arose is important. In most of these cases, the courts were simply deciding which body of law the case was going to proceed under: *Bivens* or § 1983. When it was widely believed that *Bivens* was simply the federal common law analogue of § 1983, this decision was of little consequence. It was only two years ago that the Supreme Court dramatically narrowed our understanding of the availability of a remedy for people harmed by federal actors. *See Egbert v. Boule*, 596 U.S. 482 (2022). Now, for the vast majority of constitutional violations committed by federal actors, there is no alternative cause of action. This understanding, along with an understanding of how much the use of federal task forces has expanded, requires courts to carefully analyze the color of law question to ensure accountability where a state or local government has indeed exercised some significant level of involvement in the federal task force.

With this understanding in mind, it is imperative that this Court follow the Ninth Circuit's directive to carefully sift the facts and weigh the circumstances of the conduct in this case to determine whether there was some significant state or local involvement in the conduct at issue. *Ouzts*, 505 F.2d at 550. The state and local involvement in the conduct is overwhelming.

### 2. Oregon Arrest Warrant; Washington Authority to Execute; No Federal Authority

That Defendants were enforcing a state warrant is alone dispositive.

The Ninth Circuit has repeatedly addressed a related issue in the context of bail bondsmen. *See e.g.*, *Ouzts,* 505 F.2d 547; *Gregg v. Ham*, 678 F.3d 333 (2012). California robustly regulates the authority of bail bondsmen to make arrests in California. *Ouzts*, 505 F.2d at 551-52. While bail bondsmen are private parties, they act under color of state law and can be held liable under § 1983 when they act pursuant to state regulations and with the

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 14
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

involvement of the California courts. *Id.* at 553. On the other hand, when they act solely pursuant to their contracts with the sureties without following California law, they act as purely private actors. *Id.* Courts also consistently recognize this principle with regard to tribal officers, finding that they act under color of state law when acting pursuant to a city ordinance or state law. *Evans v. McKay*, 869 F.2d 1341, 1348 (9th Cir. 1989) (officers acting pursuant to both tribal and city authority subject to § 1983); *Bressi v. Ford*, 575 F.3d 891, 897 (9th Cir. 2009). When authority to act comes from the state, an officer acts "under color of state law." *See id.*

State law, in the form of state arrest warrants and state statutes, vested the only authority Defendants had to arrest Reinoehl. RCW 10.31.100 (probable cause arrest); RCW 10.93.070 (General authority peace officer – Powers of, circumstances); RCW 10.88 (Uniform Criminal Extradition Act). The Uniform Criminal Extradition Act has been adopted by every state in the country. It is one of several uniform statutes that provide for cooperation among the states in the enforcement of each state's criminal laws without the involvement of the federal government. The Act allows any Washington peace officer to arrest a subject in Washington "upon reasonable information that the accused stands charged [with a felony in another state]." RCW 10.88.330. It provides procedures to protect the person's due process rights within the state of Washington, and to surrender the person to the accusing state to face charges there. *See* RCW 10.88.290 *et. seq.*

Likewise, Washington law, not federal law, authorized these police officers to make the arrest outside of their agencies' jurisdictions. Even though the Defendants were not within their jurisdictions, the Washington Mutual Aid Peace Officer Powers Act gave them authority to make the arrest. RCW 10.93.001, .070. And their "certificate of basic law

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 15
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

1
2
3
4

enforcement training," issued by the "Washington state criminal justice training commission," makes them eligible to use this power under Washington law. RCW 10.93.070. Of critical importance, Washington law authorized these Defendants to use reasonable force in making the arrest. *See* RCW 10.31.050 (repealed 2021).

5
6
7
8
9
10
11
12

A state court judge in Multnomah County signed a state warrant authorizing Reineohl's arrest for violation of Oregon State statutes. **Exhibit 7**. Without that state warrant, no one possessed the authority to arrest Reineohl. The authority to arrest Reineohl was entirely provided by state law: Oregon law ordering his arrest, and Washington law authorizing the execution of the Oregon warrant in Washington. The authority to use force in making the arrest – the abuse of which is the specific conduct alleged in this case – was likewise provided only by Washington law.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

Federal law did not provide Individual Defendants with the authority to make this arrest. Chapter 49 of Title 18 of the Federal Criminal Code provides the foundation under federal law to arrest and detain "fugitives" from state justice. Under 18 U.S.C. § 1073, when a person flees one state to avoid prosecution in another, the United States Attorney's Office can issue a federal complaint and obtain a federal warrant for the arrest of the fugitive. *See* U.S. Dept. of Justice Manual, 9-69.420. These warrants, known as UFAP warrants (Unlawful Flight to Avoid Prosecution), provide for federal authority to arrest a suspect wanted on state charges. No such warrant was issued in this case. 28 U.S.C. § 564 authorizes U.S. Marshals and Deputy U.S. Marshals authority to exercise the powers of a sheriff while executing the laws of the United States, but it does not alter the authority already vested by state law to "Special Deputy United States Marshals" Oleole and Gocha (and certainly not Officer Merrill) to make arrests.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 16
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

The Special Deputy Appointment forms limit task force authority "to seek and execute arrest warrants supporting a federal TF under Title 18 Authority." **Exhibits 1-4.** When executing UFAP warrants for fugitive felons, task force officers have stronger arguments that they are acting under federal authority. While investigating and apprehending fugitives wanted under state and local warrants, USMS Policy on Fugitive Task Forces, U.S. Marshals and Deputy U.S. Marshals includes limitations on task force authority to work on state and local issues. *See* **Exhibit 19**, p. 2-3.

Here, Reinoehl was not a "fugitive." There was no Title 18 warrant for his arrest. In fact, his warrant was not signed until 4:52 PM, **Exhibit 7**, well after the task force operation began.

Lack of federal authority differentiates this case from *Yassin v. Weyker*, in which Eighth Circuit considered a case where "[s]tate law had nothing to do with 'the nature and circumstances' of [the defendant's] conduct." 39 F.4th 1086, 1090 (8th Cir. 2022). Though also challenging a deputized task force officer's conduct, the defendant, Weyker, was a police officer in St. Paul, Minnesota, working with a U.S. Marshals task force in Tennessee on a federal sex trafficking investigation when a federal witness contacted her and falsely claimed that the plaintiff, Yassin, had started a fight. 39 F.4th at 1088. Weyker then gave false information about Yassin in an affidavit supporting federal criminal charges against her for witness retaliation. *Id.*

In contrast to *Yassin*, federal law has nothing to do with the nature and circumstances of the operation to arrest Reinoehl. The sole purpose of the operation was to arrest Reinoehl so that he could be returned to Oregon to face charges in state court. There were no federal charges, no federal prosecutor, and no federal authority to arrest him or use force against

him. The federal government's involvement was essentially one of facilitator—bringing the state actors together so they could better serve their state purpose. The limited federal role in this operation did not eliminate the significant state role, making the conduct actionable under § 1983.

### 3.   The Operation Was Inextricably Entwined With State Actors

State action was pervasive throughout the operation to arrest Mr. Reinoehl such that even federal actors would be liable under § 1983.

Acts by non-state, including federal, actors are attributable to the state where "close nexus between the State and the challenged action[.]" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *Cabrera v. Martin*, 973 F.2d 735 (9th Cir. 1992). "What is fairly attributable as state action is a matter of normative judgment, and the criteria lack rigid simplicity" *Brentwood,* 531 U.S. at 295. Courts use four "tests" to help guide their analysis: (1) the public function test, (2) the state compulsion test, (3) the nexus test, and (4) the joint action test. *O'Handley v. Weber*, 62 F.4th 1145, 1157-58 (9th Cir. 2023) (citing *Lugar*, 457 U.S. at 937). Regardless of which "test" is at issue, the north star remains whether the state or state actors can fairly be said to have been responsible for the conduct. *See id.*; *see also State v. Brown*, 132 Wn.2d 529, 587 (1997) (discussing federal actors acting under color of state law within the "silver platter" evidentiary doctrine).

Principles behind three of the four tests, public function, nexus, and joint action, are at issue here. Under the joint action test, a non-state actor who acts "in concert" or as a "willful participant" with the state or state actors is liable under section 1983. *O'Handley*, 62 F.4th at 1157-58; *Lugar*, 457 U.S. at 941 (quoting *Price*, 383 U.S. at 794). Courts look to

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 18
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

whether there was cooperation and interdependence such that the state was a joint participant. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). For example, private casino security guards trained by local police and authorized by local law enforcement to issue citations act in joint action. *Id.*

Closely related, the nexus test looks for "pervasive entwinement" in the composition and workings between state and non-state actors. *See O'Handley*, 62 F.4th at 1157-58. Relevant factors include whether there is participation by state officials, who has decision making authority, the funding sources, and whether the function is traditionally of the state. *See id.*; *see Brentwood*, 531 U.S. at 932 (nominally private athletic association whose membership included state officials "state actor"). Under the public functions test, non-state actors become agencies or instrumentalities of the State when "endowed by the State with powers or functions governmental in nature." *Evans v. Newton*, 382 U.S. 296, 299 (1966). Examples of formally non-state actors acting under color of state law include company towns regulating free speech, private actors operating elective process, and park management with government involvement. *Id.* at 299-302.

The operation to arrest Mr. Reinoehl depended on and was entwined with state action. Beyond depending on a state warrant and state authority to effectuate the arrest, the operation relied on state equipment and state employees who were governed by state policies. **Exhibit 9**, Merrill Dep., 63:1-23; **Exhibit 10**, Oleole Dep., 59:9-15. Defendants were equipped with radios issued by their respective departments and (attempted) communication through a Pierce County law enforcement channel. **Exhibit 10**, Oleole Dep., 35:1-13; 37-38; **Exhibit 11**, Gocha Dep., 227-30. PCSO and LPD paid Defendants' salaries (save a limited overtime exception). Dkt. 96, p. 5; **Exhibit 5** at 2. The Task Force coordinated with Pierce County

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 19
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

Bureau Chief Heishman and Pierce County SWAT Commander Delgado, and Pierce County officers Brockway, Hotz, and Munson participated in the operation. **Exhibit 18**, p. 1; **Exhibit 12**. Officer Merrill, who was not an active special deputy, Dkt. 96, p. 5, worked for the Lakewood PD and drove a car owned by Lakewood PD, **Exhibit 9**, Merrill Dep., 63:1-8. Merrill drove Oleole, and together they led the charge. *Id.*, 22:9-25. Oleole was the first to open fire, and both used weapons provided to them by their local police agencies. **Exhibit 10**, Oleole Dep., 166:7-11.

The MOUs describe task force operations as "joint law enforcement operations" in which "each agency retains responsibility for the conduct of its personnel," **Exhibit 5**, p. 1-2; **Exhibit 6**, p. 1-2. They state that task force members "shall comply with their agencies' guidelines concerning the use of firearms, deadly force, and less-than-lethal devices." **Exhibit 5**, p. 3; **Exhibit 6**, p. 3. The MOUs even include a "Release of Liability" section, explaining that "each agency," meaning the state and local agencies that employ the task force officers, "shall be responsible for the acts or omissions of its employees." **Exhibit 5**, p. 4; **Exhibit 5**, p. 4.

States traditionally control all matters related to the administration of their criminal justice system. Reflecting reverence for state control over state matters, task forces targeting state or local fugitive task forces "should operate in conjunction with the state or local authority with primary warrant responsibility." **Exhibit 18** (USMS Policy Directive 8.18, *Fugitive Task Forces*), p. 3.

Officer Merrill operating without an active deputation form demonstrates the vanishingly thin façade the United States seek to use to discount state action in this operation. The United States does not represent Officer Merrill and did not move as part its motion to

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 20
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

dismiss to have him considered a federal actor. Dkt. 44. The only difference being the date on his deputation form. He acted under color of state law as did Officers Gocha and Oleole. A piece of paper does not and cannot disclaim liability under § 1983. body like the USMS and avoid accountability under § 1983.

Together, these facts prove that the state and local involvement in the use of force against Reineohl was significant. Without the authority provided by the state of Washington and their local agencies, these Defendants could not have could not have attempted to arrest Reineohl or used force against him. Indeed, it is questionable whether a USMS deputy, acting alone, would have the legal authority to arrest Reineohl without first seeking a UFAP warrant. After sifting through the facts and weighing the circumstances of the conduct in this case, there is no other plausible conclusion but that state action was significant. Therefore, the Defendants acted under color of state law.

**B. Merrill, Oleole, And Gocha Were Acting Within The Course And Scope Of Their Employment When They Shot and Killed Reineohl.**

Many facts relevant to the question of "color of state law" for liability under § 1983 are also relevant to the question of the liability for public agencies under state tort law. State law provides liability for state and local actors when acting within the scope of their employment. Whether Pierce County and the City of Lakewood are liable for the acts of their employees depends on a simple question: Were Merrill, Oleole, and Gocha acting within the course and scope of their employment when they shot and killed Reineohl? They were. [3]

---

[3] In this motion Plaintiff only moves for partial summary judgment on the issue of whether Defendants Pierce County and the City of Lakewood may be liable for the acts of their employees because their employees were acting within the scope of their employment.

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

There are two possible sources of state law for resolving this question: Washington common law and the Washington Mutual Aid Peace Officers Powers Act. Under either source, the answer is the same—the local agencies are responsible for the torts alleged in Counts Four and Six.

### 1. Washington Common Law

If Merrill, Oleole, and Gocha were acting within the course and scope of their employment when they shot and killed Reineohl, then their employers are liable for their tortious conduct. RCW 4.92.090; *Rahman v. State of Washington*, 246 P.3d 182, 188 (2011). Pierce County and the City of Lakewood both admit that the Individual Defendants were their employees at the time of the shooting. Dkts. 91, 97. Under Washington common law, the only avenue for Pierce County and the City of Lakewood to escape liability for the conduct of their employees is to show the employees were "borrowed servants," acting under the "exclusive control" of the United States Marshals Service. *Wilcox v. Basehore*, 187 Wn. 2d 772, 389 P.3d 531, 539 (2017). Here, the uncontested facts show that Pierce County and the City of Lakewood retained at least some control over the conduct of their employees. Therefore, Plaintiff is entitled to summary judgment on this issue. *See Pichler v. Pac. Mech. Constructors*, 1 Wn. App. 447, 450, 462 P.2d 960 (1969).

The first aspect of control that the local agencies retained over their employees is dispositive. The Defendants remained subject to their local agency employer's use of force policies. Pierce County and the City of Lakewood continued to control their employees' permissible uses of force, and use of force is the specific conduct at issue in Count Six of this lawsuit. The local agencies cannot disclaim vicariously liable for conduct that they retained authority to control. They trained their employees on their policies for use of force, and the

employees remained subject to those use of force policies while working with the task force. Indeed, the local agencies each investigated the use of force against Reineohl for compliance with their policies, not any policy of the USMS.

In addition to retaining control over their employees' permissible uses of force, the local agencies retained control over their employees in myriad more general ways:

1. The local agencies controlled their employee's time off. If an employee was sick, needed vacation, or had to take over leave, this remained entirely within the control of the local agencies.

2. The local agencies controlled their employee's pay. Dkt. 96, p. 5; **Exhibit 5**, p. 2. While there was a bureaucratic process for the USMS to reimburse the local agencies for overtime worked by the Defendants on specific projects, the local agencies controlled in the first instance everything about their employees' pay. And the local agencies remained financially responsible for all regular hours pay regardless of what projects the employee was working on.

3. In addition to the use of force policies, the local agencies remained generally responsible for controlling the conduct of their employees. *See* **Exhibits 5** and **6** at 2

4. ("Furthermore, each agency retains responsibility for the conduct of its personnel."); **Exhibit 20** at 5.

Each of these aspects of retained control is an independent reason for finding that the borrowed servant defense does not apply, because each of these uncontested facts defeats the claim that the employees were under the "exclusive control" of the USMS.

The legal question at issue is whether the USMS had exclusive control over the Defendants at the time they shot and killed Reineohl. The uncontested facts show that, even

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 23
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

in the light most favorable to Pierce County and the City of Lakewood, those entities retained some control over their employees. Therefore, the employees were not under the exclusive control of the USMS and the local entities are responsible under Washington law for the torts of their employees.

2. **Washington Mutual Aid Peace Officers Powers Act**

In the case of police officer employees, Washington common law may have been supplanted by statute, making the resolution of this issue even simpler. Under RCW 10.93.040, "Any liability or claim of liability which arises out of the exercise or alleged exercise of authority by an officer acting within the course and scope of the officer's duties as a peace officer under this chapter is the responsibility of the primary commissioning agency unless the officer acts under the direction and control of another agency or unless the liability is otherwise allocated under a written agreement between the primary commissioning agency and another agency." **Exhibits 5** and **6**, p. 4.

This provision gives the MOU between the USMS and the local agencies the force of law. The MOU is a written agreement between the two entities that allocates liability. Its allocation of liability is clear.

**RELEASE OF LIABILITY:**

Each agency shall be responsible for the acts or omissions of its employees. Participating agencies or their employees shall not be considered as the agents of any other participating agency. Nothing herein waives or limits sovereign immunity under federal or state statutory or constitutional law.

Under the statute, the MOU is a "written agreement between the primary commissioning agency and another agency" that allocates liability for the conduct of police

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 24
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

officers engaged in inter-agency police actions. The statute effectively elevates these agreements to have the force of law under Washington tort law. Under the agreement, Pierce County and the City of Lakewood clearly retain liability for the conduct of their employees.

## IV.    CONCLUSION

Color of law is rooted in authority. *Yassin*, 39 F.4th 1086, *cert. denied* 143 S.Ct. 779 (2023). It is not rooted in a piece of paper. Defendants' actions here were made pursuant to their authority under state law. They could have conducted an operation to arrest Michael Reinoehl without any USMS involvement. The minimal federal participation in this overwhelmingly state operation cannot now be used as a shield against accountability for state actions.

DATED this 27th day of December, 2024.

SCHROETER GOLDMARK & BENDER

*/s/ Rebecca J. Roe*
REBECCA J. ROE, WSBA #7560
JEFFERY P. ROBINSON, WSBA #11950
LILY E. RAMSEYER, WSBA #57012
Counsel for Plaintiff
SCHROETER GOLDMARK & BENDER
401 Union Street, Suite 3400
Seattle, WA  98101
Phone:  (206) 622-8000
Fax:  (206) 682-2305
Email: roe@sgb-law.com; ramseyer@sgb-law.com;
        jeff@thewhoweareproject.org

LEVI MERRITHEW HORST PC

Jesse Merrithew, WSBA #50178
610 SW Alder Street, Suite 415
Portland, OR 97205-3605
Phone: (971) 229-1241
jesse@lmhlegal.com

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 25
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

MACDONALD HOAGUE & BAYLESS

Braden Pence, WSBA #43495
705 2nd Avenue, Suite 1500
Seattle, WA 98104-1745
Phone: (206) 622-1604
bradenp@mhb.com

***Counsel for Estate of Michael F. Reinoehl***

*I certify that this memorandum contains 7,087 words, in compliance with the Local Civil Rules.*

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT - 26
(3:23-CV-05618-DGE)

SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305