UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CINDY VAN LOO,<br><br>            Plaintiff,<br>    v.<br><br>UNITED STATES OF AMERICA et al.,<br><br>            Defendant. | CASE NO. 3:23-cv-05618-DGE<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) |

## I    INTRODUCTION

Before the Court is the Federal Defendants' motion to exclude Plaintiff's experts Joel Newman, Kenton Wong, and Russell Hicks (Dkt. No. 120) and Plaintiff's motion to exclude Defendants' expert Paul Massock (Dkt. No. 122.)  The Court GRANTS the motions in part and DENIES in part.

## II    BACKGROUND

This case concerns the shooting death of Michael Reinoehl by a United States Marshals Service ("USMS") task force.  (Dkt. No. 89 at 3.)  At issue is the testimony of the experts named

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 1

above, and the admissibility of a 3D visualization of the scene of the shooting. Wong is a forensic scientist and licensed crime scene investigator. (Dkt. No. 140 at 2.) Newman holds bachelor's and master's degrees in art and has six years of experience designing 3D visualizations of crime scenes; he works at a design firm called Fat Pencil Studio. (*Id.* at 3; Dkt. No. 144-1 at 2.) Wong and Newman were involved in creation of the 3D model—though the extent of their respective contributions is disputed. Defendants argue that Wong does not offer an opinion based on independent analysis and that he did not contribute his forensic expertise to the 3D model's creation. (*See* Dkt. No. 120 at 9–12.) Likewise, Defendants argue that Newman does not independently possess the qualifications to create a crime scene reconstruction, and that he employed guesswork in positioning figures in the model. (*Id.* at 7–9.) Hicks is a law enforcement practices expert, but Defendants argue that his experience is limited to local policing and that he is not qualified to opine on or did not consider relevant USMS practices. (*Id.* at 12–14.)

      Plaintiff argues that the 3D visualization is admissible as either substantive or demonstrative evidence, that Wong and Newman used reliable methods, and that it is improper to view their qualifications independently when they worked collaboratively. (Dkt. No. 140 at 6–11.) As to Hicks, Plaintiff argues that he did not fail to consider any pertinent evidence, that he does possess experience with federal task forces, and that the specific jurisdictions Hicks worked in are not relevant to his qualifications. (*Id.* at 11–13.) Further, Plaintiff notes that Defendants were bound by local use of force policies while serving as members of the federal task force, so testimony as to local use of force policies is relevant. (*Id.* at 13–14.)

      Plaintiff seeks to exclude Massock on the basis that he offers only one opinion, which is that the use of force by the Defendant officers was reasonable, which is a conclusion that only

the trier of fact may decide.  (*See* Dkt. No. 122.)  Defendants argue that Massock's opinions are not limited to reasonableness and are not legal conclusions, but ask that if the Court were to exclude his opinion on reasonableness that his testimony otherwise be allowed.  (*See* Dkt. No. 135 at 7–10 & n.3.)

### III     DISCUSSION

**A.  Legal Standard**

1.  <u>Expert Testimony</u>

Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Under Rule 702, the proponent must show it is "more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The first prong of Rule 702 "goes primarily to relevance." *Daubert*, 509 U.S. at 591.  Additionally, *Daubert* provides a non-exhaustive list of factors for trial courts to consider, including 1) whether the expert's technique or methodology is testable, 2) whether it has been subject to peer review, 3) "known or potential rate of error," 4) "existence and maintenance of standards controlling the technique's operation," and 5) "general acceptance." *Id.* at 593–594.

In this inquiry, the Court's role is to act as a gatekeeper and "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "The test for reliability, however, 'is not the correctness of the expert's conclusions but the soundness of his methodology.' And, reliable testimony must nevertheless be helpful." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir.1995)) (internal citation omitted). The Ninth Circuit has cautioned district courts against weighing expert "conclusions or assum[ing] a factfinding role." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022). The Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–970 (9th Cir. 2013). To determine the helpfulness of an expert's testimony, courts evaluate whether the testimony makes a fact of consequence more or less probable. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002); *Daubert*, 509 U.S. at 591.

    2. <u>Demonstrative Evidence and Visual Aids: Definition and Admissibility</u>

Plaintiff argues in the alternative that the 3D model may be offered as "demonstrative evidence." (Dkt. No. 140 at 6.) There is not a single agreed upon definition of the term "demonstrative evidence," but the Court understands its meaning here to be "an object or document that could be displayed to the jurors to help them understand the substantive evidence (testimony or other objects or documents) by interpreting, summarizing, or explaining it, but that would not be available during deliberations." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 706 (7th Cir. 2013). Demonstrative exhibits need not be admitted into evidence, but a jury may not have access to them during deliberations. *Id.* at 708; *see also United States v. Cox*,

633 F.2d 871, 874 (9th Cir. 1980).  Commentary to the Federal Rules of Evidence takes a generally favorable view of visual aids, while also urging some caution:

> In order to explain or prove how a disputed event occurred, a party may find it helpful to demonstrate the event in court, or to provide a videotaped or even a computerized recreation of the disputed event. Such demonstrative evidence is regulated by the trial court under Rule 403. Obviously, a demonstration can never fully and accurately recreate a real-life event, and so there will be questions of probative value, jury confusion and prejudice; the degree to which the demonstration comes close to recreating a real-life event is crucial in determining admissibility. Trial courts have often exercised their discretion to admit demonstrations when relevant, so long as they do not create a serious misimpression as to how an event might have occurred.

1 Federal Rules of Evidence Manual § 403.02[11] (2024) (footnotes omitted).

In the Ninth Circuit, "the admissibility of demonstrative evidence in particular is 'largely within the discretion of the trial judge.'" *United States v. Walema*, 194 F.3d 1319 (Table) (9th Cir. 1999).  But that discretion is not unbounded.  The proponent must "lay a foundation of fairness and accuracy for the admission of the demonstrative aid." *Id.*  Generally, "[c]omputer animations . . . are allowed in the Ninth Circuit." *Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1271 (D. Ariz. 2020).  "At a minimum, the animation's proponent must show the computer simulation fairly and accurately depicts what it represents, whether the computer expert who prepared it or some other witness who is qualified to so testify, and the opposing party must be afforded an opportunity for cross-examination." *Id.* (quoting *Friend v. Time Mfg. Co.*, No. 03-343-TUC-CKJ, 2006 WL 2135807, at *7 (D. Ariz. July 28, 2006)).  "The standard for admission of computer animations is the same as for demonstrative evidence." *Id.*

As of 2024, these principles have been codified into the Federal Rules of Evidence with the addition of Rule 107.  This new rule provides, in relevant part:

> **(a) Permitted Uses.** The court may allow a party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time.

> **(b) Use in Jury Deliberations.** An illustrative aid is not evidence and must not be provided to the jury during deliberations unless:
>
>     **(1)** all parties consent; or
>
>     **(2)** the court, for good cause, orders otherwise.

Fed. R. Evid. 107. The Ninth Circuit has recognized that "demonstrative aid" and "illustrative aid" are equivalent terms and the "new Rule 107(a) and Rule 403 adopt substantially similar standards." *United States v. Patterson*, No. 23-631, 2024 WL 5252239, at *1 n.1 (9th Cir. Dec. 31, 2024).

As is true here, it may be disputed whether a visual aid is substantive evidence or demonstrative in nature. In such a case, other courts have looked to whether the proffered expert developed their opinion in reliance on the model, or vice versa:

> If his expert opinions developed first, informed by an independent review of the evidence and his knowledge and experience, then the animations may properly be considered demonstrative aids and may be shown at the Court's discretion. But if the animations came first, and [the animator's] opinions are informed by the results of the software he used, then they are substantive simulations and are subject to the requirements of Rule 702.

*Johnson v. Bonner Cnty.*, No. 2:18-CV-00244-DCN, 2023 WL 5045270, at *12 (D. Idaho Aug. 7, 2023), *reconsideration denied*, No. 3:18-CV-00244-DCN, 2023 WL 6690507 (D. Idaho Oct. 11, 2023) (internal citations omitted).

**B. Analysis**

    1. <u>Wong, Newman, and the 3D Model</u>

The Court starts its analysis with a discussion of how the 3D model at issue was made, because much of the Parties' arguments about expert testimony hinges on the reliability of the model. In his report, Newman states that to build the model he and his team used laser scans of the shooting scene performed by law enforcement, photos of the scene, and aerial photographs.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 6

(Dkt. No. 121-1 at 3.)  He placed figures in the model representing Officers Oleole, Merrill, Gocha, Kimmel, Whitehurst, and the decedent, Reinoehl.  (*Id.* at 4.)  Each figure was adjusted to match the height of the person depicted, and the positions they were placed in were designed to match descriptions from the officers' deposition interviews.  (*Id.*)  Dimensions of objects rendered from aerial or ground photos are accurate within a margin of error of one foot, but objects rendered from laser scans are accurate within a margin of one inch.  (*Id.*)

The record shows that Newman created the model with very little input from Wong.  Newman stated that Wong attended "one of the meetings that I took with the attorneys on the case, maybe two.  But, otherwise, he tends to do his own work.  We don't work closely together."  (Dkt. No. 121-2 at 5.)  When asked if Wong provided "any input in how you created the 3D model?" Newman answered simply, "No."  (*Id.*)  When asked if Wong provided "any data or forensic analysis," Newman again answered "No."  Wong largely corroborated the premise that Newman worked independently.  Wong stated that he provided Newman with information about bullet trajectories and explained the margin of error in the trajectory analysis from the Washington State Police Crime Lab, which Newman incorporated.  (Dkt. No. 121-4 at 12–13.)  Wong also provided Newman with information about the potential radius of collateral damage.  (*Id.* at 12.)  Aside from these two issues, Wong stated that he did not provide Newman with any other information.  (*See id.*)  When asked if he had any "insight" into how Newman created the model or what "information sources" Newman used, Wong said "No."  (*Id.*)  Asked if he "review[ed] the entire model" once it was done, Wong said "I don't understand all of it," but he did review "what Mr. Newman had provided" and saw that the cabin of Reinoehl's car was the same in the model and that Mr. Reinoehl's height had been "plugged in."  (*Id.* at 13.)  Wong did not review data before Newman inputted it and did not verify its accuracy.  (*Id.*)

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 7

Wong explained, "[w]hat Fat Pencil Studios does and what my forensic analysis involves, we -- we work independently." (*Id.; see also id.* at 14.)  Wong did not check the laser scene scans and the model against one another, and when asked "[w]ouldn't it have been a good thing to double check that the data was the same in both?" Wong replied, "Mr. Newman at Fat Pencil Studios does his work independently and provides the data points for importing into the 3D model that I trust." (*Id.* at 14.)  Wong stated that he does not double check Newman's work because "I wouldn't even be able to make heads or tails of what he's doing. So it -- it would -- it wouldn't provide anything." (*Id.* at 15.)  From these exchanges, it is clear that Wong's involvement in creation of the model was minimal at best.

Given that Wong and Newman worked independently, the Court must analyze their testimony independently.  Plaintiff suggests that the contributions of these two experts should be evaluated together because "[e]ach may contribute his or her own complimentary skill, and there is no fault in the one to lack the acumen required of the other." (Dkt. No. 140 at 10.)  Plaintiff chides Defendants for failing to identify any "authority suggesting that a forensic scientist and a 3D animator cannot collaborate on a crime scene reconstruction, or even generally suggesting that two experts with complimentary skill sets cannot rely on each other's opinions." (*Id.*)  While the Court agrees with Plaintiff in principle that two experts from different disciplines can work collaboratively to create a report (or in this case, a model) that reflects both of their skillsets, that is not what happened here.  Newman, the illustrator, created the model, and Wong, the forensic scientist, did not meaningfully contribute.

For that reason, the Court agrees with Defendants that Wong cannot offer opinions based solely on the 3D model.  Wong's report reaches the conclusion that:

> neither the driver of the Ford Escape (Officer Merrill) nor the passenger (Deputy Oleole) could see below Mr. Reineohl's shoulder level as he sat in the driver's seat of his VW

Jetta Wagon. This is due to the relative heights of the participants and the physical layout of the involved vehicles.

(Dkt. No. 121-3 at 14.) Wong stated in his deposition that this opinion was formed based on review of the 3D model. (Dkt. No. 121-4 at 12) ("Q. Okay. And so you just said [this opinion is] based on the 3D model? A. Correct."). Thus, Wong cannot lay a foundation for the opinion, as it is not based on his own review of the evidence. In fact, it goes beyond Newman's statement as to what the same model is capable of showing—that Reineohl's hips and hands were out of view (Dkt. No. 121-1 at 4), with no explanation given as to how he reached the more specific conclusion that the officers could not see anything below shoulder level. Similarly, this opinion must be excluded because it does not "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). While Wong has expertise in forensic science, he did not apply that expertise to creation of the model. Contrary to Wong's statement in his report that the model is "illustrative of my opinions," the record reveals the opposite—that his opinion is a product of the model, so it is subject to the Rule 702 analysis. *Johnson*, 2023 WL 5045270 at *12.

However, the Court finds that Wong can testify as to opinions derived from his own training and experience. Defendants do not challenge his qualifications as a forensic scientist but argue that he "did not perform any crime scene reconstruction of his own," he merely "parrots" the findings of Washington State Police ("WSP") reports. (Dkt. No. 120 at 10.) They argue that the only independent opinion Wong offers is the one about officer sightlines. (*Id.* at 9–10.) The Court disagrees that Wong offers only one opinion. Rather, Wong's report draws the conclusion that the officers' gunfire risked "catastrophic collateral damage" with "devastatingly fatal consequences" to bystanders, and he confirmed that this is his own independent conclusion. (Dkt. Nos. 121-3 at 14; 121-4 at 10.) He based this conclusion on WSP reports and the witness

interviews contained therein, as well as a consideration of the dense population in the neighborhood where the shooting occurred and the premise that "bullets unabated may travel long distances of two miles or more." (Dkt. No. 121-4 at 9–10.) Defendants acknowledge that Wong has experience in ballistics (Dkt. No. 120 at 3) and the Court sees no reason to exclude this testimony.

As for Newman, the Court starts by reviewing his qualifications and methods. Newman does not have any formal training in forensics or crime scene reconstruction, but he has six years of experience creating 3D models of crime scenes "and other complex scenarios such as accidents, construction projects, and logistics." (Dkt. Nos. 144 at 1; 144-1 at 2.) The Ninth Circuit has commented that "Rule 702 'contemplates a broad conception of expert qualifications.'" *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998). Likewise, the "knowledge, skill, experience, training, or education called for by Rule 702 "need only exceed 'the common knowledge of the average layman'" and the standard is "liberal." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022). Based on this, the Court concludes that Newman is qualified as an expert in 3D illustration generally but is not qualified as an expert in crime scene forensics specifically. *Contra Johnson*, 2023 WL 5045270 at *11, *13 (animator was also an expert in crime scene reconstruction). Newman did employ at least some reliable methods in creating the illustration, such as incorporating laser scans of the scene, using aerial imagery, accounting for height differences of individuals involved, and estimating rates of error.

Ultimately, the Court concludes that Newman can testify as to the one opinion in his report, on the basis of his expertise in 3D modeling. Based on the model, Newman would testify that "[t]he portion of Reinoehl's hands and hips, as described by the officers is more than 6 inches outside of any possible field of view they might have had at the moment shots were fired.

This is well outside of the margin of error[.]" (Dkt. No. 121-1 at 4.) This opinion would have to be subject to the Rule 702 analysis since Newman draws this conclusion on the basis of his model rather than the reverse. *Johnson*, 2023 WL 5045270 at *12. While it is admittedly a close question, the Court concludes that Newman has sufficient qualifications and used sufficiently reliable methods to offer this opinion.[1] The Court questions how helpful this testimony will be to the trier of fact, because it appears from the record that the fact Newman would testify to (that the officers could not see Reinoehl's hands or hips while they were in their respective surveillance cars at the moment shooting started) is not genuinely in dispute. (*See* Dkt. No. 148-8 at 6) (Merrill stating that while Merrill was in his car "I couldn't see his hand necessarily, but I could see that his right arm was going in towards something in the center console area"—though he states he could see Reinoehl's hands after exiting the surveillance car); (Dkt. No. 124-12 at 6) (Oleole stating "I did not see a gun in his hand. I didn't see his hands."); (Dkt. No. 124-11 at 10) (Gocha stating that he could not see Reinoehl's hip, he could see "just lower than chest up.") Nonetheless, the Ninth Circuit has cautioned that "a district court may not exclude expert testimony simply because the court can, at the time of summary judgment, determine that the testimony does not result in a triable issue of fact. Rather the court must determine whether there is 'a link between the expert's testimony and the matter to be proved.'" *Stilwell*, 482 F.3d at 1192. Since the placement of Reinoehl's hands is at least *relevant* to the ultimate issue (the reasonableness of force) if not disputed itself, the Court will err on the side of allowing the testimony.

---

[1] In *Krause*, the court accepted the unchallenged qualifications of an expert who had significant experience in 3D modeling, and held BFA and MBA degrees, but had no apparent formal training in criminal or forensic sciences. 459 F.Supp.3d at 1271; *Krause v. County of Mohave*, Case No. 3:17-cv-08185-SMB (D. Ariz.), Dkt. No. 123-1 at 10–13 (CV of expert Tavernetti).

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 11

As to the model itself, it may be useful to the trier of fact as a visual aid, and Newman can testify to lay the foundation to use the model for that purpose. *Johnson*, 2023 WL 5045270 at *12 ("If an animation is truly demonstrative, the offering party need only lay foundation before showing it to the jury.")  The Court concludes that the model itself is demonstrative, not substantive evidence, as it is "a product of [Newman's] review of the evidence and illustrate[s] the conclusions he drew." *Johnson*, 2023 WL 5045270 at *13.  The model may be presented to the trier of fact as a visual aid, but will not be available during deliberations.  Fed. R. Evid. 107.[2] Newman can testify as to how he created the model to "lay a foundation of fairness and accuracy for the admission of the demonstrative aid." *Walema*, 194 F.3d 1319 (Table).  The model may be useful to a trier of fact because "the animations are relevant and draw directly from the factual record to recreate the scene of the shooting." *Krause*, 459 F. Supp. 3d at 1271.

Defendants attack the fairness and accuracy of the model on the basis that Newman engaged in "guesswork" in placement of figures in the model and that static figures do not capture the fluidity of the situation (*see* Dkt. No. 120 at 7)[3], but the Court finds that these concerns do not require total exclusion.  Newman acknowledged that the figures are "static" and "frozen in a point in time that we – that we choose to – to try to interpret or illustrate" the positions indicated in the record.  (Dkt. No. 121-2 at 8.)  Federal Defendants can cross-examine Newman as to the limitations of static figures and any deficiencies in placing them, but the Court

---

[2] The Court is aware that several of the claims in Plaintiff's Complaint are brought under the Federal Tort Claims Act, under which there is no jury trial. 28 U.S.C. § 2402; (*See* Dkt. No. 89). For purposes of this motion, the Court treats "jury" as largely interchangeable with "trier of fact," with any particular distinctions of a bench trial to be decided at a later date, if necessary.

[3] Defendants attack Newman for his response to a question asking if he was making a "best guestimate" in his model, but this appears to be a reference to how Newman interpreted a particular image of Reinoehl, not an admission that his entire model or methodology was a "guestimate." (*See* Dkt. No. 121-2 at 7.)

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 12

does not believe that the model is so clearly unfair or inaccurate as to mandate that the demonstrative aid be excluded in its entirety.  *See Krause*, 459 F. Supp. 3d at 1272–1273 (finding that any purported inaccuracies in the model in bullet trajectories or defendant's physical location should be addressed through cross-examination and jury instruction); *see also Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); *Alaska Rent-A-Car, Inc.,* 738 F.3d at 969 ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

      This result is consistent with how other courts have treated computer simulations, including in police shooting cases.  In *Hinkle v. City of Clarksburg, W.Va*, 81 F.3d 416, 424–425 (4th Cir. 1996), the Fourth Circuit found no reversible error in a trial court's decision to allow a jury to view a computer simulation of a police shooting, created by a "forensic animation technologist," where the jury understood that "this animation was designed merely to illustrate Appellees' version of the shooting and to demonstrate how that version was consistent with the physical evidence." *Id.* at 424–425.  The court recognized the risk of prejudice from a simulation, because "the jury viewing a recreation might be so persuaded by its life-like nature that it becomes unable to visualize an opposing viewpoint of those events." *Id.* at 425.  However, the court found that the risk of prejudice was effectively mitigated by instructing the jury that "the video is not meant to be an exact recreation of what happened during the shooting" but rather that "it represents [the expert's] evaluation of the evidence presented." *See id.*; *see also Johnson*, 2023 WL 5045270 at *13 (requiring jury instruction that "animations are not exact recreations of the event, but merely illustrations of an expert's evaluation of the evidence.")  By

contrast, where courts have excluded animations or portions thereof, there has been more clear prejudice that cannot be cured by jury instruction. *See Friend*, 2006 WL 2135807 at *7 (excluding just the portion of an animation that depicted plaintiff acting in a "careless" manner, taking no action to evade an oncoming obstacle).

For those reasons, the motions to exclude Wong and Hicks are GRANTED in part and DENIED in part.

### 2. Russell Hicks

The Court DENIES Defendants' motion to exclude Russell Hicks. Defendants acknowledge that Hicks is "a retired police officer who also served as an academy instructor for the Washington State Criminal Justice Training Commission." (Dkt. No. 120 at 3.) More specifically, Hicks has 30 years of enforcement experience, he taught at the Training Commission for fourteen years, reaching the rank of Basic Law Enforcement Academy Assistant Commander. (Dkt. No. 140 at 4–5.) As it happens, his experience includes training officers Merrill and Oleole, and he discusses his recollections of that in his report. (*See* Dkt. No. 121-5 at 8.) Defendants attack Hicks on the basis that he lacks experience in "USMS fugitive operations" specifically. (Dkt. No. 120 at 4.) They argue that Hicks has never been trained on "vehicle pins or high-risk fugitive apprehensions ("HRFA")" and his analysis fails to consider specialized USMS training for those purposes. (*Id.* at 13–14.)

Defendants' arguments are unavailing. First, the record indicates Hicks does have limited experience in the areas Defendants identify: he worked on local/federal task forces (focused on narcotics); he trained federal agents and attended federal trainings; and he assisted with fugitive apprehensions, including "run[ing] across" federal agencies like FBI, DEA, and USMS in that process. (Dkt. No. 121-6 at 5–8.) Second, the Court agrees with Plaintiff that

Hicks need not have been a law enforcement officer in the exact same jurisdiction or agency to offer testimony on law enforcement practices. (Dkt. No. 140 at 12–13); *Trexler v. City of Belvidere*, No. 3:20-cv-50113, 2023 WL 415184 at *3 (N.D. Ill. Jan. 25, 2023) (rejecting the argument that a police officer with 30 years of experience could not testify as to police practices in Illinois because his experience was gained out-of-state).

Finally, the propriety of the "vehicle pin" maneuver is itself in dispute, and Hicks has relevant training and experience to opine on it. Hicks opines that the vehicle pin or "bumper to bumper" maneuver Oleole and Merrill used is dangerous because it put them in too close a proximity to the suspect and "unnecessarily compress[ed] the time to properly evaluate and make the appropriate recognition of any threats that may exist;" it is therefore not consistent with police academy training or violence de-escalation and mental health training law enforcement officers are required to participate in pursuant to Washington law. (Dkt. No. 121-5 at 37, 59–60.) Hicks further notes that the Memorandum of Understanding ("MOU") that allowed Oleole and Merrill to serve on a USMS task force required them to adhere to the use of force policies of their home agencies, therefore it was, in Hicks' view, incumbent upon the officers to alert their task force supervisors of the inconsistency. (Dkt. Nos. 142-2 at 15–17.) Since Hicks has significant experience as a law enforcement trainer in Washington, he can opine on why the vehicle pin maneuver is not taught in Washington, and based on the MOU that testimony may also be relevant to the trier of fact in evaluating Oleole and Merrill's use of force on the USMS task force. Defendants can, of course, cross-examine Hicks on these opinions or any shortcomings in his experience.

3. <u>Paul Massock</u>

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 15

1    The Court GRANTS in part and DENIES in part Plaintiffs' motion to exclude the testimony of Paul Massock.  Specifically, Massock cannot offer the conclusion that the use of force here was "reasonable," but he can testify as to other information in his report.

Massock is the Deputy Chief (Tactical) of the Special Operations division of the Bureau of Alcohol, Tobacco, and Firearms.  (Dkt. No. 136-1 at 2.)  He has over 30 years of law enforcement experience, he trains agents on use of force policies, and conducts post-incident reviews for USMS.  (Dkt. No. 135 at 4.)  He is clearly qualified to offer an expert opinion on law enforcement practices.  However, Plaintiffs argue that Massock offers just one opinion, which is that the use of force in this case was reasonable.  (Dkt. No. 122 at 1.)  They argue that opinion is impermissible because it is a legal conclusion.  (*Id.* at 3–4.)  Plaintiff relies on *Dold v. Snohomish Cnty.*, No. 2:20-CV-00383-JHC, 2023 WL 123335, at *2 (W.D. Wash. Jan. 5, 2023), which excluded opinions from an expert report that "a reasonable officer would believe that the defendant deputies had the legal authority, exigent circumstances, to enter the residence," and a series of similar statements about the reasonableness of the officers' use of force.  As *Dold* reasons, "[w]hile experts may permissibly opine as to standard law enforcement practices and whether defendants' conduct is in accord with those practices, they may not offer legal conclusions that are solely within the Court's or the fact-finder's province." *Id.* at *1 (quoting *Fontana v. City of Auburn*, No. C13-0245-JCC, 2014 WL 4162528, at *6 (W.D. Wash. Aug. 21, 2014)).  "Such an opinion does not aid the jury in making its decision; it merely attempts to substitute the expert's judgment for that of the jury[ ] or ... the Court." *Id.*

The Court agrees with the *Dold/Fontana* analysis and holds that Massock cannot opine on the reasonableness of the officers' use of force, which is a conclusion for the trier of fact to draw.  However, the Court does not find that Massock's testimony must be excluded in its

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE (DKT. NOS. 120, 122) - 16

entirety. His report, for instance, explains how USMS task forces make plans for an apprehension, it discusses the specific preparations and equipment used here, the factors that go into a totality of the circumstances analysis and how officers would consider Reinoehl's history in determining the appropriate level of force, and it includes a discussion of the officers' actions leading up to and during the shooting. (*See generally*, Dkt. No. 123-1.) Massock can testify to these topics without giving the legal conclusion that the use of force was reasonable; his analysis may be useful to the trier of fact to understand the facts at issue, and it is based on his experience.

## IV    CONCLUSION

The motions to exclude (Dkt. Nos. 120, 122) and GRANTED in part and DENIED in part consistent with this opinion.

Dated this 4th day of March, 2025.

David G. Estudillo
United States District Judge