UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CINDY VAN LOO, | CASE NO. 3:23-cv-05618-DGE |
| Plaintiff, | |
| v. | ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) |
| UNITED STATES OF AMERICA et al., | |
| Defendant. | |

## I.    INTRODUCTION

Before the Court are the summary judgment motions of Defendants Pierce County (Dkt. No. 125), Lakewood (Dkt. No. 126), Officers Oleole and Gocha (Dkt. No. 131), and the United States (Dkt. No. 132) as well as Plaintiff's partial motion for summary judgment (Dkt. No. 129). For the reasons that follow, the Court GRANTS Defendants' motions and DENIES Plaintiff's motion.

## II.    PROCEDURAL HISTORY

1    As discussed *infra*, the key question in this case is whether local police officers acting as

2  part of a United States Marshals Service ("USMS") Violent Offender Task Force ("VOTF")

3  were acting under color of state or federal law at the time they killed Michael Reinoehl.  This

4  Court previously denied, in relevant part, Defendants' motions to dismiss, finding that the

5  answer to that question is "fact bound."  (Dkt. No. 77 at 9, quoting *Yassin v. Weyker*, 39 F.4th

6  1086, 1090 (8th Cir. 2022) (alteration omitted)).  At the same time, the Court recognized that this

7  matter and other legal questions presented by the case were likely to recur at summary judgment.

8  (*Id.* at 26.)  After the Court's ruling on the motion to dismiss, Plaintiff submitted a Second

9  Amended Complaint, which is the operative Complaint for purposes of this motion.  (*See* Dkt.

10  No. 89.)  Discovery is now complete, and with the benefit of a fulsome factual record, as well as

11  relevant legal developments, the Court considers these issues anew.

12    **III.    FACTUAL BACKGROUND**

13    **A.  Portland Protests and Shooting of Aaron Danielson**

14    On September 3, 2020, law enforcement officers shot and killed Michael Reinoehl

15  outside of a home in Lacey, Washington.  (Dkt. No. 77 at 2–3.)  Reinoehl was wanted on an

16  arrest warrant issued in Multnomah County, Oregon.  (*Id.*)  He had been participating in protests

17  in Portland, Oregon that followed the murder of George Floyd in May 2020.  (*Id.* at 2.)  Those

18  protests spurred counterdemonstrations, where "far-right activists . . . descended on the City of

19  Portland while armed with deadly force and with the express intention of confronting and

20  disrupting ongoing protests against police violence."  (*Id.*, quoting Dkt. No. 37 at 9.)  One of

21  those counterdemonstrators, Aaron Danielson, was killed, and the Multnomah Warrant was

22  issued based on probable cause that Reinoehl had killed him.  (*See id.*)  Reinoehl gave a national

23  media interview in which he asserted that he killed Danielson as a lawful act of self-defense.

24

1    (*Id.*)  These allegations garnered significant national attention, including tweets by the then (and

2    current) President of the United States.  (*See* Dkt. No. 89 at 10.)  Reinoehl and his family

3    received death threats and one or more people fired live ammunition at their home in Portland,

4    causing them to go into hiding in Lacey.  (*Id.*; Dkt. No. 77 at 2.)

5        **B.  Organization of VOTFs**

6         While Reinoehl was hiding, law enforcement was beginning to plan his apprehension

7    under the auspices of the VOTF.  Pursuant to federal law, the USMS operates VOTFs around the

8    nation, which are "directed and coordinated by the United States Marshals Service, for the

9    purpose of locating and apprehending fugitives."  34 U.S.C. § 41503.  The Pacific Northwest

10    VOTF covers the Western and Eastern Districts of Washington, the District of Oregon, and the

11    District of Alaska, and each district manages its own officers and splits a share of funding.  (Dkt.

12    No. 124 at 2.)  State and local law enforcement participate in these VOTFs with the permission

13    of their home agencies and the USMS, and members are referred to as Task Force Officers

14    ("TFO").  (*Id.*)  The USMS Special Deputation Office reviews applications from local officers,

15    and once approved they are sworn in as Special Deputy U.S. Marshals.  (*Id.*)

16         Portland Police reached out to the VOTF in the District of Oregon for help apprehending

17    Reinoehl.  (*Id.* at 4.)  Reinoehl was assigned a "fugitive identification number" ("FID") in the

18    USMS system.  (*See id.* at 3–4.)  Based on information that Reinoehl had fled to Lacey, on the

19    morning of September 3, 2020, TFO Ryan Goss of the Oregon VOTF and his supervisor

20    contacted the Western District of Washington VOTF, including Task Force Commander Craig

21    McCluskey and the Team Leader in Pierce County, Ryan Kimmel.  (*Id.* at 4–5.)  Kimmel and

22    McCluskey were both USMS employees, McCluskey the then-Supervisory Deputy U.S. Marshal

23    and Kimmel a Deputy U.S. Marshal ("DUSM.")  (Dkt. No. 124-14 at 6.)  Although the warrant

24

1    in Multnomah County had not yet been issued, a Pierce County based VOTF team was

2    assembled.  (Dkt. No. 124 at 5.)  Lacey is in Thurston County, Washington, not Pierce County,

3    but Thurston was within Kimmel's area of responsibility.  (*See id.*)  The team working on

4    Reinoehl's case included Defendants Craig Gocha and James Oleole, of the Pierce County

5    Sheriff's Office ("PCSO"), Michael Merrill, of Lakewood Police (collectively, the "Individual

6    Defendants") and former Defendant Jacob Whitehurst, of the Washington Department of

7    Corrections.[1]  (Dkt. No. 124 at 6.)  Erik Clarkson, Casey McEathron, and Justin Watts (all

8    employees of PCSO) also worked on the investigation—they were each deputized TFOs but are

9    not named defendants.  (*See* Dkt. Nos. 124 at 6; 124-14 at 6.)[2]  Each of these officers had active

10   special deputations on September 3, 2020, except for Merrill, whose deputation lapsed three days

11   earlier on August 31, 2020.  (Dkt. Nos. 124 at 6; 124-33.)  Neither Merrill nor his supervisor

12   Kimmel were aware Merrill's deputation had lapsed.  (Dkt. No. 124 at 6; *see also* Dkt. No. 127

13   at 2.)

14        Local officers serve on the VOTFs by virtue of Memoranda of Understandings ("MOU")

15   between local agencies and USMS.  (Dkt. No. 146 at 3.)  The MOUs, including those signed by

16   Pierce County and Lakewood, state that TFOs "shall comply with their agencies' guidelines

17   concerning the use of firearms, deadly force and less-lethal devices" and contain a "Release of

18   Liability" stating that "[e]ach agency shall be responsible for the acts or omissions of its

19   employees."  (*Id.*; Dkt. Nos. 130-5 at 4–5; 130-6 at 4–5.)  The MOUs place responsibility for the

20   "[d]irection and coordination" of the VOTF on the Chief Deputy U.S. Marshal ("CDUSM") of

21   the District, and Special Deputies must be approved by the CDUSM to join the VOTF.  (*See* Dkt.

22

23   [1] Defendants Whitehurst and State of Washington were dismissed from the case.  (Dkt. No. 110.)

24   [2] PSCO officers John Munson, Byron Brockway, and Jesse Hotz were also involved in some
     capacity and were *not* TFOs, but are not named as defendants.  (*See* Dkt. No. 124-14 at 6–7.)

No. 130-6 at 3.)  The deputation forms state that they "do[] not constitute employment by the United States Marshals Service, the United States Department of Justice, or the United States Government."  (Dkt. No. 146 at 4; *see e.g.*, Dkt. No. 130-1 (Merrill's deputation form).)  Local agencies are responsible for paying the officers and authorizing time off; they also provide equipment.  (Dkt. No. 146 at 5.)  However, TFOs submit timesheets to USMS for their federal task force work, and here, USMS reimbursed the TFOs' home agencies for overtime spent working on the Reinoehl investigation.  (Dkt. No. 124 at 7.)  Defendants Gocha, Oleole, and Merrill received overtime pay from federal funds.  (*Id.*)  Clarkson, Gocha, Merrill, Oleole and Whitehurst's USMS timesheets were all approved by Kimmel, and show work performed on September 3, 2020 under the same FID number.  (*See* Dkt. No. 124-35 at 3, 5, 8, 10, 11, 13.)

In addition to the MOUs, the VOTFs operate under USMS policies and procedures. USMS Policy Directive 8.18 allows task force members to make arrests on state and local warrants under certain circumstances.  (Dkt. No. 130-19 at 3–4.)  Like the MOUs, USMS's Standard Operating Procedures ("SOP") state that Special Deputies must comply with their home agency use of force policies, as well as relevant USMS policies.  (*See* Dkt. No. 130-20 at 6, 20.) The Special Deputies "have limited federal law enforcement authority in support of fugitive investigations" and "do not possess general authority to act as Deputy United States Marshals." (*Id.* at 5.)  Any violation of law or policy should be reported to the CDUSM, who has authority to remove a Special Deputy from the Task Force.  (*Id.* at 7, 9.)  Special Deputies "will be appropriately identified as police officers: raid jackets, vests, neck badge, etc." but should "wear their parent agency approved equipment which identifies them as a member of that agency. They should not be issued USMS raid jackets."  (*Id.* at 12.)  The SOPs allow for verbal pre-operational

1    plans where there is insufficient time to formulate a written plan, but they should follow a

2    standard checklist issued to USMS personnel.  (*Id.* at 13.)

3    ### C.  Preparations to Apprehend Reinoehl

4    Around 3:30 p.m. on September 3, 2020, officers met in Pierce County for a briefing on

5    the apprehension of Reinoehl.  (Dkt. No. 89 at 12.)  At this time, the Multnomah Warrant had yet

6    to be issued.  (*Id.*)  The briefing was conducted by Clarkson, and was attended by Gocha, Oleole,

7    Merrill, Kimmel, and others.  (*Id*; Dkt. No. 124 at 9.)  The contents of the briefing are a source of

8    dispute between the Parties.  Plaintiff generally characterizes the information presented as

9    haphazard, incomplete, or one-sided.  For instance, a PowerPoint presented at the meeting

10   displayed only question marks ("???") as placeholders for information related to the time and

11   place the warrant would be issued, and the primary and secondary communications channels.

12   (Dkt. No. 89 at 14–15.)  The PowerPoint included a statement that Reinoehl believed he was "at

13   war" with police, though Plaintiff questions the validity of that and other statements attributed to

14   Reinoehl.  (*See id.* at 13; Dkt. Nos. 130-8 at 15; 146 at 8.)

15   Plaintiff focuses on what was not included in the briefing: a plan for how to "take"

16   Reinoehl, or discussion of law enforcement identifying themselves to Reinoehl and giving him a

17   chance to surrender.  (Dkt. No. 89 at 13–14.)  Defendants focus instead on the information that

18   was discussed: Reinoehl's date of birth and FID; that he was wanted for murder and the nature of

19   the allegations; that he had been arrested in July of 2020 for resisting arrest and that a firearm

20   had fallen off his person during that arrest; that he fled to 7601 3rd Way SE, Lacey, Washington

21   and was driving a Silver Jetta Wagon; that he was armed with a .38 or .380 caliber handgun, an

22   AR-22 rifle, and shotgun; and that an associate named "Nathaniel Dinguss" was at the apartment

23   with Reinoehl.  (Dkt. Nos. 124 at 7–8.)  Several TFOs watched video footage of the Danielson

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 6

1  homicide.  (*Id.* at 8.)  Dinguss' Honda Passport was associated with the 7601 3rd Way SE

2  address.  (*See id.* at 9.)  Per Defendants, the briefing did discuss contingencies for how to

3  apprehend Reinoehl, including what to do if he left the apartment and went back inside, or if he

4  left on foot or got into a car.  (*Id.* at 10.)  They discussed using a "vehicle pin" maneuver to

5  prevent Reinoehl from driving away, in which they would block in his car using other vehicles.

6  (*See id.*)  Officers got assignments: Oleole and Merrill would be paired in Merrill's vehicle, a

7  Silver Ford Escape, and would conduct surveillance and the vehicle pin if needed.  (*Id.* at 11.)

8  Gocha and Kimmel would be paired in Kimmel's vehicle, a Silver Chevy Traverse, would

9  conduct surveillance, and would be another pinning vehicle if needed.  (*Id.*)  Whitehurst would

10  be alone, and Clarkson and three others were in a minivan.  (*Id.*)  These assignments were

11  handwritten out on a whiteboard in the room.  (Dkt. No. 124-38.)

12         The team leaders generally acknowledged that they were working on a tight timeframe

13  but dispute the idea that they had no plan for the operation.  Clarkson acknowledged in

14  deposition that planning for the presentation was "hasty," but that the haste was "not a negative

15  thing," rather it reflected their "limited time frame."  (Dkt. No. 124-9 at 17, 22.)  Clarkson stated

16  that he left blank spaces in the PowerPoint about communications channels because he wanted

17  the plans to remain "flexible."  (*Id.* at 18.)  Kimmel, also in deposition testimony, rejected the

18  contention that there was "no plan," stating that, "I would say 'no plan' means no command, that

19  nobody says who's available. Nobody says, hey, let's get together. Nobody puts together a

20  briefing. Nobody does the briefing. Nobody reaches out to locals. Nobody plans any portion of

21  it." (Dkt. No. 124-8 at 11.)  Likewise, he rejected the idea that there was no command structure,

22  noting that McCluskey was on scene and Clarkson planned the tactics.  (*Id.*)

23         **D.  Travel to Lacey and Surveillance**

24

1        The Multnomah Warrant was signed just before 5:00 p.m. on September 3, 2020, and was

2  entered into the USMS system.  (Dkt. No. 124 at 11.)  The TFOs traveled to Lacey and rehearsed

3  their plans in the parking lot of the Lacey Police Department.  (*Id.*)  Kimmel notified the Lacey

4  PD of their operations, believing they were operating in Lacey city limits, but in fact they were

5  in unincorporated Thurston County; Kimmel stated that his contact in Lacey advised that they

6  would inform Thurston County, but Kimmel did not inform Thurston himself.  (Dkt. No. 124-8

7  at 17.)  Photos of the officers in the equipment they were wearing on September 3rd show that

8  Gocha's vest had the word "Police" on it, Oleole's vest stated "Sheriff," Merrill's vest stated

9  "Marshall" on the front and "Police" on the back, Whitehurst's vest stated "US Marshal Task

10  Force," and each officer appears to be wearing a badge of their home agency.  (*See* Dkt. Nos.

11  124-39; 124-40; 124-41; 124-42.)  Merrill and Oleole's vehicle was locally owned; Kimmel's

12  was a USMS vehicle.  (Dkt. Nos. 124 at 11; 146 at 12.)  Oleole and Merrill's weapons were also

13  provided by their home agencies, and Gocha carried a personally purchased firearm.  (Dkt. No.

14  146 at 12–13.)

15        Around 6 p.m. the officers departed the Lacey Police parking lot for 7601 3rd Way SE,

16  and positioned themselves for surveillance.  (Dkt. No. 124 at 12.)  Merill drove the Ford Escape

17  with Oleole in the passenger seat, and they parked on School Road near the intersection with 3rd

18  Way SE.  (*Id.*)  Oleole had a view of the apartment and two cars, the Jetta and Passport, while

19  Merrill was watching the back of the apartment.  (*Id.*)  The Chevy, with Gocha driving and

20  Kimmel in the passenger seat, parked behind Merrill and Oleole on School Road.  (*Id.*)

21  Whitehurst parked under a tree on 3rd Way SE, and the van with Clarkson and the others drove

22  past the apartment and parked out of sight.  (*Id.* at 13.)  The officers used unmarked cars to

23

24

1    maintain the "element of surprise" during surveillance.  (Dkt. No. 130-10 at 10.)  The following

2    diagram depicts the scene:



(Dkt. No. 89 at 20.)  The Parties agree that "[r]adios were garbled" at the scene and the officers

could not all hear each other, at least in part because officers were using a Pierce County

frequency while operating in Thurston.  (*Id.* at 21; Dkt. No. 124 at 15 n.6.)  Oleole described

radio transmission as "absolutely terrible."  (Dkt. No. 130-10 at 3.)  The officers had cellphones

at the scene, but it is unclear if they were used.  (Dkt. Nos. 124 at 15 n.6; 130-12 at 13.)

### E.  The Shooting

After a period of surveillance of about 30 to 60 minutes, at approximately 6:45 p.m.,

Reinoehl exited the apartment and started walking to the Jetta.  (Dkt. Nos. 89 at 22; 124 at 14;

124-8 at 7.)  Reinoehl carried a backpack that the officers believed to be a rifle bag, and wore a

fanny pack.  (*See* Dkt. Nos. 124 at 13; 124-10 at 5; 124-11 at 7.)  Plaintiff describes these articles

as "ordinary" in appearance.  (Dkt. No. 146 at 15.)  Reinoehl had a holster-like piece of

equipment  his left hip that Defendants believed could hold a gun.  (*See* Dkt. Nos. 124 at 14;

124-11 at 7.)  Plaintiff characterizes this article as a cellphone holder.  (Dkt. No. 146 at 16–17;

1    *see also* Dkt. No. 148-38 at 3.)  Reinoehl got into the Jetta and turned it on, as the officers looked

2    on and communicated.  (Dkt. No. 124 at 15.)

3           About 20 seconds after Reinoehl entered the car (per Kimmel's estimate), Merrill and

4    Oleole made the decision to move in, despite a contrary directive.  (*See id;* Dkt. No. 130-15 at 6.)

5    Clarkson stated over radio that "we are too far, let him drive," but neither Merrill nor Oleole

6    heard this statement.  (Dkt. Nos. 124 at 16; 124-10 at 5; 124-12 at 4.)  The significance of Merrill

7    and Oleole moving forward despite Clarkson's "let him drive" directive is heavily disputed, with

8    Plaintiff characterizing it as "direct contravention" and Defendants describing it as "ultimately

9    immaterial."  (Dkt. Nos. 124 at 16, 146 at 18.)  Clarkson described the command structure as

10   "decentralized," so in his view the decision to move forward was not insubordinate.  (*See* Dkt.

11   No. 130-12 at 11.)  Clarkson explained that "decentralized" meant that officers "are able to make

12   decisions for themselves at the time as they see fit based off the general guidance that the

13   commander gives," and that this command structure reflected the officers' "decades of

14   experience,"; thus, "if [the officers] are able to make a decision and arrest someone, they don't

15   have to ask me if they see an opportunity."  (Dkt. No. 124-9 at 9.)  Clarkson also stated that "let

16   him drive" did not mean that he wanted Reinoehl drive away entirely, but rather that he wanted

17   to let Reinoehl drive around the corner so that the team could initiate the arrest there.  (*Id.* at 4.)

18   However, Merrill acknowledged that he would "probably not" have moved in had he heard the

19   order, describing Clarkson as the "commanding officer."  (Dkt. No. 124-10 at 10.)  Oleole also

20   acknowledged he would have heeded the order.  (Dkt. No. 124-12 at 4.)  Gocha stated that he did

21   hear Clarkson say "we're too far" but did not think it was a direct order.  (Dkt. No. 130-11 at 20.)

22   To him, there was "no such thing as an order" because everyone had "the exact same

23   commission regardless of rank" and "[i]t's not like the military."  (Dkt. No. 124-11 at 26–27.)

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 10

1   McCluskey acknowledged that some officers went "preemptively ahead of the rest of the team . .

2   . somebody jumped the gun and pulled up a little early," and that forced the rest of the team to

3   advance.  (Dkt. No. 130-13 at 9.)

4         Ultimately, once Merrill and Oleole set events in motion, Gocha and Kimmel moved in,

5   and Whitehurst came too.  (Dkt. No. 124 at 15.)  The Jetta was already pinned in the back by a

6   parked pickup truck, so Merrill and Oleole pinned the Jetta from the front, in a front bumper to

7   front bumper position.  (*Id.*)  Gocha and Kimmel stopped at a 45-degree angle to front passenger

8   door of the Jetta, and Whitehurst came too, stopping at an angle at the back passenger side.  (*Id.*)

9   The following diagram depicts the positions of the officers and their cars in the vehicle pin:



19  (Dkt. No. 124-44.)  After moving in, Oleole opened the passenger door of his vehicle and, per his

20  account, yelled "Police as loud as I could while exiting the vehicle."  (Dkt. Nos. 124 at 16; 124-

21  12 at 10.)  He did not have time to get out of the car completely, and "began pointing [his rifle]

22  towards the suspect."  (Dkt. No. 124-47 at 4.)  Merrill stated that he did hear Oleole yell

23  "commands of some sort."  (Dkt. Nos. 124-10 at 5; 130-9 at 3–4.)  Merrill acknowledged the

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 11

1   lights and sirens on their car were not activated as they moved in, saying it was a "safety

2   concern" because Reinoehl could have fired his rifle.  (Dkt. No. 124-10 at 5, 11.)  Kimmel and

3   Gocha acknowledged their lights and sirens were not on either, due to the car accelerating so fast

4   that the controller fell to the floor, and the lack of time.  (Dkt. Nos. 130-11 at 7; 130-15 at 3.)

5            Within moments of the officers moving in, they opened fire.  Oleole stated that

6   Reinoehl's "[e]yes got real big and [he] dove down" and from that Oleole "perceived [Reinoehl]

7   was grabbing a gun so I started shooting," and he fired through the windshield of his car toward

8   the Jetta.  (Dkt. No. 124-12 at 7, 10.)  Oleole acknowledged that he could not see Reinoehl's

9   hands but could see him "reaching for something, which I believe was a gun, so I shot first."  (*Id.*

10  at 6.)  Similarly, Merrill stated he "couldn't see [Reinoehl's] hand necessarily, but I could see

11  that his right arm was going in towards something in the center console area" and then it "came

12  back up and I saw what I thought was a firearm, a pistol."  (Dkt. No. 128 at 4.)  Merrill put his

13  Ford Escape in park, heard gunfire and saw glass flying, and believed "we were getting shot at."

14  (*Id.*)  Merrill got out of the vehicle to get his rifle and saw Reinoehl attempting to open the driver

15  side door of the Jetta, which is when Merrill opened fire.  (Dkt. No. 124 at 17.)  At that point,

16  Merrill could see "that [Reinoehl] had something in his hands" and Merrill began "yelling

17  commands to [Reinoehl]."  (Dkt. No. 128 at 6–7.)  This was all happening in a manner of

18  seconds.  Gocha estimated that the shooting started "within a couple of seconds" of the officers

19  moving in, "very near simultaneously," and Oleole stated that the time from moving in to the

20  first shot was "[a] second," but Merrill estimated that "20 seconds" elapsed between Oleole

21  shouting and the start of gunfire.  (Dkt. Nos. 124-10 at 5–6; 124-11 at 10; 124-12 at 25.)

22           Other officers on the scene provided similar accounts.  Kimmel stated that he saw that

23  Reinoehl "dipped down" in a "furtive manner" and believed he was reaching for a gun; Kimmel

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 12

1    estimated that "no more than a couple seconds" elapsed between Reinoehl reaching for a gun and

2    the officers opening fire.  (Dkt. No. 124-8 at 8, 15.)  Gocha stated that when he arrived, "I

3    observed Michael with what appeared to be a very surprised look on his face."  (Dkt. No. 124-11

4    at 10.)  He saw Reinoehl "make a move towards his right hip where I saw the holster earlier."

5    (*Id.*)  Gocha stated he yelled "'police' really loudly, and 'stop.'"  (*Id.*)  But in a "very, very, very

6    compressed timeline," with the other officers shooting, he too fired toward the Jetta.  (*Id.*)

7    However, he acknowledged that he could only see "just lower than chest up," so he could not see

8    Reinoehl's hip.  (*Id.*)

9          After the initial shooting started, Reinoehl exited the car.  Whitehurst stated that when he

10   arrived on the scene he saw Reinoehl exit the Jetta with "his right hand in his right pocket, and

11   he was pulling on something inside his pocket, trying to get something out of his pocket."  (Dkt.

12   No. 124-13 at 8.)  Reinoehl "fell or dove" behind the pickup truck, and Whitehurst yelled

13   "Police, stay down. Police, stay down," but Reinoehl got back up and reached for his pocket.

14   (*Id.*)  Whitehurst saw a gun coming out of the pocket and fired two shots, and Reinoehl fell to the

15   ground.  (*Id.* at 8–9.)  Gocha stated that Reinoehl "started running this way, but he kept

16   stumbling" out of the car "while digging into his pocket, his right front pocket.  (Dkt. No. 124-11

17   at 12.)  Merrill described Reinoehl as "crouched down a little bit towards the back of his vehicle.

18   And then he gets up and starts to run from us" and "[h]is body was facing away from us."  (Dkt.

19   No. 124-10 at 7–8.)  Reinoehl's hands were at his waist, and "[h]e starts to turn towards his

20   upper body towards us, and his right arm comes out towards us" and Merrill believed that

21   Reinoehl was "going to shoot at us" so he fired his rifle.  (*Id.* at 8.)  Oleole also described

22   Reinoehl as "stumbling" and "running away," but denied that Reinoehl raised an arm in his

23   direction.  (Dkt. No. 124-12 at 11.)  Oleole stated that Reinoehl was still reaching for his

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 13

1    waistband or pocket, and Oleole fired again until Reinoehl fell. (Dkt. No. 124-47 at 5.)

2    Ultimately, the gunfire caused Reinoehl to fall to the ground, and all four officers stopped

3    shooting. (Dkt. No. 124 at 20.) Officers approached Reinoehl with a shield and secured him

4    with handcuffs. (*Id.* at 21.) They found the butt of a handgun protruding from his pocket. (*Id.*)

5    They rendered emergency medical aid, but Reinoehl died at the scene. (*Id.*)

6         Plaintiff generally disputes the officers' accounting of events, stating that it would not

7    have been possible for the officers to see Reinoehl's hands. (Dkt. No. 146 at 23–25.) Plaintiff

8    argues that Merrill's statements about what he could see of Reinoehl's hands or arms are

9    inconsistent and contradicted by Oleole. (*Id.*) Plaintiff notes the barrage of gunfire posed danger

10   to bystanders at the scene. (*Id.* at 26.) Plaintiff does not dispute that Reinoehl had a gun in his

11   pocket, but states that it was not racked or fired, as it had rounds in the magazine but not the

12   chamber. (*Id.*; Dkt. No. 148-38.) Plaintiff disputes that Reinoehl ever reached for the gun, since

13   he had a wound on his right thumb, but no blood was found on the gun. (Dkt. No. 146 at 26–27.)

14        Civilian witnesses stated that they did not know at the time of the incident that they were

15   witnessing a police operation. Witness Terry Lee stated that he saw two unmarked cars without

16   lights driving "fast and aggressive" down School Street, and believed he was seeing a road rage

17   incident. (Dkt. No. 130-17 at 3–4.) When asked if he heard police yell a command, he stated

18   "[n]ot that I can recall, but I can't be 100 percent certain." (*Id.* at 6.) Another witness, Garrett

19   Louis, also saw unmarked cars without lights speeding down the street at what he estimates was

20   double the speed limit, until they came to a "screeching stop." (Dkt. No. 130-16 at 4.) He did

21   not know he was seeing police and thought "it was a drug deal or a drug dealer chasing

22   somebody." (*Id.* at 5.) He grabbed children in front of him to move them out of harm's way and

23   believes that his son's life was put in danger by the gunfire. (*Id.* at 6; Dkt. No.148-34 at 7.)

24

1

### F.  Post-Shooting Events and Investigations

2          After the shooting, the officers returned to the Lacey Police Department, where they

3    waited for hours together in a conference room.  (Dkt. No. 146 at 27.)  The officers state that

4    they did not discuss the shooting during this period, but Plaintiff suggests a jury could disbelieve

5    that and find that they coordinated their stories.  (*See id.*)

6          Post-incident investigation revealed that Reinoehl's backpack contained aa disassembled

7    AR-15 rifle with a defaced serial number and hundreds of rounds, and there were also bullets in

8    his fanny pack.  (Dkt. No. 148-31 at 2–3.)

9          The Thurston County Prosecuting Attorney Jon Tunheim conducted an investigation

10    which concluded that the officers' use of force was justified under Washington law, and did not

11    bring any charges.  (Dkt. No. 124-49 at 21–23.)  He reasoned that, at the time the shooting first

12    started, Oleole was justified in not waiting for Reinoehl to raise a weapon before firing and his

13    actions indicated perception of an immediate threat; the analysis was similar for Merrill and

14    Gocha.  (*Id.* at 21–22.)  Once Reinoehl stepped out of the car, the officers were justified in use of

15    force because they perceived a continued threat to themselves and because Reinoehl could have

16    hurt others had he escaped, Tunheim found.  (*Id.* at 23–24.)  Failure to use marked cars or lights

17    would not change the use of force analysis, which is "done from the perspective of the involved

18    officers, not the suspect." (*Id.* at 23.)  However, Tunheim criticized the VOTF's failure to give

19    notice of the operation to the Thurston County Sheriff's Office, and their failure to plan for a

20    more effective communications channel, since Pierce County radios not working in Thurston

21    was a "predictable issue for which a contingency plan could have been developed in advance."

22    (*Id.* at 24.)  This poor communication prevented the team leader from "effectively

23    communicat[ing] a decision to the other officers" to move in and "[i]t appears the decision to

24

1    proceed with attempting an arrest was actually made by the two officers who simply decided to

2    move in." (*Id.* at 24–25.) Tunheim felt "compelled to say how fortunate it was that no

3    bystanders were injured or killed," noting that a bullet struck a nearby apartment and there was

4    evidence that a small child was hit by debris. (*Id.* at 25.)

5         Pierce County and Lakewood also reviewed their respective officers' compliance with

6    policies. (Dkt. Nos. 124 at 21; 148-40.) The United States Department of Justice Civil Rights

7    Division investigated the incident and found that the evidence did not support a criminal civil

8    rights charge. (Dkt. No. 124-50.)

9                      **IV.    SUMMARY JUDGMENT STANDARD**

10         Summary judgment is proper only if the pleadings, the discovery and disclosure materials

11    on file, and any affidavits show that there is no genuine issue as to any material fact and that the

12    movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

13    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

14    showing on an essential element of a claim in the case on which the nonmoving party has the

15    burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue

16    of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

17    for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

18    (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

19    metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a

20    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

21    requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty

22    Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors

23    Association*, 809 F.2d 626, 630 (9th Cir. 1987).

24

1    The determination of the existence of a material fact is often a close question.  The court

2    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

3    e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

4    *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

5    of the nonmoving party only when the facts specifically attested by that party contradict facts

6    specifically attested by the moving party.  The nonmoving party may not merely state that it will

7    discredit the moving party's evidence at trial in the hopes that evidence can be developed at trial

8    to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

9    Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not

10   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## V.    ANALYSIS

### A.    The Task Force Officers Were Acting Under Color of Federal Law, Therefore No § 1983 Cause of Action is Available

12   Defendants Gocha and Oleole move for summary judgment on the § 1983 claims against

13   them on the basis that they were acting under color of federal law.  (Dkt. No. 131 at 11.)

14   Defendant Merrill makes the same argument.  (Dkt. No. 126 at 4.)  Plaintiff cross-moves for

15   summary judgment on the grounds that Individual Defendants were acting under color of state

16   law.  (Dkt. No. 129 at 3.)  By its terms, "§ 1983 provides no cause of action against federal

17   agents acting under color of federal law"; thus, if the Individual Defendants were acting under

18   color of federal law, § 1983 is inapplicable.  *Billings v. United States*, 57 F.3d 797, 801 (9th Cir.

19   1995).

20   Upon reviewing the factual record and the relevant caselaw, the Court finds that the

21   Individual Defendants were acting under color of federal law.  The Court is not writing on a

22   blank slate, as this issue frequently recurs.  "Specifically as to USMS Fugitive Task Forces,

1   every court to have considered the issue has held that these Task Forces and their members

2   (including deputized local or state law enforcement) are acting pursuant to federal law and

3   federal authority[.]"  *Escobar v. Correa*, No. 22-CV-08434 (MMG), 2024 WL 4042122, at *7

4   (S.D.N.Y. Sept. 4, 2024).  Indeed, this Court has previously held that Washington DOC officers

5   executing a state warrant with the USMS VOTF were acting under color of federal law.  *Nelson*

6   *v. Weber*, No. 316CV05680BHSJRC, 2017 WL 3034641, at *4 (W.D. Wash. May 19, 2017),

7   *report and recommendation adopted*, No. C16-5680 BHS-JRC, 2017 WL 3017632 (W.D. Wash.

8   July 17, 2017).

9           A recent Ninth Circuit decision—issued after briefing concluded on these summary

10  judgment motions (*see* Dkt. No. 162, notice of supplemental authority)—provides the legal

11  framework for this color of law analysis, and significantly bolsters the conclusion that the locally

12  employed USMS Special Deputies were acting under color of federal law.  In *Thai v. County of*

13  *Los Angeles*, 127 F.4th 1254 (9th Cir. 2025), the court held that investigators with the Los

14  Angeles District Attorney's Office working on a federal task force investigating Social Security

15  fraud, the Cooperative Disability Investigations Unit ("CDI"), were acting under color of federal

16  law.  The Ninth Circuit outlined the relevant factors to consider in this inquiry.  First, the court

17  evaluated "the source of authority under which the challenged conduct took place."  *Id.* at 1259.

18  As to this factor, the court "focuses not on whose law is being implemented, but rather on

19  whether the authority of the state was exerted in enforcing the law."  *Id.* at 1260 (quoting *Tongol*

20  *v. Usery*, 601 F.2d 1091, 1097 (9th Cir. 1979)).  At this step, the *Thai* panel favorably cited out-

21  of-circuit cases invoked here by Defendants, including *Yassin*, 39 F.4th at 1088–1090, *King v.*

22  *United States*, 917 F.3d 409, 433 (6th Cir. 2019), *rev'd sub nom. on other grounds by Brownback*

23  *v. King*, 592 U.S. 209 (2021), and *Askew v. Bloemker*, 548 F.2d 673, 677–678 (7th Cir. 1976).

24

1    *See id.* at 1259–1260.  The court concluded that "[i]f the impetus for execution of the

2    program derives from federal law, then it is under color of federal law, regardless whether the

3    officers are state employees."  *Id*. at 1260.

4            Next, the court considered "the extent to which 'the state was involved in authorizing or

5    administering the task force' as opposed to whether the federal government was primarily

6    responsible for 'manag[ing] the operation with the benefit of state resources.'"  *Id.*  (quoting

7    *King*, 917 F.3d at 433).  "The identity of the individuals supervising the daily operations of the

8    program and defendants is indicative of such management. A crucial inquiry is whether day-to-

9    day operations are supervised by the Federal or state government."  *Id.*  (citation omitted).  The

10   *Thai* panel favorably discussed the holding of *Askew*, which found that local officers on a federal

11   drug enforcement task force "were acting under color of federal law because they were provided

12   federal credentials, paid out of federal funds, and were directed by and subject to the immediate

13   control of federal officers."  *Id.*  The *Thai* court summarized:

14          To determine whether state officials assigned to a joint federal-state program operate
            under color of state law, we consider the totality of the circumstances. In general, where
15          the source of authority for the program is federal in nature and the state officials'
            participation in the challenged conduct is subject to the immediate control of a federal
16          supervisor, those officials act under color of federal law, not under color of state law.

17   *Id.*

18          Applying that legal framework to the facts of the case, the court held that the CDI

19   officers at issue were acting under color of federal law because: one, "the CDI Unit is

20   implemented under federal law," its purpose is to combat Social Security fraud, and the MOU

21   cites a federal statute for authority, so in sum, "the CDI Unit is created under federal authority

22   primarily for the purpose of investigating corruption in a federal benefits program."  *Id.* at 1261.

23   Two, a federal agent was supervising day to day operations, and the local officers "were subject

24

to the immediate control and supervision of a federal officer." *Id.* Three, the court noted that "even though the officers continued to receive their paychecks from Los Angeles County while they were assigned to the CDI Unit, [] the [Social Security Administration] reimbursed Los Angeles County for their salaries and overtime." *Id.* The court found that the CDI was similar to other task forces whose officers had been found to not be subject to § 1983 suits, including in *Yassin* (USMS fugitive task forces), *Jakuttis v. Town of Dracut*, 95 F.4th 22, 29 (1st Cir. 2024) (DEA) and *King* (FBI). *Id.* at 1261–1262. The fact that California had initiated the investigation by making a referral to the CDI did not change the analysis, because "such administrative actions do not alter the overall character of the officers' conduct" and the officers "would not have been assigned to the investigations of [plaintiffs] if not for the CDI Unit's acceptance of those cases by [the] OIG Special Agent." *Id.* at 1262. Of particular importance here, the Ninth Circuit rejected the notion that adhering to state or local policies during investigations or failing to adhere to federal policies changed the analysis: the officers' "use of some state practices or imperfect implementation of federal practices does not alter the fact that they were implementing federal authority under the supervision of a federal agent." *Id.* at 1263. For all those reasons, suit under § 1983 was unavailable. *Id.*[3]

---

[3] While *Thai* does not consider USMS VOTFs specifically, the Ninth Circuit has held that USMS special deputies act under color of federal law—in contexts other than § 1983. *United States v. Weiland*, 420 F.3d 1062, 1070 (9th Cir. 2005) (USMS deputies are federal officers under Federal Rule of Criminal Procedure 41); *United States v. Diamond*, 53 F.3d 249, 252 (9th Cir. 1995) (same, under 18 U.S.C. § 111). And numerous district courts have "persuasively determined that local law enforcement officers who are deputized to serve on a task force operated by the U.S. Marshals Service are federal actors when they conduct task force business." *Andrews v. Brown*, No. 3:23CV264, 2024 WL 4520123, at *4 (E.D. Va. Oct. 17, 2024); *see also James v. City of Rochester*, 673 F. Supp. 3d 279, 288 (W.D.N.Y. 2023) (same); *Challenger v. Bassolino*, No. CV1815240KMMAH, 2023 WL 4287204, at *4 (D.N.J. June 30, 2023), *appeal dismissed*, No. 23-2339, 2023 WL 9378392 (3d Cir. Nov. 22, 2023) (same).

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 20

1    This Court now applies the *Thai* framework to the facts of this case.  First, the Court

2    looks to the legal regime that created the USMS VOTF.  Congress, in enacting the Presidential

3    Threat Protection Act of 2000, directed the creation of "permanent Fugitive Apprehension Task

4    Forces consisting of Federal, State, and local law enforcement authorities in designated regions

5    of the United States, to be directed and coordinated by the United States Marshals Service, for

6    the purpose of locating and apprehending fugitives."  34 U.S.C. § 41503(a); *see also* Pub. L. No.

7    106-544.  The MOUs at issue here cite that Act and 28 U.S.C. § 566(e)(1)(B), which authorizes

8    USMS to "investigate such fugitive matters, both within and outside the United States, as

9    directed by the Attorney General."  (Dkt. No. 130-5 at 2 (Pierce County MOU); *see also* Dkt.

10   No. 130-6 at 2 (Lakewood MOU)).  They also cite 28 U.S.C. § 564, which states that "United

11   States marshals, deputy marshals and such other officials of the Service as may be designated by

12   the Director, in executing the laws of the United States within a State, may exercise the same

13   powers which a sheriff of the State may exercise in executing the laws thereof."  (*See id.*)  As to

14   control and supervision, the MOUs cite 28 U.S.C. § 561(g) (stating that the "Director [of USMS]

15   shall supervise and direct the United States Marshals Service in the performance of its duties")

16   and 28 C.F.R. 0.111 (outlining authorities of the USMS Director, including, in subpart (n),

17   "Investigation of alleged improper conduct on the part of U.S. Marshals Service personnel.").  In

18   short, there is no question that the USMS VOTFs rely on federal law for their existence and

19   serve a federal purpose.

20       Second, the Court looks to the control of day-to-day operations of the VOTF.  Here, two

21   USMS employees, McCluskey and Kimmel, were in charge of the VOTF, with Kimmel

22   designated as the "team leader" and overseeing the Pierce County-based team.  (Dkt. No. 124 at

23   4.)  Kimmel delegated a significant leadership responsibility to a locally employed (but federally

24

1    deputized) officer, Clarkson, to devise tactics for arresting Reinoehl and executing the warrant.

2    (Dkt. No. 124-8 at 4.)  But that does not change the analysis.  *Thai* directed courts to look at

3    "[t]he identity of the individuals *supervising* the daily operations of the program"—and the

4    record reflects that Kimmel and McCluskey supervised, even though they allowed local officers

5    to make important decisions.  *See Thai*, 127 F.4th at 1260 (emphasis added).  Similarly, that

6    officers apparently followed a "decentralized" command structure on the ground while executing

7    the arrest does not convert supervision from federal to local.  Kimmel acknowledged that "as it

8    relates to tactics, the arrest function, Erik [Clarkson] was in charge" but McCluskey was on

9    scene, and "as it relates to the fugitive investigation and communication with local law

10   enforcement in Portland . . . I was in charge." (*See* Dkt. No. 130-15 at 5.)  Kimmel also

11   approved each of the timesheets for the TFOs working on this case.  (*See* Dkt. No. 124-35 at 3, 5,

12   8, 10, 11, 13.)  As in *Thai*, local agencies issued the TFOs' paychecks but were reimbursed by

13   USMS, at least for overtime, though it does not appear that USMS paid for the TFOs' base

14   salaries.  (*See* Dkt. No. 124 at 7.)

15          Considering the totality of the circumstances, through the lens of the authorization,

16   purpose, and control of the program, the Court finds that the USMS Special Deputies here were

17   acting under color of federal law.  The record shows that this operation was federal throughout.

18   It first took on a federal character when Portland police contacted USMS in Oregon for help

19   apprehending Reinoehl, he was assigned a USMS FID, and the task force began compiling

20   information.  (Dkt. No. 124 at 4.)  After learning that Reinoehl had fled to Lacey, TFOs in

21   Oregon contacted their counterparts in the Western District of Washington—McCluskey and

22   Kimmel, both USMS employees.  (*Id.*)  From there, the team was built out with Special Deputy

23   U.S. Marshals, including Clarkson, Gocha, Oleole, Whitehurst, and Merrill—each of whom had

24

active federal deputations, except for Merrill.  (*Id.* at 5–6.)  The work that these officers did to apprehend Reinoehl was done at the direction and behest of a federally created and supervised entity, the USMS VOTF, and each officer understood their work to be done in furtherance of the VOTF's mission.  (Dkt. No. 124 at 6–7.)

To avoid this conclusion, Plaintiff points to several facts highlighting the local aspects of the Defendants' work, but *Thai* and similar cases reject each of those as a basis for finding that officers were acting under color of state law.  Individual Defendants were employed by local agencies, which were responsible for their pay (at least in part) and time off, and the Defendants used equipment of those local agencies, some of which identified their local agencies.  *See*, *supra* Section III; (Dkt. No. 146 at 5, 12–13.)  But courts caution against overreliance on these trappings of office.  *See Askew*, 548 F.2d at 677 (St. Louis police officers did not act under color of federal law by virtue of the fact that they "continued to carry their SLPD badges, remained accountable to SLPD supervisors, and were paid by checks issued by the SLPD.")  Rather, what controls the analysis is whether the "totality of the circumstances surrounding the alleged raid out of which plaintiffs' § 1983 claim arises clearly shows that these agents were acting pursuant to federal authority."  *Id.; Thai*, 127 F.4th at 1260.  Likewise, Plaintiff emphasizes that the MOUs here required Individual Defendants to follow their home agencies use of force policies, and the MOUs stipulate that home agencies retain responsibility for the acts of their officers.  But *Thai* states that "use of some state practices . . . does not alter the fact that [local officers] were implementing federal authority under the supervision of a federal agent."  *Thai*, 127 F.4th at 1263; *see also Yassin*, 39 F.4th at 1091.  Contract law does not control this analysis.

The state arrest warrant does not control, either.  Plaintiff notes that Reinoehl was wanted on a state warrant and tries to distinguish *Yassin* on the grounds that the case concerned federal

charges.  (*See* Dkt. Nos. 129 at 13; 146 at 32.)  But *King* specifically rejects the idea that the

"'nature and character' of a task force should change based on whether the task force chooses to

pursue a state fugitive or a federal fugitive."  917 F.3d at 433.  Instead, "the nature and character

of a cooperative federal-state program is determined by the source and implementation of

authority for the *program*, not for the particular work that the agency chooses, in the exercise of

its authority, to perform on a given day."  *Id*.  Similarly, Plaintiff argues that Defendants needed

to rely on Washington law for authority to arrest Reinoehl (and that state law did allow

Defendants to execute an Oregon warrant outside of their jurisdictions), while Defendants argue

that the TFOs' deputations and federal law independently gave the officers arrest authority.  (*See*

Dkt. Nos. 129 at 15–16; 138 at 8, 13–15; 146 at 35–37, 63; 153 at 4–5.)  The Court finds it

unnecessary to resolve this dispute, because even if Washington law gave the officers arrest

authority, the record is conclusive that the officers would not have been executing an Oregon

warrant in Thurston County but for their participation in the federal task force.  *Cf. Thai*, 127

F.4th at 1262 (rejecting the idea that a California investigative referral dictated that the officers

were acting under color of state law, because the officers would not have been working on the

case but for the CID's acceptance of the referral).  Likewise, even if the officers *could have*

relied on state law, it does not follow that they must have done so if other sources of authority

were available.[4]

_____

[4] Defendants cite a DOJ Office of Legal Counsel opinion, also cited in the MOUs, "Authority of
FBI Agents, Serving as Special Deputy United States Marshals, To Pursue Non-Federal
Fugitives," 19 U.S. Op. Off. Legal Counsel 33, 1995 WL 944018 (Feb. 21, 1995) ("OLC
Opinion"); (*See* Dkt. Nos. 126 at 7; 130-5 at 2; 138 at 13–14.)  The OLC Opinion, notably
written before enactment of the Presidential Threat Protection Act, concludes that 28 U.S.C. §
564, which allows USMS personnel to exercise the powers of a state sheriff "in executing the
laws of the United States within a state," does not provide authority to initiate an investigation of
a state fugitive, but once initiated, provides deputy marshals with authority to pursue that state

1    The cases Plaintiff cites to support its color of law argument are inapposite; they discuss

2    a private/state action distinction but not the state/federal distinction at issue here.  In *Lugar v.*

3    *Edmondson Oil Co.*, the Supreme Court held that a private creditor could be sued through § 1983

4    because garnishment under state law constituted state action.  457 U.S. 922, 942 (1982).  In *West*

5    *v. Atkins*, the court held that a contract physician in a state hospital was a state actor for purposes

6    of § 1983.  487 U.S. 42, 54 (1988).  In *O'Handley v. Weber*, the Ninth Circuit clarified the test

7    for state action by private parties under *Lugar*.  62 F.4th 1145, 1157–1158 (9th Cir. 2023); *see*

8    *also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (same).  And *Brentwood*

9    *Academy v. Tennessee Secondary School Athletic Association* held that a non-profit entity

10   responsible for administering interscholastic sports in public schools could be sued under § 1983.

11   531 U.S. 288, 295 (2001).  These and similar cases all fall within a strand of doctrine that is

12   simply irrelevant to the inquiry at hand.  It is undisputed that the Individual Defendants were

13   *government* actors; the question is *what government* they were acting in furtherance of, and these

14   cases offer no insight as to that question.

15   While the Court has little trouble concluding that Oleole and Gocha acted under color of

16   federal law, Merrill is a somewhat tougher case because of his lapsed deputation.  The United

17   States did not certify that Merrill was acting within the scope of federal employment and

18   substitute itself for him as a defendant under the Westfall Act, 28 U.S.C. § 2679(d), unlike the

19   other Individual Defendants.  (*See* Dkt. No. 29.)  But the color-of-law inquiry under § 1983 calls

20   for a different analysis, wherein the court employs a totality of the circumstances test focused on

21   

22   fugitive—because participation on the task force constitutes "executing the laws of the United
States within a state."  *See* OLC Opinion at \*7.  Plaintiff notes that OLC opinions are non-

23   binding and argues that this Opinion does not conclusively establish that Defendants had federal
law authority in this case.  (*See* Dkt. No. 158 at 3–4.)  The Court does not rule on whether the

24   OLC Opinion is rightly decided, but notes that it provides a federal-law rationale for the arrest.

the "nature and character" of the task force. *Thai*, 127 F.4th at 1260; *King*, 917 F.3d at 433. While the Court is unaware of any other case raising this unique fact pattern, the Court finds that Merrill's technical lapse does not change the § 1983 analysis. Merrill did the same work as the other Special Deputy U.S. Marshals, for the same purpose and in the same manner, under supervision of the same federal officers who believed (incorrectly) that his deputation was current. He would not have been working on the Reinoehl matter but for his participation on the Task Force; as a Lakewood City police officer, Merrill had no reason to be in unincorporated Thurston County searching for a person wanted for an alleged crime that occurred in Oregon. *See Thai*, 127 F.4th at 1262. To find that he acted under color of state law while the others acted under color of federal law would be factually illogical and legally unsupported.

Therefore, summary judgment is GRANTED as to Count One of the Complaint (Dkt. No. 89 at 29), the § 1983 claim against the Individual Defendants, and Plaintiff's partial motion as to color of state law is DENIED.

**B.    Local Defendants Are Entitled to Summary Judgment on Counts Four and Six Because Defendants Were Acting Outside the Scope of their Local Employment**

As a result of the Court's holding *supra* that the Individual Defendants were acting in furtherance of the federal government throughout the Reinoehl investigation and shooting, it follows that they were acting beyond the scope of their local employment. Accordingly the Local Government Defendants are entitled to summary judgment on the state law negligence and battery counts against them as a matter of law.[5]

---

[5] It appears that Pierce County has not properly moved for summary judgment as to Count Six of the Complaint. Pierce County seeks dismissal of the case in its entirety but asserts in its motion for summary judgment that "[t]he sole claim against Pierce County is a claim for negligence" (Count Four), yet that is factually incorrect, as the County is named in Count Six of the Second

1    Defendant City of Lakewood moves for summary judgment on the negligence claim on

2  the grounds that it owed no duty to Reinoehl arising from Officer Merrill's conduct, and Pierce

3  County moves for summary judgment on negligence on the similar grounds that Officers Oleole

4  and Gocha were acting outside the scope of their County employment during the Reinoehl

5  operation, thus there is no duty or vicarious liability for the County.  (*See* Dkt. No. 126 at 15–17;

6  *See generally* Dkt. No. 125.)

7    In Washington, "[t]o sustain a negligence claim, a plaintiff must establish four elements:

8  duty, breach, proximate cause, and resulting harm."  *Zorchenko v. City of Fed. Way*, 549 P.3d

9  743, 746 (Wash. Ct. App. 2024) *review denied*, 559 P.3d 486 (Wash. 2024).  Here, the focus is

10  on the first two elements: duty and breach.  Under the "public duty doctrine," courts have held

11  that "public officials carrying out duties under municipal law owe a duty to the general public,

12  but have no actionable duty in tort to particular individuals."  *Id.* (citing *Munich v. Skagit*

13  *Emergency Commc'ns Ctr.*, 288 P.3d 328 (2012) (Chambers, J., concurring)).  However, a

14  plaintiff can establish liability by showing that the "duty breached was owed to an individual and

15  was not merely a general obligation owed to the public."  *Beltran-Serrano v. City of Tacoma*,

16  442 P.3d 608, 614 (2019).  In the policing context, a plaintiff can make this showing when the

17

18    Amended Complaint, battery – wrongful death.  (*Compare* Dkt. No. 125 at 3 *with* 89 at 32.)
   Plaintiff notes this deficiency in its response.  (*See* Dkt. No. 146 at 61.)  Pierce County asserts
19  that any battery count is improper because the Court previously dismissed Count Six as barred
   by a statute of limitations, but Plaintiff re-pled the count under Washington Revised Code
20  4.20.010 to remedy that issue after an unopposed motion for leave to do so, and the County did
   not move to dismiss the count from that amended complaint.  (*See* Dkt. Nos. 77 at 22; 89 at 32;
21  153 at 2 n. 1.)  Even assuming that Pierce County has not properly moved for summary judgment
   on Count Six, the Court can still grant summary judgment on that count as to all of the
22  Defendants.  Plaintiff was on notice that it needed to respond to summary judgment on Count Six
   from Lakewood's motion—which raises nearly identical issues—and the Court has identified
23  that there are no material facts genuinely in dispute as to the battery.  *See* Fed. R. Civ. Pro. 56(f)
   (allowing a court to enter summary judgment *sua sponte* under certain circumstances).
24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 27

1   alleged negligence arises from an officer's "affirmative interaction" with the plaintiff.  *Id.* at 615.

2   Here, there is no doubt that Oleole, Merrill, and Gocha directly interacted with Reinoehl, but

3   they did so in their capacity as federal task force officers, not local officials.  *See supra.*

4         The Court agrees with the Defendants that they owed no duty to Reinoehl on these facts.

5   The Complaint alleges that Local Defendants are liable either for the conduct of their agents or

6   "for their own torts" (*see* Dkt. No. 89 at 31)—accordingly, the Court will assess whether the City

7   or County formed a duty either by their own acts or the acts of their employees.  As to the

8   former, Plaintiff does not appear to argue in its response to the summary judgment motion that

9   the City or County are liable at the entity-level for their own acts (see Dkt. No. 146 at 62), and

10  the record does not support such a finding.  A federal USMS employee, Kimmel, was in charge

11  of the VOTF team, and a Pierce County Sheriff's Officer, Clarkson, planned the tactical

12  operations—but did so in his capacity as a TFO.  (*See* Dkts. No. 124 at 6; 130-15 at 4.)  The lead

13  was developed first by Portland PD, then relayed to the Oregon VOTF and then sent on to USMS

14  in Western Washington, with Lakewood and Pierce County having no direct role in that chain of

15  communication.  (*See* Dkt. No. 124 at 4–5.)  The Individual Defendants did use vests, cars, and

16  other equipment belonging to their home agencies (*see* Dkt. Nos. 124 at 11; 146 at 12–13), but

17  Plaintiff does not appear to argue that a City or County act or omission with respect to the

18  equipment is the source of the tort liability.  Plaintiff does allege that the City and County did not

19  "require their Local Officer Defendant Employees to comply with their policies and procedures

20  while operating with VOTF" (Dkt. No. 89 at 18), but the record indicates that the conduct of the

21  officers while operating with the VOTF, including choice of police tactics and manner of

22  executing those tactics, was directed not by the City or County itself but by Task Force

23

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 28

1    leadership (and Plaintiff did not plead a negligent supervision claim).  In short, if the City and

2    County have any liability here, it would have to be based on vicarious liability.

3          And the City and County do not have vicarious liability, because the officers were acting

4    beyond the scope of their local employment.  Vicarious liability "imposes liability on an

5    employer for the torts of an employee who is acting on the employer's behalf."  *Niece v.*

6    *Elmview Grp. Home*, 929 P.2d 420, 425–26 (Wash. 1997).  "An employee's conduct will be

7    outside the scope of employment if it 'is different in kind from that authorized, far beyond the

8    authorized time or space limits, or too little actuated by a purpose to serve the master.'"  *Robel v.*

9    *Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002) (quoting RESTATEMENT (SECOND) OF AGENCY §

10   228(2) (1958)); *see also Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 214 (Wash. 2018)

11   (same).  "The proper inquiry is whether the employee was fulfilling his or her job functions at

12   the time he or she engaged in the injurious conduct."  *Robel*, 59 P.3d at 621.  In this case,

13   vicarious liability does not attach to Lakewood or Pierce County because the Task Force Officers

14   were acting with a purpose to serve the VOTF, not advancing any case or investigation of the

15   local entities.  *See supra*.  Beyond the fact that the USMS, Pierce County Sheriff's Office, and

16   Lakewood PD all share a surface-level interest in apprehending fugitives, the record does not

17   reflect that the officers were acting in furtherance of their roles as City or County employees

18   with respect to the Reinoehl investigation or shooting.[6]

19         Based on the foregoing, the City and County do not have vicarious liability for the acts of

20   Merrill, Oleole, and Gocha, as the officers were not acting in furtherance of their local

21

22   _____

     [6] Plaintiff notes that Pierce County officers who were not part of the VOTF also participated in
23   the operation, including Brockway, Hotz, and Munson.  (Dkt. No. 146 at 10.)  But Plaintiff's
     negligence and battery claims against Pierce County and Lakewood are based only on the
24   conduct of Gocha, Oleole, and Merrill (*see id.* at 60–61), so the analysis on those counts is the
     same even assuming that the County does maintain vicarious liability for the non-TFOs.

employment with respect to Reinoehl, and the City and County do not owe a duty to Reinoehl based on the individual defendants' interactions with him.  Therefore, the Court GRANTS summary judgment to Defendants Pierce County and Lakewood on Count Four, negligence.[7]

For these same reasons, the City and County cannot be liable for battery, as the battery claim is based on the City and County's liability for the actions of their employees (*see* Dkt. No. 89 at 32), and the analysis as to vicarious liability for that count is the same.  The Court therefore GRANTS summary judgment as to Count Six in favor of Defendants.  The battery claim cannot be sustained on the merits, either, as discussed *infra*.

### C.    A Cause of Action Under *Bivens* Is Also Unavailable

In recent years, the Supreme Court has drastically curtailed the availability of the implied cause of action recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and that ultimately precludes availability of the *Bivens* remedy here.  At first blush, this case would seem to be relevantly similar to *Bivens*: federal officers accused of using excessive force under the Fourth Amendment at the Plaintiff's home.  But the Supreme Court has cautioned that such "superficial similarities are not enough to support the judicial creation of a cause of action" and that "recognizing a *Bivens* cause of action is 'a disfavored judicial activity.'"  *Egbert v. Boule*, 596 U.S. 482, 495, 491 (2022).  Applying post-*Egbert* precedents, and considering the strong weight of authority, the Court holds that *Bivens* is unavailable here.

Courts follow a two-step process to determine if a *Bivens* remedy is available.  First, the court asks "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]'

---

[7] Pierce County argues that the "borrowed servant" doctrine provides another avenue to find that it is not liable to Reinoehl.  (Dkt. No. 125 at 16.)  The Court finds it unnecessary to reach that argument.

1   different from the three cases in which the Court has implied a damages action." *Id.* at 492.

2   (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017)).  If it is, then "a *Bivens* remedy is

3   unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less

4   equipped than Congress to 'weigh the costs and benefits of allowing a damages action to

5   proceed.'" *Id.*  "If there is even a single 'reason to pause before applying *Bivens* in a new

6   context,' a court may not recognize a *Bivens* remedy." *Id.* (quoting *Hernandez v. Mesa*, 589 U.S.

7   93, 102 (2020)).

8                    i.    <u>USMS Fugitive Task Force Members Are a New Category of Defendant</u>

9          At the first step, the Supreme Court has enumerated several factors that present a "new

10  *Bivens* context," including "the statutory or other legal mandate under which the officer was

11  operating" or a "new category of defendants." *Ziglar*, 582 U.S. at 135, 140.  Several courts of

12  appeal have held that the structure of USMS fugitive task forces is a legal regime unlike the FBI

13  narcotics enforcement at issue in *Bivens*, and thus presents a new context.  For instance, after

14  reviewing the legislative history of the USMS and fugitive task forces specifically, the Eleventh

15  Circuit recently found that "[o]fficers participating in a USMS joint task force are a new

16  category of defendants." *Robinson v. Sauls*, 102 F.4th 1337, 1344 (11th Cir. 2024).  The Tenth,

17  Third, Second, and Sixth Circuits have reached the same conclusion.  *See Logsdon v. United*

18  *States Marshal Serv.*, 91 F.4th 1352, 1358 (10th Cir. 2024); *Henry v. Essex Cnty.*, 113 F.4th 355,

19  362 (3d Cir. 2024); *Lewis v. Bartosh*, No. 22-3060-PR, 2023 WL 8613873, at *1 (2d Cir. Dec.

20  13, 2023); *Cain v. Rinehart*, No. 22-1893, 2023 WL 6439438, at *4 (6th Cir. July 25, 2023).

21  Several district courts have also declined to extend *Bivens* to cases involving the USMS,

22  including in the Ninth Circuit.  *See e.g., Chavez v. United States*, No. 3:22-cv-107, 2023 WL

23  2071555, at *17 (D. Or. Feb. 17, 2023) (declining to extend *Bivens* to USMS fugitive task

24

1    force's mistaken identity arrest in Oregon); *Wickline v. Cumberledge*, No. 2:23-cv-799, 2024

2    WL 4340045, at *4 (S.D.W. Va. Sept. 27, 2024) (finding USMS fugitive task force operates

3    under different legal mandate than *Bivens*); *Fairchild v. Cundiff*, No. 23-CV-01972, 2024 WL

4    1328885, at *2 (N.D. Ill. Mar. 28, 2024) (finding USMS Inspector is a new type of defendant).[8] [9]

5          The Ninth Circuit has not weighed in on this question specifically, but its recent cases in

6    this area leave little reason to think it would reach a different conclusion.  In *Pettibone v. Russell*,

7    the Ninth Circuit held that an officer in the Federal Protective Service directing a multi-agency

8    operation was operating under a different legal mandate than the officers in *Bivens*.  59 F.4th

9    449, 455 (9th Cir. 2023).  As Plaintiff notes (Dkt. No. 146 at 46) there are distinguishing factors

10   between this case and *Pettibone*—the officer there was a supervisor carrying out an executive

11   order (at the same Portland protests that give rise to this case)—but the differences are not so

12   significant as to think the result would be different here.  In *Mejia v. Miller*, the Ninth Circuit

13   held that a Bureau of Land Management ("BLM") officer was operating under a different legal

14   mandate than the officers in *Bivens*. Even though the BLM and the FBI are both federal agencies,

15

16   _____

     [8] Numerous courts have also held that the distinction between cases involving a valid warrant, as
17   existed here, and the warrantless arrest in *Bivens* presents a new context.  *See Chavez*, 2023 WL
     2071555, at *17 ("The most notable difference between the present case and *Bivens* is the
18   existence of the warrant upon which the Marshal Defendants based Plaintiff's arrest.");
     *Challenger*, 2023 WL 4287204, at *7 (collecting cases).  Because the USMS Fugitive Task
19   Force's legal regime is sufficient to present a "new context," the Court finds it unnecessary to
     consider whether existence of a lawful warrant renders this a "new context."

20   [9] As Defendants note, the Undersigned also previously adopted, in relevant part, a report and
     recommendation finding that claims against U.S. Marshals present a new *Bivens* context.  *Wood
21   v. United States*, No. 2:22-CV-636-DGE-DWC, 2023 WL 7305035, at *9 (W.D. Wash. July 21,
     2023), *report and recommendation adopted in part, rejected in part,* No. 2:22-CV-00636-DGE-
22   DWC, 2023 WL 7014285 (W.D. Wash. Oct. 25, 2023) (Estudillo, J.).  That portion of the report
     and recommendation was unobjected.  *Wood*, 2023 WL 7014285 at *2.

23

24

     ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
     DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 32

1    "*Mejia* does not point to any reason to believe that most federal agencies have the same or

2    similar legal mandates, or more to the point, that BLM has the same mandate as agencies

3    enforcing federal anti-narcotics law."  61 F.4th 663, 668 (9th Cir. 2023).  Again, there are

4    important distinctions between *Mejia* and this case—the former involved an arrest on public

5    lands, not at a private home (*see id.*)—but the discussion of federal agencies not being similarly

6    situated is instructive.  As the Ninth Circuit cautioned, "[u]nder *Egbert*, rarely if ever is the

7    Judiciary equally suited as Congress to extend *Bivens* even modestly."  *Id.* at 669.

8         Plaintiffs do identify one post-*Egbert* district court case holding that involvement of

9    USMS agents does not create a new context.  *Orellana v. United States*, No. CV TDC-20-0845,

10   2023 WL 6217447, at *6 (D. Md. Sept. 25, 2023) (*see* Dkt. No. 146 at 45–46).  That decision

11   applied Fourth Circuit law, and in light of the overwhelming weight of authority on the other

12   side, this Court is compelled to reach a different result.

13                    ii.    Special Factors Weigh Against Recognizing a *Bivens* Remedy

14        Since the Court held that this is a new *Bivens* context, it must continue with the analysis

15   to determine if "special factors" weigh against recognizing a *Bivens* remedy.  If there is "*any*

16   rational reason (even one) to think that *Congress* is better suited to 'the costs and benefits of

17   allowing a damages action to proceed,'" then Bivens is unavailable.  *Egbert*, 596 U.S. at 496

18   (quoting *Ziglar*, 582 U.S. at 136) (emphasis in original).  The existence of "alternative remedial

19   structures" *alone* is "reason enough to 'limit the power of the Judiciary to infer a new *Bivens*

20   cause of action.'"  *Id.* at 493 (quoting *Ziglar*, 582 U.S. at 137).  In *Egbert*, the Court held that the

21   existence of an Executive Branch investigation and grievance procedure constituted an

22   alternative remedial structure, *even if* that scheme was inadequate and afforded no right of

23   review.  *Id.* at 497–98.  "So long as Congress or the Executive has created a remedial process

24

1    that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess

2    that calibration by superimposing a *Bivens* remedy." *Id.* at 498.  Likewise, the Ninth Circuit

3    found in *Pettibone* that the existence of an Inspector General grievance process sufficient to

4    preclude a *Bivens* remedy.  59 F.4th at 456–457.

5         Here, USMS has an internal grievance process, and is part of the Department of Justice,

6    which has an Office of the Inspector General to investigate misconduct.  (*See* Dkt. No. 131 at

7    21); 28 C.F.R. § 0.111(n) (authorizing investigations into misconduct by the USMS Director); 5

8    U.S.C. § 413 (authorizing DOJ OIG).  Under the extremely deferential test of *Egbert*, that

9    concludes the analysis.  *See Robinson*, 102 F.4th at 1346–1347 (finding that USMS grievance

10   procedures and DOJ OIG "foreclose a *Bivens* action here").  Likewise, some courts have

11   reasoned that creating a damages remedy would "chill recruitment for the task forces."  *Id.* at

12   1345.[10]

13        Plaintiff argues that there is special reason to believe that the Judiciary is better suited to

14   determine if a *Bivens* remedy is available in this instance than Congress: the U.S. Marshals serve

15   the Judiciary, and the Judiciary has a unique interest in assuring the Marshals adhere to the

16   Constitution.  (*See* Dkt. No. 146 at 48–49.)  That is true to an extent, though as Defendants point

17   out, the USMS is formally an executive branch agency.  (Dkt. No. 154 at 11–12.).  Regardless,

18   under the legal regime applicable here, there need only be *one* reason to think Congress is better

19   suited to make the determination, and the existence of an alternative—even an ineffective one—

20   foreclose judicial intervention.

21

22

23   _____

     [10] However, availability of qualified immunity as a defense to a *Bivens* action should also protect
     against judicial interference with law enforcement activities.  *See Ziglar*, 582 U.S. at 181
24   (Breyer, J., dissenting).

1

2          For these reasons, Individual Defendants Oleole, Gocha, and Merrill's motions for

3     summary judgment as to the *Bivens* claims against them, Count Two of the Complaint (Dkt. No.

4     89 at 30), are GRANTED.[11]

5          **D.    Counts Three and Five of the Complaint Are Barred by the FTCA's**
           **Discretionary Function Exemption**

6          Plaintiff pleads three claims against the United States under the Federal Tort Claims Act

7     ("FTCA"): Count Three, state law negligence based on the conduct of Kimmel in planning the

8     operation (Dkt. No. 89 at 30); and two counts in the alternative should the Court conclude that

9     the Individual Defendants were acting under of federal law (as the Court has concluded, *see*

10    *supra*)—Count Five, negligence, and Count Seven, battery, both based on the conduct of the

11    Individual Defendants (Dkt. No. 89 at 32–33.)  The Court finds that Counts Three and Five are

12    blocked by the FTCA's discretionary function exemption and Count Seven fails on the merits.

13         The FTCA allows suits against the United States

14         for injury or loss of property, or personal injury or death caused by the negligent or
           wrongful act or omission of any employee of the Government while acting within the
15         scope of his office or employment, under circumstances where the United States, if a
           private person, would be liable to the claimant in accordance with the law of the place
16         where the act or omission occurred.

17    28 U.S.C. § 1346(b)(1).  This section "operates as a limited waiver of sovereign immunity from

18    suits for negligent or wrongful acts of government employees[.]"  *Gonzalez v. United States*, 814

19    F.3d 1022, 1026 (9th Cir. 2016).  There are several exceptions to this waiver of immunity,

20    including, as relevant here, the "discretionary function" exception.  *See id.* at 1027.  Under this

21    rule, immunity is not waived for claims

22

23    _____

      [11] Because the Court grants summary judgment on the § 1983 and *Bivens* claims, it does not
24    reach the defense of qualified immunity raised in the motions.

based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [is] abused.

28 U.S.C. § 2680(a).  If the exception applies, the court "lack[s] subject matter jurisdiction over the claims." *Gonzalez*, 814 F.3d at 1027.  However, "in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly." *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).  In the Ninth Circuit, "the United States bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity." *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).

Courts follow a two-part test to determine if the discretionary function exception applies, as articulated in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988).  At the first step, courts ask if the decision "involves an element of judgment or choice." *Id.* at 536.  If no, that ends the inquiry, since "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.*  If yes, the court continues to ascertain "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.*  Congress intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Id.* at 536–537 (internal citation omitted).  At the second step, the court focuses "'not on the agent's subjective intent in exercising the discretion conferred by statute or regulation,' but rather 'on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Gonzalez*, 814 F.3d at 1027–1028 (quoting *United States v. Gaubert*, 499 US.

1    315, 325 (1991)).  Likewise, "[t]he decision 'need not *actually* be grounded in policy

2    considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'"  *GATX/Airlog*

3    *Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002).

4          But the Ninth Circuit has also recognized what might be characterized as an exception to

5    the exception, that "[e]ven if the agents' actions involved elements of discretion, agents do not

6    have discretion to violate the Constitution."  *Nieves Martinez v. United States*, 997 F.3d 867, 877

7    (9th Cir. 2021).  That is because the Constitution itself is a legal mandate that federal officials

8    are bound to abide.  *See Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004).  Applying this rule

9    leaves the Court in somewhat uncharted territory, because the Circuit has left open the question

10   of "the level of specificity with which a constitutional proscription must be articulated in order to

11   remove the discretion of a federal actor."  *Nurse v. United States*, 226 F.3d 996, 1002 n. 2 (9th

12   Cir. 2000).  Courts in the circuit have recognized that "the mere pleading of a plausible

13   constitutional violation rendered the discretionary function exception inapplicable"—but these

14   cases were decided at the motion to dismiss stage.  *See Fuentes-Ortega v. United States*, 640 F.

15   Supp. 3d 878, 883 (D. Ariz. 2022) (citing two cases, both denying in relevant part motions to

16   dismiss); *Nurse*, 226 F.3d at 1002 (reversing a dismissal, in relevant part).  Here, on summary

17   judgment, the Court assumes that to find a lack of discretion on the basis of a Constitutional

18   violation, there must be more than a *plausible* allegation of a violation, but rather sufficient

19   evidence for a trier of fact to find a violation at trial.  While it would be helpful for the Circuit to

20   clarify this issue for future cases, ultimately the standard of proof for the alleged constitutional

21   violation does not factor into the Court's analysis of the discretionary function exception,

22   because the Court agrees with Defendants that as to Counts Three and Five—the only counts for

23

24

1    which the United States invokes the exception—there is no applicable Fourth Amendment

2    violation.

3            i.    <u>Step One: The Decisions at Issue Involve an Element of Judgment or Choice</u>

4            The Ninth Circuit has generally recognized that "the discretionary function exception

5    protects agency decisions concerning the scope and manner in which it conducts an investigation

6    so long as the agency does not violate a mandatory directive." *Vickers v. United States*, 228 F.3d

7    944, 951 (9th Cir. 2000); *see Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996), *as

8    amended* (Sept. 26, 1996) (manner of investigating death of a Marine colonel was discretionary);

9    *Alfrey v. United States*, 276 F.3d 557, 566 (9th Cir. 2002) (decision on whether and how to

10   search a prison cell and database in response to a threat were discretionary).  In an unpublished

11   case, the Ninth Circuit specifically held "that the Task Force's determinations of whom to arrest

12   and when to arrest them came within the discretionary function exception." *Dupris v.

13   McDonald*, 554 F. App'x 570, 573 (9th Cir. 2014).  A court within the circuit has likewise held

14   that with regard to a USMS fugitive task force investigation, the decisions to a) search a database

15   for plaintiff's information, b) surveil his home, and c) "arrest Plaintiff based on the information

16   they knew at the time of arrest . . . involved 'an element of judgment.'"  *Chavez*, 2023 WL

17   2071555, at *13.

18           Here, the USMS policies that governed the officers' conduct did not mandate any

19   particular course of action in apprehending Reinoehl, and their decision about whether, when, or

20   how to do so was imbued with discretion.  The MOUs that established the VOTF, and the USMS

21   Policy Directive and SOPs, cumulatively establish authority for TFOs to make arrests, direct

22   them to follow home-agency use of force policies in so doing, and place the CDUSM in charge,

23   but do not specify any particular manner of carrying out arrests.  *See supra Section III*.  As

24

another court has already held, the USMS has "no set policy directives mandating the precise manner in which an arrest should be made." *Greico v. United States*, No. 1:14-CV-00933-RHW, 2015 WL 1489356, at *3 (D. Or. Apr. 1, 2015) (decision by USMS to make an arrest in a crowded parking lot was a matter of discretion). The pre-operational briefing plan was likewise intended to be "flexible" to account for whatever situations may arise (*See* Dkt. No. 130-12 at 13), not set according to specific policy dictates.

1.    *The Discretionary Function Exception Is Not Precluded As To Counts Three and Five By A Constitutional Violation*

Having concluded that the officers exercised discretion in apprehending Reinoehl, the Court considers Plaintiff's argument that the officers effectively exceeded whatever discretion they were allowed by violating the Constitution. The Court agrees with Defendant that this argument is categorically unavailable as to Count Three of the Complaint, since it is predicated only on Officer Kimmel's "fail[ure] to require adequate planning"—not a Fourth Amendment use of force violation. (*See* Dkt. Nos. 132 at 10; 89 at 30–31.) Similarly, Count Five (by reference to Count Four) alleges that Individual Defendants "failed to meet the standard of care in several ways including, but not limited to, failing to develop a plan to safely execute the arrest or failing to follow the plan, failing to establish an adequate incident command structure, and failing to conduct the operation with adequate communications." (Dkt. No. 89 at 31–32.) Again, this count is based on planning activities, not the allegedly excessive use of force.

In response, Plaintiff further states that "Individual Defendants also violated the First Amendment during the pre-shooting planning and briefing session by retaliating against Reinoehl for his left-wing political expressions, viewpoints, and associations (that he was antifascist or "antifa")." (Dkt. No. 146 at 54.) Because Plaintiff does not *plead* a First

Amendment claim anywhere in the Complaint (let alone demonstrate it could survive summary judgment) the Court does not consider this argument. Finally, as to Count Seven of the Complaint, state law battery, the reasonableness of the officers' use of force is clearly at issue, but the United States clarifies that it is not invoking the discretionary function exemption as to Count Seven (*see* Dkt. No. 152 at 1), so the Court need not analyze its applicability.

For these reasons, the Court concludes that the officers' exercised discretion with respect to Counts Three and Five and continues to step-two of the analysis.

### ii.  Step-Two: The Decisions Are Susceptible to Policy Analysis

The same courts that have held that law enforcement operations are discretionary at step one have also held that those decisions are susceptible to policy analysis at step two, and this Court does not see reason to depart from that analysis. The Ninth Circuit has recognized a "strong presumption" that law enforcement activities subject to discretionary guidelines are "grounded in policy considerations" because "[t]he investigation of crime involves policy judgments at the core of the executive branch. In investigations, no less than prosecutions, the executive must consider the reliability of the information, the relative importance of the crime, and the agency's mission and resources." *Gonzalez*, 814 F.3d at 1032. Though cases such as *Gonzalez*, *Alfrey* and *Sabow* discuss policy judgment as to investigations rather than use of force, that is relevant as to Counts Three and Five of the Complaint, which challenge the VOTF's planning (or lack thereof) before the use of force. Even as to the arrest itself, the *Chavez* court concluded that a USMS arrest involves policy determinations, reasoning that

> The Marshal Defendants were required, for instance, to determine how much to rely on the information provided by law enforcement agencies in another state and district before effectuating an arrest. The Marshal Defendants were also required to consider the policy implications of effectuating an arrest based on a warrant issued in California. To hold Defendant United States liable for these policy choices would require this Court to engage in precisely the type of "judicial second-guessing" that the discretionary function

1    exception was designed to prevent.

2    *Chavez*, 2023 WL 2071555, at \*14.  Other circuit courts have reached the same conclusion—and

3    while these courts were considering mistaken identity arrests (not at issue here), the policy

4    considerations they discuss are similar to those USMS confronted in this case.  *See Mesa v.*

5    *United States*, 123 F.3d 1435, 1438 (11th Cir. 1997) ("in deciding how extensively to investigate

6    the location and identity of the subject, agents may weigh the urgency of apprehending the

7    subject in light of such factors as the potential threat the subject poses to public safety and the

8    likelihood that the subject may destroy evidence"); *Milligan v. United States*, 670 F.3d 686, 695

9    (6th Cir. 2012) (same, as to USMS).

10        The Ninth Circuit has held that "decisions to knowingly lie under oath, tamper with

11    witnesses, or fabricate evidence cannot be 'grounded in' and are not 'susceptible to' [policy]

12    analyses, [so] the discretionary function exception does not provide refuge for such conduct."

13    *Myles v. United States*, 47 F.4th 1005, 1012 (9th Cir. 2022) (internal citations omitted).  But

14    there is no misconduct of that sort alleged here.  By contrast, law enforcement decisions that

15    "further[ed] an investigation" but "may have been negligent and even abusive" are not

16    "completely lacking legitimate policy rationale and they are shielded by the discretionary-

17    function exception."  *Nieves Martinez*, 997 F.3d at 881–882 (rejecting argument that

18    interrogation that allegedly "terrorized and browbeat" plaintiff fell outside of policy analysis).

19        Previously, on a motion to dismiss posture, this Court held that "[t]he failure to plan how

20    the warrant was to be executed as described in the complaint is not susceptible to policy

21    analysis."  (Dkt. No. 77 at 19, citing *Green v. United States*, 630 F.3d 1245, 1252 (9th Cir.

22    2011)).  The Court focused on Plaintiff's allegation that "there was no clear command structure"

23    and held that "[t]he decision to establish a particular command structure is susceptible to policy

24

1  analysis; the absence of any command structure allegedly due to the lack of forethought is not."

2  (*Id.*)

3        At this stage of the litigation, after fulsome discovery, it is clear that there was *some* plan

4  to arrest Reinoehl and *some* command structure.  Whether those plans were sufficiently thorough

5  or properly accounted for the risks of the arrest is the kind of policy judgment that the

6  discretionary function exception denies this Court jurisdiction to consider.  For instance, as to

7  command structure, the record shows that Kimmel led the team and Clarkson was in charge of

8  operational tactics, but command was "decentralized" such that individual officers could make

9  decisions in the field as conditions warranted.  (*See* Dkt. Nos. 124 at 9; 130-12 at 11; 130-15 at

10  4.)[12]  As to the pre-operation briefing, it did leave some details blank, but officers reviewed

11  information about Reinoehl, his associate, and the Portland shooting, decided on a tactic for the

12  arrest (the vehicle pin maneuver) and delegated assignments.  (*See* Dkt. Nos. 124 at 7–11.)

13  Before carrying out the arrest, they rehearsed the vehicle pin maneuver in the Lacey PD parking

14  lot, and once at the scene the officers positioned themselves for surveillance.  (*Id.* at 11–12.)  At

15  each step in this process, the officers made decisions.

16        To be clear, this is not meant as an endorsement of the VOTF's planning for or execution

17  of this operation.  Indeed, Thurston County Prosecuting Attorney Tunheim raised serious

18  concerns, particularly the VOTF's failure to anticipate that Pierce County radios would not work

19  in Thurston, and the way in which the poor communication impacted the decision to move in on

20  Reinoehl.  (Dkt. No. 124-49 at 24–25.)  Likewise, Tunheim criticized the failure to deconflict by

21

22  [12] Even if the Court were to draw an inference that, contrary to the officers' testimony, the
command structure was not "decentralized" and that Oleole and Merrill directly disobeyed

23  Clarkson's order, that would not help Plaintiff in this analysis—it would only strengthen the
finding that there was *some* command structure or plan (and individual deviation from the same),

24  not a total absence of a structure or plan.

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 42

not informing the Thurston County Sheriff's Office of the operation, which could have resulted in officer-on-officer fire, and noted the substantial risk that the gunfire placed on bystanders. (*See id.*)  But this Court's role is not to decide if the VOTF's plan was a *good* plan, or a complete or thorough one that adequately accounted for all risks and contingencies—that is the kind of second guessing that the FTCA does not permit the Court to engage in.

For these reasons, the Court GRANTS summary judgment as to Counts Three and Five of the Complaint.

### E.    Counts Six and Seven of the Complaint Fail on the Merits

Count Seven of the Complaint alleges a state law battery claim against the United States under the FTCA, based on the use of force of the Individual Defendants.  (*See* Dkt. No. 89 at 33.) Neither the United States' motion nor Plaintiff's response argue that the inquiry as to battery differs in any material respect from the Fourth Amendment reasonableness standard; the United States incorporates by reference its briefing on reasonableness of force under the Fourth Amendment.  (*See* Dkt. Nos. 132 at 15; 146 at 59–60; 152 at 12.)  Count Six of the Complaint alleges battery against Pierce County and the City of Lakewood; the City's summary judgment briefing on this issue likewise incorporates its qualified immunity arguments by reference.  (Dkt. No. 126 at 17.)[13]

---

[13] The United States also argues that it is entitled to summary judgment under Washington Revised Code § 4.24.420, which states in relevant part:

> In an action arising out of law enforcement activities resulting in personal injury or death, it is a complete defense to the action that the finder of fact has determined beyond a reasonable doubt that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death, the commission of which was a proximate cause of the injury or death.

Wash. Rev. Code. § 4.24.420(2); (*see* Dkt. No. 132 at 16.)  Plaintiff's response does not address this argument.  The Court finds it unnecessary to reach this issue and does not make a

Battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 9, at 39 (5th ed. 1984)). Washington recognizes a state law qualified immunity to battery for police use of force that is "reasonable," though not force that is "excessive." *Id.* at 641 & n. 5; *see also Boyles v. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991) ("Generally, a police officer making an arrest is justified in using sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest.").

Following the lead of the Parties, and because liability for a police officer for Washington state law battery turns on reasonableness, the Court evaluates the merits of the claim by applying the multi-factor test for reasonableness of force of *Graham v. Connor*, 490 U.S. 386, 396 (1989). Under *Graham*, the reasonableness of force "requires careful attention to the facts and circumstances of each particular case," and in that totality of the circumstances inquiry, courts should consider three factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The inquiry "is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances

---

determination if, beyond a reasonable doubt, Reinoehl was engaged in a felony at the time of the shooting.

confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  Of the

*Graham* factors, "[t]he 'most important' of these factors is 'whether the suspect posed an

immediate threat to the safety of the officers or others.'"  *Napouk v. Las Vegas Metro. Police

Dep't*, 123 F.4th 906, 915 (9th Cir. 2024) (quoting *Lal v. California*, 746 F.3d 1112, 1117 (9th

Cir. 2014)).  The factors are "not exclusive" in the totality test, and the court may also consider

"the availability of less intrusive force, whether proper warnings were given, and whether it

should have been apparent to the officer that the subject of the force used was mentally

disturbed." *Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024) (quoting *Estate of

Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) ("*Lopez*")).  Applying the *Graham* factors

and considering the totality of circumstances, the Court finds that Defendants are entitled to

summary judgment on the battery claim because Plaintiff lacks admissible evidence[14] from

which a reasonable jury could conclude that the use of force was unreasonable.

As to the first *Graham* factor, there is no doubt that Reinoehl was wanted for a severe

offense, murder, so that factor weighs in favor of Defendants.  On the second factor, Plaintiff

lacks admissible evidence from which the trier of fact could discredit the statements of the

officers that they reasonably feared for their lives.  At the onset of the operation, the officers

were aware that Reinoehl was wanted for murder and was armed.  (Dkt. No. 124 at 7–8.)[15]

---

[14] On summary judgment, the Court only considers admissible evidence.  *See* Fed. R. Civ. Pro. 56(c); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980).

[15] The officers also had knowledge about Reinoehl's associations and attitude towards police. The briefing PowerPoint stated he was "at war with police" and showed pictures of his tattoos. (Dkt. No. 130-8 at 10, 15.)  Merrill was aware of an interview where Reinoehl purportedly said he was "one hundred percent Antifa."  (Dkt. No. 124-10 at 13.)  Whitehurst said he was aware of the Antifa association but denied it impacted his evaluation of Reinoehl's dangerousness.  (Dkt. No. 124-13 at 17.)  Kimmel stated he had a "vague memory" of Reinoehl's stating "this is civil war, and in a war, there are casualties."  (Dkt. No. 124-8 at 12.)  Other officers also confirmed their awareness of the "at war with police" statement.  (Dkt. Nos. 124-11 at 19; 124-12 at 18.)

1   Some of the officers also viewed video of the Danielson shooting and factored that into their

2   assessment of Reinoehl.  (*See* Dkt. No. 124-11 at 20, Gocha stating "based on the video, it was a

3   pretty brutal and unjustified shooting. It looked like an execution on the street, showing his

4   propensity for violence and danger.")  When the officers started surveillance, Reinoehl emerged

5   from his home carrying what appeared to the officers as a rifle bag, fanny pack, and holster.

6   (Dkt. No. 124 at 13–14.)  Plaintiff argues that a jury could find these objects were "ordinary"

7   (Dkt. No. 146 at 15–16), but Plaintiff's characterization is not evidence.  To the contrary, the

8   evidence shows that Reinoehl was armed with a gun in his pocket (Dkt. No. 124 at 21), and the

9   bag he was carrying contained a disassembled rifle with a loaded magazine and hundreds of

10  rounds of ammunition.  (Dkt. No. 148-31 at 2.)  The officers' belief that Reinoehl posed a threat

11  to their safety was at least not objectively unreasonable.

12          Plaintiff's evidence, drawing inferences in their favor, is sufficient for a trier of fact to

13  find that Reinoehl was at least initially unaware that the individuals who pinned him in with their

14  cars were law enforcement—though the Court finds that does not negate the reasonableness of

15  the officers' use of force.  The Court draws this inference from the facts that the officers were

16  undisputedly in unmarked cars without lights and sirens (*see* Dkt. Nos. 130-11 at 7; 130-15 at 3

17  (testimony of Kimmel and Gocha); 148-25 at 11 (Oleole)) and at least one bystander does not

18  recall hearing a police command.  (*See* Dkt. No. 130-17 at 6, Q: "did you hear any yelling before

19  the first gunshot?" A: "[n]ot that I can recall, but I can't be 100 percent certain.")  The lack of a

20

21  ────────────────
    Plaintiff argues that a jury could find Reinoehl never made these statements, that they are post-
22  facto justifications, and/or that officers wanted to retaliate against Reinoehl for his views.  (*See*
    Dkt. No. 146 at 8–9, 38, 54.)  Ultimately, these statements factor very little into the Court's
23  assessment of the reasonableness of the officers' fear for their safety.  The truth or falsity of
    Reinoehl's statements about police are not at issue, and even if false would not negate other
24  indicators of his dangerousness, such as the warrant for murder supported by probable cause.

warning would not be dispositive; the Ninth Circuit has held that "[t]he absence of a warning does not necessarily mean that [] use of deadly force was unreasonable" but can weigh against reasonableness. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014); *see also Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) (in cases of suspects wanted for crimes involving "serious physical harm, deadly force may be used if necessary to prevent escape, and if, *where feasible*, some warning has been given" (emphasis added)).  The trier of fact could also find that police escalated by using the vehicle pin maneuver, relying on testimony by Plaintiff's expert Russell Hicks.  (*See* Dkt. No. 121-5 at 37, 59, 69.)  Hicks would further testify that Oleole's statement that Reinoehl's surprised facial expression indicated awareness of police is unsupported by any accepted practice (undermining Oleole's credibility) and that use of unmarked cars and plainclothes officers for a high-profile arrest was inconsistent with standard police practices.  (*Id.* at 25, 52.)  But even assuming Reinoehl was initially unaware he was dealing with law enforcement or that law enforcement tactics escalated the situation, neither fact cuts against the reasonableness of the officers' belief that their lives were in danger at the time that they used deadly force, when they not-unreasonably believed that Reinoehl was reaching for a weapon.  *Graham*, 490 U.S. at 396 (reasonableness determined from officers' perspective).

Plaintiff has no admissible evidence to contradict the officers' statement that Reinoehl was reaching for a gun, and so they reasonably feared for their safety.  Plaintiff does have two experts, Joel Wong and Kevin Neuman, who would testify about the officers' sightlines.  Wong would testify that "neither the driver of the Ford Escape (Officer Merrill) nor the passenger (Deputy Oleole) could see below Mr. Reinoehl's shoulder level as he sat in the driver's seat of his VW Jetta wagon."  (Dkt. No. 121-3 at 14.)  However, the Court held (by separate order) that Wong's opinion is excluded as unreliable.  (Dkt. No. 166 at 8–9.)  Newman would testify, on the

basis of the model he constructed, that "[t]he portion of Reinoehl's hands and hips, as described by the officers is more than 6 inches outside of any possible field of view they might have had at the moment shots were fired. This is well outside of the margin of error[.]" (Dkt. No. 121-1 at 4.)  But that actually is consistent with the officers' statements that they could not see Reinoehl's hands from inside their vehicles but could see his arm reaching for something.  Merrill testified that he could not see Reinoehl's hands while he sat in the surveillance car (though Merrill stated he could see the hands later after jumping out of the car.)  (Dkt. No. 148-8 at 6) ("I couldn't see his hand necessarily, but I could see that his right arm was going in towards something in the center console area").  Oleole testified "I did not see a gun in his hand. I didn't see his hands." (Dkt. No. 124-12 at 6.)  And Gocha stated that he could not see Reinoehl's hip, he could see "just lower than chest up." (Dkt. No. 124-11 at 10.)   And neither expert's testimony would, to any extent, contradict the officers' testimony about Reinoehl reaching for a weapon after he exited the car.  (*See* Dkt. Nos. 124-10 at 8; 124-11 at 13; 124-13 at 8.)

Since Reinoehl cannot testify for himself, the Court further considers whether anything else in the record would contradict the officers' account of events.  The Ninth Circuit has held that "[b]ecause the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079–1080 (9th Cir. 2014); *see also Lopez*, 871 F.3d at 1002–1003, 1007 (contradictory statements on how decedent held gun sufficient to establish fact dispute).  But here, the circumstantial evidence makes it *more* likely that Reinoehl was reaching for his gun.  In *Cruz*, the court found that circumstantial evidence contradicted officers' statements that the decedent was reaching for a gun on his waistband—*because he had no gun.*

1   *Cruz*, 765 F.3d at 1079.  Not so here, where Reinoehl had a firearm in his pocket (plus a

2   disassembled rifle in his backpack with a cache of ammunition).  (Dkt. Nos. 124 at 21; 148-31).

3   It is undisputed that Reinoehl did not fire the gun at the officers, and a trier of fact could find that

4   he did not grip the gun with his injured hand (based on the lack of blood on the gun) (Dkt. No.

5   146 at 26–27), but Plaintiff has no evidence to contradict the testimony that he reached for it.

6   Even finding some inconsistencies in the officers' accounts of events, e.g. Merrill stated that

7   Reinoehl did raise his arm towards officers outside of the car and Oleole stated that he did not

8   (*compare* Dkt. No. 124-10 at 8 *with* 124-12 at 11), these inconsistencies would not be enough to

9   create a triable fact question on whether the use of force was justified, considering the record in

10  its entirety.  Likewise, Oleole and Gocha's use of force and disciplinary history, which Plaintiff

11  stresses (Dkt. No. 146 at 5–7), could damage their credibility generally but does not create a

12  genuine dispute of material fact as to the facts of this case.  Thus, considering the totality of the

13  record, the Court finds that the second and most important Graham factor weighs in Defendants'

14  favor.

15          Finally, the third factor also weighs in Defendants' favor.  There is no question that

16  Reinoehl fled to Lacey after the Portland shooting, but in terms of the events of the shooting

17  itself, and viewing the evidence in the light most favorable to Plaintiff, the Court can draw an

18  inference (for the same reasons described *supra*) that Reinoehl did not know that police were

19  shooting at him and therefore would not have attempted surrender.  But even were that true, it

20  does not tip the analysis in Plaintiff's favor because reasonableness is assessed from the officers'

21  perspective and therefore the focus is on the circumstances the officers encountered, not

22  Reinoehl's subjective intent.  *See Spencer v. Pew*, 117 F.4th 1130, 1139 (9th Cir. 2024) (court

23  could infer from evidence on third factor that plaintiff did not intend to run from police or resist

24

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 125, 126, 131, 132) AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 129.) - 49

arrest, but his "subjective intentions are not relevant except to the extent that they were communicated to the officers.").  What the officers could observe at the time was that Reinoehl first moved toward something in his vehicle, which the Defendants believed was a weapon, and then exited the car after the shooting started (at a minimum, the latter fact, that Reinoehl exited the car, is undisputed).  Several officers also stated Reinoehl was attempting to run—which does not appear to be contradicted by record evidence.  (*See* Dkt. Nos. 124-10 at 7; 124-11 at 12.) Deadly force is permissible as to a fleeing suspect where there is probable cause that they have committed a crime involving "serious physical harm" or pose harm to "either the officer or others."  *Garner*, 471 U.S. at 11.

Application of the *Graham* factors lead to only one reasonable conclusion.  Because the admissible record evidence is insufficient for a trier of fact to find that the officers' use of force was unreasonable, and thus there is no basis to find that the officers are liable for battery under Washington law, the Court GRANTS summary judgment as to Count Seven of the Complaint. As noted *supra*, the analysis here also supports granting summary judgment on the battery claim against the City and County under Count Six of the Complaint.

## VI.    CONCLUSION

For the foregoing reasons, the Court GRANTS in full Defendants' summary judgment motions (Dkt. Nos. 125, 126, 131, 132) and DENIES Plaintiff's partial motion for summary judgment (Dkt. No. 129).  Defendants' motion to stay (Dkt. No. 161) is DENIED as moot.

The Clerk shall close the case.

Dated this 4th day of March, 2025.

David G. Estudillo
United States District Judge